**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

**IN RE:**

**AREDIA® AND ZOMETA® PRODUCTS LIABILITY LITIGATION**

**(MDL No. 1760)**

**This Document Relates To Case Nos.:**
**3:07-CV-01184; 3:07-CV-01185; 3:07-CV-01186; 3:07-CV-01187; 3:07-CV-01188; 3:07-CV-01189; 3:07-CV-01190; 3:07-CV-01191; 3:07-CV-01192; 3:07-CV-01193; 3:07-CV-01194; 3:07-CV-01195; 3:07-CV-01196; 3:07-CV-01197; 3:07-CV-01198; 3:07-CV-01199; 3:07-CV-01200; 3:07-CV-01201; 3:07-CV-01202; 3:07-CV-01203; 3:07-CV-01204; 3:07-CV-01205; 3:07-CV-01206; 3:07-CV-01207; 3:07-CV-01208; 3:07-CV-01209; 3:07-CV-01210; 3:07-CV-01211; 3:07-CV-01213; 3:07-CV-01225; 3:07-CV-01226; 3:07-CV-01280**

**No. 3:06-MD-1760**

**JUDGE CAMPBELL**

**MAGISTRATE JUDGE BROWN**

**NOVARTIS PHARMACEUTICALS CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A SECTION 1404(a) VENUE TRANSFER OF THE SEVERED *ANDERSON*, *BECKER* AND *WOOD* ACTIONS TO PLAINTIFFS' HOME FORA FOLLOWING THE CLOSE OF MDL DISCOVERY IN EACH CASE**

Plaintiffs contend that a plaintiff's choice of forum should control the transfer analysis (Opp. at 3-4), but courts disagree when, as here, plaintiffs' chosen forum is neither the home district for any plaintiff, nor the jurisdiction where any of the claims arose.[1] *See, e.g., In re Consol. Parlodel Litig.*, 22 F. Supp. 2d 320, 323-24 (D.N.J. 1998) (the weight afforded a plaintiff's forum choice "diminishes when the plaintiff chooses a foreign forum rather than his or

[1] Indeed, many of the cases cited by plaintiffs support NPC's position that transfer to plaintiffs' home fora is appropriate. *See, e.g., Fannin v. Jones,* 229 F.2d 368 (6th Cir. 1956) (refusing to issue writ of mandamus to vacate order transferring case to home forum); *Cambridge Filter Corp. v. Intern'l Filter Co.,* 548 F. Supp. 1308 (D. Nev. 1982) (transferring case to forum with governing state law and where potential non-party witnesses could be compelled to appear for trial); *Vaughn v. Am. Basketball Ass'n.,* 419 F. Supp. 1274 (S.D.N.Y. 1976) (transferring action to forum where key witnesses reside, where the incidents giving rise to the action occurred and where the court was more familiar with governing law); *Mobil Oil Corp. v. W.R. Grace & Co.*, 334 F. Supp. 117, 128 (S.D. Tex., 1971) (granting defendant's motion for transfer to home forum).

her home forum," and the "plaintiff's interest decreases even further where the central facts of a lawsuit occur[red] outside the chosen forum.") (internal quotation and citation omitted). Moreover, the Middle District of Tennessee cannot in any meaningful sense be said to be *plaintiffs'* choice of forum (as opposed to the forum chosen by plaintiffs' *counsel*). *Cf. In re Eastern Dist. Repetitive Stress Injury Litig*. (*EDRSIL*), 850 F. Supp. 188, 194 (E.D.N.Y. 1994) ("A primary goal of plaintiffs in suing in this district was apparently to effect a *de facto* multidistrict consolidation. Therefore, little deference need be shown to their choice of forum.").

Plaintiffs' suggestion that the location of their counsel should govern the location of trial (Opp. at 8-9) ignores that their counsel recruited clients nationwide for their failed putative class actions in this district. Plaintiffs should not now be heard to complain about the consequences of that decision. The substantial prejudice to key witnesses who would be absent from their jobs (if they chose to voluntarily appear for trial in Nashville) and/or the inability to obtain the live testimony of key witnesses trumps the convenience of plaintiffs' counsel. *See, e.g., In re Volkswagen AG*, 371 F.3d 201, 206 (5th Cir. 2001) (district court abused discretion by considering location of counsel in determining 1404(a) transfer motion); *In re EDRSIL*, 850 F. Supp. at 194 ("Convenience of witnesses is the most powerful factor governing the decision to transfer a case."); *Applied Web Sys., Inc. v. Catalytic Combustion Corp.,* No. 90 C 4411, 1991 WL 70893, at *4 (N.D. Ill. April 29, 1991) ("easily" disposing of claim that transfer would impose financial hardship of having to obtain second counsel following transfer; "[c]onvenience of counsel simply is not a factor for consideration under Section 1404(a).") (Exhibit A).

Asking the Court to resolve transfer issues now is not premature. The Court's Case Management Order ("CMO") required briefing on the proper venue for trial of the severed putative class actions in advance of the dates set for the initial trials. Now that the Court has

determined that previously reserved trial slots should be used for trial of the *Anderson* and *Melau* cases, the parties need to know whether they must prepare for the *Anderson* and *Melau* trials in this Court, or whether trial will proceed in each plaintiff's respective home district, where live testimony may be compelled and the convenience of non-party witnesses is greatest.

NPC's motion, supporting memorandum and declaration present the general substance of the key witness' expected trial testimony. Nothing more is required. As is typical of pharmaceutical products liability cases, causation will be the key trial issue and accordingly plaintiffs' treating physicians will be the key witnesses. *In re Consol. Parlodel Litig.*, 22 F. Supp. 2d 320, 324 (D.N.J. 1998). NPC's motion described the type of testimony the key witnesses are likely to give regarding causation, *e.g.*: the decision to prescribe the treatment, the information the plaintiffs received, and the risk factors each plaintiff has for developing their claimed injuries.[2] Plaintiffs do not dispute that the key witnesses in this litigation will be plaintiffs' prescribing physicians and other physicians or dentists who treated each plaintiff before and after he or she was treated with Aredia® and/or Zometa® or that none of the witnesses (with the exception of the witnesses for the two Tennessee plaintiffs) resides in Tennessee or is subject to this Court's compulsory process to testify at trial.[3] A trial in each plaintiff's home forum would be much more convenient for these critical witnesses and would ensure, by subpoenas served on these witnesses (if necessary), that the jury can evaluate live testimony. *Parlodel Litig.*, 22 F. Supp. 2d 320 (defendants are entitled to live testimony at trial of such

---

[2] Plaintiffs cite no pharmaceutical product liability cases, relying instead upon *Z-Tel Communications v. SBC Communications, Inc.,* 331 F. Supp. 2d 567 (E.D. Tex. 2004), regarding corporate parties and an alleged anticompetitive scheme and *Laumann Mfg. Corp. v. Castings USA, Inc.*, 913 F. Supp. 712 (E.D.N.Y. 1996), involving a contractual dispute between two corporations. Neither case addresses the context of the cases at issue here, and neither supports denial of NPC's transfer motion.

[3] Contrary to plaintiffs' assertions that NPC "cannot rely on the inconvenience of . . . the [p]laintiffs' witnesses to support its motion," Opp. at 4, convenience of medical providers and NPC's right to obtain compulsory process to have them appear at trial is a predominant factor in the private interest analysis that militates in favor of transfer.

critical witnesses).

With respect to the *Reinardy* and *Tracy* plaintiffs, who allege that they received their key treatment in two jurisdictions, NPC agrees with plaintiffs' point that the District of Minnesota is the proper district to transfer plaintiff Reinardy's claims, *see* Docket #1135 at 8, and requests that the Court transfer the *Reinardy* lawsuit to that forum.[4] More generally, the fact that key witnesses are located in more than one jurisdiction simply does not suggest that the trial should be held in the Middle District of Tennessee where *no* witness resides. Further, contrary to plaintiffs' assertions, NPC devoted a portion of its opening memorandum to the issues presented by the *Montgomery* and *Foster* plaintiffs. *See* Docket #1074 at 15-18.

Plaintiff's "judicial economy" argument also fails. Opp. at 9-10. Discovery is not yet complete in any of these cases, and thus prediction of a faster trial in either the Middle District of Tennessee or plaintiff's home district would be based upon conjecture.[5] Moreover, as another federal court explained when granting motions to transfer products liability cases to the plaintiff's home district, the court's expertise with respect to the litigation, (including "some familiarity with the science" involved in the litigation) is not a bar to transfer. *See e.g., In re EDRSIL*, 850 F. Supp. at 188, 195 (transferring cases to home districts for trial upon finding no discernable benefit to retaining cases which have minimal contact with the district in which cases are pending).

---

[4] Plaintiffs' argument that some of the health care providers in *Tracy* are located in Washington (as opposed to Oregon, where Mr. Tracy lives and to which NPC requests the case be transferred) ignores the 100-mile radius provision of Federal Rule of Civil Procedure 45. Longview, Washington, where one of Mr. Tracy's oncologists and four of his dental treaters are located, is 50 miles from Portland, Oregon, well within the subpoena power of the Oregon court.

[5] Even if this Court were to examine the relative docket congestion of the various courts to which NPC seeks to transfer, plaintiffs' "evidence" of the number of pending cases nearly a year ago provides the Court with no method of accurately determining when a trial would occur in any district following the completion of pre-trial discovery and transfer from this Court.

The local interest in resolution of this litigation does not belong solely to Tennessee. Opp. at 10-11. To the extent that Tennessee has an interest in this litigation, that interest would be satisfied by trials in the *Foster* and *Montgomery* actions in the appropriate districts. Plaintiffs' claim that there are no complexities or unsettled issues in the laws of several jurisdictions involving products liability laws (Opp. at 11) ignores this Court's prior decision concluding just the opposite. *See* Docket #683 at 8-9. As the law of each plaintiff's home forum likely governs that plaintiff's claims, and the laws of product liability varies significantly among jurisdictions, transfer will allow plaintiff's action to be tried within the district most familiar with those laws. *See, e.g., Parlodel Litig.*, 22 F. Supp. 2d at 327 ("the apparent application of the law of each Plaintiff's home state weighs in favor of transfer"); *In re EDRSIL*, 850 F. Supp. at 196 (the "law of products liability varies significantly among jurisdictions.").

## CONCLUSION

For the foregoing reasons, this Court should transfer these actions to their respective home fora for trial following the completion of pre-trial discovery in each case.[6]

Respectfully submitted,

Dated: February 12, 2008

s/ Katharine R. Latimer

Joe G. Hollingsworth
Katharine R. Latimer
Catherine R. Baumer
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

[6] Plaintiffs Arbuckle, Casali and Wood have not opposed NPC's motion to transfer. Accordingly, the Court should transfer their lawsuits to the respective home district of each plaintiff following the close of case-specific fact discovery.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February 2008, a true and correct copy of the foregoing Novartis Pharmaceuticals Corporation's Reply Memorandum in Support of its Motion for a Section 1404(a) Venue Transfer of the Severed *Anderson*, *Becker* and *Wood* Actions to Plaintiffs' Home Fora Following the Close of MDL Discovery in Each Case was served by operation of the Court's Electronic Case Filing System on the following, including Plaintiffs' Liaison Counsel:

C. Patrick Flynn, Esq.
Flynn & Radford, PC
320 Seven Springs Way, Suite 150
Brentwood, TN 37027

Robert G. Germany, Esq.
Pittman, Germany, Roberts & Welsh, L.L.P.
P.O. Box 22985
Jackson, MS 39225-2985

F. Dulin Kelly, Esq.
Clinton L. Kelly, Esq.
Andy L. Allman, Esq.
Kelly, Kelly & Allman
629 East Main Street
Hendersonville, TN 37075

John O. Threadgill, Esq.
Threadgill Law Firm, PC
9724 Kingston Pike, Suite 701
Knoxville, TN 37922

s/ Katharine R. Latimer
Katharine R. Latimer
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

# Exhibit A

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

Applied Web Systems, Inc. v. Catalytic Combustion Corp.
N.D.Ill.,1991.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
APPLIED WEB SYSTEMS, INC., an Illinois corporation, Plaintiff,
v.
CATALYTIC COMBUSTION CORP., a Wisconsin corporation, Defendant.
**No. 90 C 4411.**

April 29, 1991.

*MEMORANDUM OPINION AND ORDER*

ALESIA, District Judge.

*1 Plaintiff, Applied Web Systems, Inc. ("AWS"), originally filed this five-count action in the Chancery Division of the Circuit Court of the Eighteenth Judicial District in DuPage County, Illinois ("the state court"). Defendant, Catalytic Combustion Corp. ("CCC"), subsequently removed the action to this Court based on diversity of citizenship. Following removal, CCC filed several motions: (1) a motion for reassignment of another case between the same parties currently pending before Judge Nordberg and entitled *Applied Web Systems, Inc. v. Catalytic Combustion,* No. 90 C 4412 ("Case No. 90 C 4412"), pursuant to Rule 2.31 of the Rules of the United States District Court for the Northern District of Illinois ("Local Rule 2.31"); (2) a motion to consolidate this case and Case No. 90 C 4412 for trial and discovery, pursuant to Rule 42 of the Federal Rules of Civil Procedure; and (3) a motion to transfer both cases to the United States District Court for the Western District of Wisconsin, pursuant to 28 U.S.C. § 1404(a). For the reasons stated below, the Court grants CCC's motion to reassign Case No. 90 C 4412 to this Court based on relatedness and its motion to consolidate both cases for purposes of discovery, but denies without prejudice CCC's motion to consolidate both cases for trial. The Court also denies CCC's motion to transfer both cases to the Western District of Wisconsin.

I. *Facts*

AWS is an Illinois corporation with its principal place of business in Elgin, Illinois. AWS sells certain pollution control incinerators. CCC is a Wisconsin corporation with its principal place of business in Bloomer, Wisconsin. CCC manufacturers pollution control incinerators which are used mainly in the printing industry for the disposal of inks. On October 11, 1987, AWS and CCC entered into a contract whereby CCC agreed to sell AWS incinerators for resale to AWS customers.[FN1]

AWS subsequently sold four incinerators manufactured by CCC to two AWS customers. AWS sold two CCC incinerators to Cellu-Craft Midwest, Inc. ("Cellu-Craft"), located in Palatine, Illinois. These CCC incinerators were installed at Cellu-Craft plants in Palatine and Bellwood, Illinois. AWS sold two other CCC incinerators to Continental Web Press ("CWP"). These CCC incinerators were installed in a CWP plant in Itasca, Illinois.

Mechanical and operational problems allegedly arose with all four of these incinerators. Both AWS and CCC attempted to resolve the problems, but their efforts ultimately proved unsuccessful. As a result, on June 29, 1990, AWS filed two lawsuits against CCC in state court. CCC removed both cases to federal court. One case, bearing Docket No. 90 C 4411, was assigned to this Court; the other case, bearing Docket No. 90 C 4412, was assigned to Judge Nordberg.

In the case assigned to this Court (Case No. 90 C 4411), AWS complains of the CCC incinerators sold to Cellu-Craft. The complaint consists of five counts and alleges claims for breach of contract, intentional misrepresentation, specific performance, intentional interference with contractual relations, and intentional interference with prospective economic advantage. In the case assigned to Judge Nordberg (Case No. 90 C 4412), AWS complains of the CCC incinerators sold to CWP ("the CWP case"). The complaint filed in the CWP case consists of four counts, and its allegations essentially mirror those of the complaint filed in the Cellu-Craft case pending before this Court. The only difference between the complaints filed in the two cases is that the complaint filed in the CWP case does not include a claim for intentional interference with contractual relations. CCC has asserted the same affirmative defenses in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

both cases. Based on these facts, CCC has filed several motions.

II. *Discussion*

A. *Motion for Reassignment Based on Relatedness*

***2** First, CCC moves to reassign Case No. 90 C 4412 to this Court as a related case, pursuant to Rule 2.31 of the Rules of the United States District Court for the Northern District of Illinois ("Local Rule 2.31"). Local Rule 2.31 defines "relatedness" and sets forth the conditions under which related cases may be reassigned. In relevant part, the rule provides that two or more cases may be related if they "involve the same issues of fact or law" or they "grow out of the same transaction or occurrence." Local Rule 2.31(a). The rule further provides that a case may be reassigned based on relatedness only if certain criteria are met:

A case may be reassigned to the calendar of another judge if it is found to be related to an earlier-numbered case assigned to that judge and each of the following criteria is met:

1. Both cases are pending;

2. The handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;

3. The earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

4. Where a finding of relatedness is requested on the basis of common questions of law, such questions are complex and numerous; or

Where such a finding is requested on the basis of common questions of fact, such questions are susceptible of resolution in a joint hearing.

Local Rule 2.31(b).

CCC argues that all of these criteria have been satisfied and we agree. The complaints filed by AWS in this case and in the CWP case are virtually identical and CCC's defenses in both cases are identical. As noted above, the only difference between this case and the CWP case is that each involves a different AWS customer. Although this case contains one additional count which is not included in the CWP case, both cases unquestionably will share common issues of law and fact. Based on these similarities, the handling of both cases by this Court will result in a substantial saving of judicial time and effort. In addition, reassignment of the CWP case will not delay the proceedings in this case. AWS filed both cases on the same day and both cases are in the early stages of the litigation process. Given these circumstances and AWS's lack of opposition to the motion, we grant CCC's motion for reassignment of Case No. 90 C 4412 based on relatedness.

B. *Motion to Consolidate for Trial and Discovery*

Because of the similarities between this case and the CWP case, CCC also moves to consolidate the two cases for discovery and trial, pursuant to Rule 42 of the Federal Rules of Civil Procedure. Rule 42 vests the courts with broad discretion to consolidate actions involving common questions of law or fact to the extent deemed appropriate. Fed.R.Civ.P. 42(a).

Again, AWS has not opposed this motion. We have reviewed the motion, and for the reasons outlined above, conclude that consolidated discovery will benefit the parties and the witnesses in both cases. Because the defects claimed to exist in all four of the incinerators are very similar, the same discovery requests undoubtedly will be posed in each case. Streamlining discovery not only will eliminate duplication of time and effort by all parties, but also will contain litigation costs. Accordingly, we grant CCC's motion to consolidate these cases for discovery.

***3** At this time, however, the Court declines to grant CCC's motion to consolidate these cases for trial. The Court will be in a better position to determine whether consolidation for trial is appropriate after the parties have completed discovery. Thus, the Court denies without prejudice CCC's motion to consolidate these cases for trial.

C. *Motion to Transfer*

Finally, CCC moves to transfer both cases to the Western District of Wisconsin. Section 1404(a) governs the transfer of an action from one district to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

another and provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). In order to invoke the provisions of Section 1404(a), the movant bears the burden of establishing (1) that venue is proper in the transferor district; (2) that the transferor court has the power to transfer the case (that is, that the transferee court is in a district where the case might have been brought); and (3) that the convenience of the parties and witnesses and the interests of justice favor transfer. *Bally Mfg. Corp. v. Kane,* 698 F.Supp. 734, 736-37 (N.D.Ill.1988); *Hotel Constructors, Inc. v. Seagrave Corp.,* 543 F.Supp. 1048, 1050 (N.D.Ill.1982).

In this case, the parties concede that venue properly lies both in this district, where AWS resides, and in the Western District of Wisconsin, where CCC resides. Thus, our analysis focuses on the final component of Section 1404(a), which requires an individualized, case-by-case analysis of three factors: the convenience of the parties, the convenience of witnesses,and the interests of justice. *See Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986). The movant bears the burden of demonstrating that the transferee forum is "clearly more convenient." *Coffey,* 796 F.2d at 219-20. In evaluating whether the movant can sustain this burden, the Court must also accord weight to the plaintiff's choice of forum. In this case, an analysis of these factors reveals that CCC has failed to meet its burden.

1. *Plaintiff's Choice of Forum*

Although a plaintiff's choice of forum is an important consideration in determining whether a motion to transfer should be granted, it is not absolute and will not defeat a well-founded motion for transfer. *See Espino v. Top Draw Freight System, Inc.,* 713 F.Supp. 1243, 1244 (N.D.Ill.1989). A plaintiff must select a forum which bears a reasonable relationship to the events which form the basis for the action; if the chosen forum lacks significant contacts with the underlying cause of action, a plaintiff's choice of forum has reduced value. *See Ratner v. Hecht,* 621 F.Supp. 378, 382 (N.D.Ill.1985).

In this case, the underlying litigation bears a significant nexus to this forum. AWS resides in Illinois and it sold the four CCC incinerators at issue to two of its customers who also reside in Illinois. The allegedly defective incinerators also continue to be located in Illinois. Having concluded that this litigation bears significant ties to this district, we examine whether the Western District of Wisconsin is a clearly more convenient forum in spite of this nexus.

2. *Convenience of Parties*

***4** At the outset, CCC acknowledges that it will be inconvenienced if this litigation proceeds in this district and that AWS will be similarly inconvenienced if this litigation proceeds in the Western District of Wisconsin. Nevertheless, CCC argues that transfer is warranted because the inconvenience to CCC of a trial in Illinois "somewhat outweighs" the inconvenience to AWS of a trial in Wisconsin. According to CCC, a trial in the Western District of Wisconsin would impose a significantly smaller travel burden on CCC personnel than a trial in the Northern District of Illinois. Whereas a trial in Chicago (the seat of the Northern District of Illinois) would require CCC personnel to travel 350 miles, a trial in Madison (the seat of the Western District of Wisconsin) would require CCC personnel to travel approximately 200 miles. In contrast, argues CCC, a trial in Chicago would require AWS personnel to travel approximately 40 miles and a trial in Madison would require AWS personnel to travel approximately 110 miles.

In response, AWS makes two points. First, AWS contends that its attorneys are located in this district and, consequently, this factor favors retaining this litigation here. AWS points out that CCC has two sets of attorneys, one set licensed to practice in Illinois and the other set licensed to practice in Wisconsin. Unlike CCC, AWS has only one set of attorneys and, therefore, argues AWS, transferring this action to Wisconsin would cause AWS greater inconvenience because it would impose upon it the additional financial burden of retaining a second set of counsel in Wisconsin.

This argument, however, is disposed of easily. Convenience of counsel simply is not a factor for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

consideration under Section 1404(a). *See* Koos, Inc. v. Performance Industries, Inc., 747 F.Supp. 487, 490 (N.D.Ill.1990). Even if it were, the Western District of Wisconsin does not require out-of-state parties to retain local counsel, so AWS could continue to use the counsel it already has retained, thus vitiating its claim that it would suffer greater inconvenience by having to retain a second set of attorneys in Wisconsin. *See* Rule 1(A)(D) of the Rules for the United States District Court for the Western District of Wisconsin.

AWS also argues that the difference in distance does not overwhelmingly favor either party. As a result, AWS contends, transferring this action to the Western District of Wisconsin would merely shift the inconvenience from one party to the other. We agree. That the Western District of Wisconsin is 150 miles closer to CCC than the Northern District of Illinois and, as a result, will be "somewhat more convenient" for CCC does not tip the scales in favor of CCC on this issue. Relatively small differences in distance are not significant. *See* Peterson v. United States Steel Corp., 624 F.Supp. 44, 46 (N.D.Ill.1985). Given these facts, the Court finds that each party will be inconvenienced by having to litigate these cases in the other party's forum of choice. The convenience to the parties therefore weighs in neither party's favor and is a neutral factor.

3. *Convenience of Witnesses*

***5** In analyzing the convenience of witnesses, the Court considers not only the number of witnesses to be called by each party, but also the nature and quality of their testimony and whether these witnesses will be subject to compulsory process. *See* Bally Mfg. Corp., 698 F.Supp. at 738-39. The Court also takes into account the location of relevant documents and sources of proof. *See* Koos, Inc., 747 F.Supp. at 491.

Here, each party has identified a number of witnesses who will be inconvenienced if this litigation proceeds in the other party's forum. Between them, the parties have identified the following individuals as probable witnesses in this litigation:

1. Six CCC employees, all of whom reside in Wisconsin;

2. Seven AWS employees, all of whom reside in Illinois;

3. Three experts, one of whom resides in Wisconsin, one of whom resides in Illinois, and one of whom resides in Germany;

4. Three non-party, non-expert witnesses, all of whom reside in Wisconsin; and

5. Nine non-party, non-expert witnesses, all of whom reside in Illinois and are either Cellu-Craft or CWP employees.

In weighing the relative inconvenience of witnesses, the Court generally assigns little weight to the location of employee-witnesses or experts. Because these witnesses usually are within the control of the parties (and, in the case of experts, usually are paid for their time and travel), they will likely appear voluntarily whether the litigation proceeds in the forum of residence or in a foreign forum. *See* Peach Tree Bancard Corp. v. Peachtree Bancard Network, Inc., 706 F.Supp. 639, 641 (N.D.Ill.1989) (employee-witnesses); Karrels v. Adolph Coors Co., 699 F.Supp. 172, 176 (N.D.Ill.1988) (expert witnesses). Notably, neither party to this litigation has indicated that either its employees or its experts would not voluntarily testify in a foreign forum.

The resolution of this issue therefore hinges on the relative inconvenience of the other non-parties expected to testify in this case and the location of the relevant documents and sources of proof. On balance, both of these factors strongly militates against transfer. First, whereas AWS has identified nine non-party witnesses who will be inconvenienced by having to litigate in a foreign forum, CCC has identified only three such witnesses. The sheer number of witnesses alone, however, is not dispositive. The nature and quality of their expected testimony and their availability by compulsory process must also be evaluated. Obviously, the live testimony of material non-party witnesses is preferred. Bally Corp., 698 F.Supp. at 738. *See also* Hotel Constructors, 543 F.Supp. at 1051.

CCC has designated three non-party, non-expert witnesses who are not subject to compulsory process in this district. Two of these witnesses participated in the inspection of the allegedly defective incinerators.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

The third witness analyzed samples of insulation used in the allegedly defective incinerators. CCC states that these witnesses, when asked about their willingness to travel to Chicago to testify, expressed reluctance and indicated that their work keeps them busy all year long.

***6** Although we do not discount the importance of the testimony of these non-parties witnesses to CCC's case, we believe that the testimony of the non-parties witnesses identified by AWS will be even more critical. Significantly, all nine of AWS's non-party witnesses are either Cellu-Craft or CWP employees. Because the allegedly defective incinerators were sold to Cellu-Craft or CWP and were installed and maintained at facilities owned by them and located within this district when the mechanical and operational problems arose, the testimony of these witnesses will play a crucial role in resolving the issues at the heart of this case. None of these witnesses would be subject to compulsory process in the Western District of Wisconsin. Moreover, these witnesses, in contrast to CCC witnesses mentioned above, have not merely expressed reluctance to voluntarily travel to this district to testify. Indeed, AWS has submitted affidavits from the Corporate Engineering Manager of Cellu-Craft and the Chief Financial Office of CWP which unequivocally state that neither they nor any of their other respective employee-witnesses will voluntarily travel to Madison, Wisconsin to testify at trial. These affidavits also indicate that the absence of these employees from their employment would impose a great hardship on their respective employers. AWS's statements that both Cellu-Craft and CWP have threatened to sue AWS as a result of the mechanical and operational problems with the incinerators lend further credence to the conclusion that these non-party witnesses are potentially hostile. On balance, then, the relative inconvenience of non-party witnesses who are not experts strongly counsels against transfer.

Furthermore, as AWS points out, the allegedly defective incinerators at the heart of this lawsuit are located on the rooftops of various buildings within this district. They are neither easily moved nor easily transported. Permitting this litigation to proceed here therefore would allow both parties ready access to these incinerators and would eliminate the problems posed by having to move or transport these heavy objects. Accordingly, this factor, together with the significant inconvenience which would result to AWS's non-party witnesses if this litigation proceeded in the Western District of Wisconsin, heavily weighs against transfer.

4. *Interests of Justice*

The final factor to be considered under Section 1404(a) is the interests of justice. Generally, this factor embraces traditional notions of judicial economy, rather than the private interests of the litigants and their witnesses. *Coffey*, 796 F.2d at 221;*Bally Mfg. Corp.*, 698 F.Supp. at 739. Factors typically considered under the "interest of justice" rubric include whether the litigants are more likely to receive a speedier trial in one forum versus another and, in diversity cases, whether the district court trying the case will be familiar with the applicable state law. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir.1989); *Coffey*, 796 F.2d at 221.

***7** In this case, CCC claims that both of these factors weigh in favor of transfer. First, CCC argues that transfer is warranted because Wisconsin law will govern this action. CCC points out that the Paragraph 16(a) of the 1987 agreement between AWS and CCC contains the following choice of law clause: "This Agreement was accepted in Wisconsin and shall be interpreted and construed according to the laws thereof." Based on this provision, CCC contends, the interests of justice will be served by having these cases decided by the district court most familiar with the applicable state law-in this case, the United States District Court for the Western District of Wisconsin.

AWS disagrees with CCC's interpretation of the choice of law provision contained in the 1987 agreement. AWS first argues that the 1987 agreement between the parties is unclear as to the governing law. This argument is predicated on the following language which appears in Paragraph 16(a) immediately following the choice of law language: "If any provisions of this Agreement are or shall become in conflict with laws, ordinances, or regulations of any jurisdiction, then such provisions shall be deleted automatically and the remaining terms and conditions of this Agreement shall remain in full force and effect." Citing this language, AWS maintains that "[t]he net result of this choice of law provision is to have no choice of law because it is impossible to determine if the contract terms comply with all laws of all states." (Plaintiff's Response at 5).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

We reject this line of reasoning summarily. Severability language akin to that contained in Paragraph 16(a) of the parties' agreement is universally used in contracts in order to preserve the enforceability of some provisions of the contract should others subsequently be declared legally invalid. To argue that such boilerplate language operates to nullify a choice of law provision which is clear, unambiguous, facially valid, and expressly agreed to by the parties strains logic and merits no further discussion. Illinois courts have long enforced agreements regarding choice of law absent compelling circumstances which warrant disregarding such agreements. *See* Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1081 (7th Cir.1986) (citing Illinois law); Peach Tree Bancard Corp., 706 F.Supp. at 641. CCC has pointed to no such circumstances here. Accordingly, this clause clearly makes Wisconsin law applicable to the contract claims which AWS has brought against CCC.

Perhaps recognizing this, AWS also argues that in any event, the choice of law provision in the 1987 agreement does not govern AWS's remaining claims. AWS notes that only two of the five counts in this case seek recovery under the agreement; the remaining three counts seek recovery for tortious conduct. Similarly, in the CWP case, two of the four counts seek recovery under the agreement; the remaining two counts seek recovery for tortious conduct.

***8** We agree with AWS. Absent an agreement fixing the substantive law, in diversity actions, the court must apply the substantive law suggested by the transferor forum state's conflict of laws rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97, (1941); *Sarnoff*, 798 F.2d at 1080;*Peach Tree Bancard Corp.*, 706 F.Supp. at 642. In tort cases, Illinois has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *Miller v. Long-Airdox Co.*, 914 F.2d 976, 978 (7th Cir.1990) (citing *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970)). In applying this test, Illinois courts presume that the law of the state where the injury occurred will govern " 'unless another state has a more significant relationship to the occurrence or to the parties involved.' " *Miller*, 914 F.2d at 978 (quoting *Ferguson v. Kasohm*, 131 Ill.App.3d 424, 426, 475 N.E.2d 984, 986 (1st Dist.1985).

Here, the injury clearly occurred in Illinois. The incinerators at issue in this dispute were sold to an Illinois corporation, were resold to two Illinois customers, and are located in Illinois. The mechanical and operational problems which gave rise to this litigation occurred in Illinois. Although CCC is a Wisconsin corporation and the parties may have executed and accepted the contract in Wisconsin, the significance of these Wisconsin contacts pales in comparison to the significance of the Illinois contacts. Because CCC cannot point to any factor which makes Wisconsin's interests in these actions more significant than Illinois' interests, Illinois law likely will control AWS's tort claims.

Cumulatively, then, the choice of law issue appears to result in a draw. While the district court sitting in the Western District of Wisconsin will be more familiar with the law governing the four contract claims, this Court will be more familiar with the law governing the five tort claims. Federal judges are often called upon to apply the law of other jurisdictions in diversity cases, and generally, contract law is relatively straightforward and not particularly complex. Given these facts, CCC has failed to demonstrate that this factor favors transfer to the Western District of Wisconsin.

CCC additionally contends that transferring this litigation to the Western District of Wisconsin will promote the interests of justice because the parties will receive a quicker resolution of this litigation there. Although CCC selectively cites some of the court management statistics to bolster its claim (*e.g.*, the number of filings in each district, the percentage of cases pending for more than three years in each district, and the average number of months required for some percentage of cases to reach trial in each district), CCC neglects to mention the more relevant statistics which discredit or, at least, cast doubt upon CCC's position.

Of the numerous court management statistics available for the twelve-month period ended June 30, 1990, two statistics appear to bear the most relevance to this analysis: the median numbers of months from filing to disposition of civil cases and the median number of months from issue to trial in civil cases. In this case, a comparison of each of these statistics for both districts yields mixed results. On the one hand, the court management statistics reveal that both in this district and in the Western District of Wisconsin,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

the median number of months for a civil case from filing to disposition is exactly the same: five months. *See* Administrative Office of the United States Courts, *1990 Federal Court Management Statistics* at 101, 107. This certainly suggests that the parties are not more likely to receive a quicker resolution of their claims in Wisconsin. On the other hand, the court management statistics indicate that the median number of months from issue to trial in civil cases is twelve months in this district, compared to seven months in the Western District of Wisconsin. *See* Administrative Office of the United States Courts, *1990 Federal Court Management Statistics* at 101, 107. This suggests that the parties might receive an earlier trial in the Western District of Wisconsin. While this conflict might require resolution if the other factors weighed in favor of transfer, the five-month difference alone, when weighed against the other factors counseling against transfer, is not sufficient to tip the scales in favor of transfer.

***9** Accordingly, CCC has failed to meet its burden of demonstrating that the Western District of Wisconsin is a clearly more convenient forum. CCC's motion to transfer this case and the CWP case to the United States District Court for the Western District of Wisconsin is therefore denied.

III. *Conclusion*

For the reasons outlined above, the Court grants CCC's motion for reassignment of Case No. 90 C 4412 based on relatedness; grants CCC's motion to consolidate this case and Case No. 90 C 4412 for discovery; denies without prejudice CCC's motion to consolidate this case and Case No. 90 C 4412 for trial; and denies CCC's motion to transfer both cases to the United States District Court for the Western District of Wisconsin.

IT IS SO ORDERED.

FN1. The contract was actually entered into between CCC and Continental Thermal Design, Inc., an Illinois corporation. Continental Thermal Design, Inc. was merged into AWS on May 1, 1989.

N.D.Ill.,1991.
Applied Web Systems, Inc. v. Catalytic Combustion Corp.
Not Reported in F.Supp., 1991 WL 70893 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.