# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

_____

| | |
|---|---|
| ) | |
| **IN RE: AREDIA® AND ZOMETA®** ) | **No. 3:06-MD-1760** |
| **PRODUCTS LIABILITY LITIGATION** ) | |
| **(MDL No. 1760)** ) | **JUDGE CAMPBELL** |
| ) | |
| **This Document Relates To:** ) | **MAGISTRATE JUDGE BROWN** |
| ) | |
| **Case Nos.:** ) | |
| **3:06-CV-00377, Punnose K. Thomas v. NPC** ) | |
| **3:06-CV-00381, Karleen Hogan v. NPC** ) | |
| **3:06-CV-00521, John E. Brodie v. NPC** ) | |
| **3:06-CV-00550, Cheryl J. White v. NPC** ) | |
| **3:06-CV-00659, Tim Crews v. NPC** ) | |
| **3:07-CV-01184, Terry Anderson v. NPC** ) | |
| **3:07-CV-01198, Patricia Melau v. NPC** ) | |
| **3:08-CV-00068, Rita Fussman v. NPC** ) | |
| **3:08-CV-00069, Beth Forman v. NPC** ) | |
| **3:08-CV-00071, Helene Deutsch v. NPC** ) | |

_____)

## NOVARTIS PHARMACEUTICALS
### CORPORATION'S OPPOSITION TO PLAINTIFFS' STEERING
### COMMITTEE'S MOTION TO COMPEL DISCOVERY RESPONSES

The Plaintiffs' Steering Committee's ("PSC") Motion to Compel Discovery Responses

("Motion") (DE # 1439), fails to acknowledge controlling Orders of this Court that reject the

discovery the PSC once again seeks in its motion, fails to apply the correct legal standard for the

discoverability of information under Federal Rule of Civil Procedure 26(b)(1), fails to comply

with important Rules of this Court governing the orderly presentation of discovery disputes, and

attempts to compel the production of documents and information that were never the specific

subject of any discovery request in this case.  Moreover, the PSC rejected the reasonable offers

of Novartis Pharmaceuticals Corporation ("NPC") to compromise and work together to resolve

certain of the PSC's concerns.  Instead, the PSC seeks an order compelling production of

**FILED UNDER SEAL**

irrelevant and nonresponsive documents and information that plaintiffs are not entitled to have, or information NPC long ago provided or is willing to provide at this time.

## I.     LEGAL STANDARDS

### A.     The Information the PSC Seeks Is Not Properly Within the Scope of Discovery.

The PSC misstates the standard for discovery embodied in Federal Rule of Civil Procedure 26(b)(1).  As this Court previously recognized when it rejected the PSC's broad request for "all" information about Reclast® in this case, "Rule 26(b)(1) provides that discovery is permitted where it relates to the claims and defenses at issue."  Order Concerning Reclast, Jan. 24, 2008 ("Order Concerning Reclast") (DE # 1106); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter *that is relevant to any party's claim or defense*.") (emphasis added).  Rule 26(b)(1) thus curtails the availability of discovery beyond information that is relevant to the claims and defenses at issue.[1]

Information merely relevant to the "subject matter involved in the action" is only discoverable upon a showing of "good cause."  *See* Order Concerning Reclast at 2 ("Broader discovery requires an affirmative showing of good cause.  Fed. R. Civ. P. 26(b)(1)."); *Stampley v. State Farm Fire & Cas. Co.*, 23 F. App'x 467, 470 (6th Cir. 2001) (noting good cause standard); *Hill v. Motel 6*, 205 F.R.D. 490, 493 (S.D. Ohio 2001) (good cause must be shown to broaden discovery beyond what is relevant to a claim or defense); *see also Miller v. Fed. Express Corp.*, 186 F.R.D. 376, 383 (W.D. Tenn. 1999) (court set temporal and subject-matter limitations on information produced to ensure adherence to Rule 26(b)(1)).

---

[1] The 2000 amendment to Rule 26(b)(1) narrowed the scope of discovery and prevents the production of information that does not directly relate to the claims and defenses at issue, absent an affirmative showing of "good cause."  *See Thompson v. Dep't of Hous. & Urban Dev.*, 199 F.R.D. 168, 171 (D. Md. 2001) ("the new rule . . . [means] that the scope of discovery be narrower than it was, in some meaningful way"); *Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("the scope of discovery was narrowed to cover facts that are not privileged that are relevant to the claims and defenses raised in the pleadings").

FILED UNDER SEAL

The Sixth Circuit has clearly stated that discovery is not boundless and that it is within the Court's discretion to limit or deny discovery that is overly broad or unduly burdensome.  In *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288 (6th Cir. 2007), the Court stated, "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *Id.* at 305 (affirming district court's decision to limit and/or deny discovery requests seeking information going back twenty years because of relevance, over breadth and undue burden).  Moreover, the party seeking discovery bears the burden of demonstrating relevance once the responding party has objected.  *See Miller*, 186 F.R.D. at 383; *Allen v. Howmedica Liebinger*, 190 F.R.D. 518, 522 (W.D. Tenn. 1999) (denying motion to compel because plaintiff failed to demonstrate even minimal level of relevance and production would result in undue burden).

**B.     The PSC's Motion to Compel Does Not Comply With Local Rule 37.01.**

The PSC's motion fails to comply with the important Local Rules of this Court governing discovery disputes.  The PSC failed to comply with Local Rule 37.01(a), which requires that "[p]rior to filing any discovery motion, counsel for the parties shall prepare a joint written statement of the matters at issue in the discovery dispute," and further requires that "[t]he joint statement of issues shall be attached to any discovery motion."  Although the parties corresponded with regard to certain of the issues set forth in the PSC's motion, the PSC never requested that NPC participate in an effort to draft a joint statement of issues, although NPC would have participated if the PSC had asked.  *See Lee v. Metro. Gov't of Nashville/Davidson County*, No. 3-06-0108, 2008 WL 687514, at *6 (M.D. Tenn. Mar. 11, 2008) (admonishing plaintiffs and rejecting their excuse for failure to provide a joint statement of issues, noting that "a joint written statement, if detailed and specific, could have been helpful to both the Court and

FILED UNDER SEAL

the parties.").  The PSC likewise failed to comply with Local Rule 37.01(b)(2) requiring the

party moving to compel discovery to "[q]uote verbatim each deposition question, interrogatory,

request for admission, or request for production to which objection has been taken," "[i]nclude

the response and the grounds assigned for the objection . . . ," and "[i]nclude the reasons

assigned as supporting the motion . . . immediately following the objection."  L.R. 37.01(b)(2).

These are not simply academic failures.  The Local Rules were promulgated by the judges of this

Court to govern the conduct of litigation – specifically, here, discovery disputes.  This Court

recognizes that the party seeking discovery is the party upon whom the burden should be placed.[2]

## II.    RESPONSES TO DISCOVERY ISSUES RAISED BY PLAINTIFFS

NPC responds to the PSC's arguments in the order set forth in its motion:

### A.    The Redaction Issue.

The PSC was correct that "[t]his is a simple issue."  This Court already rejected the

PSC's argument on this issue almost a year ago in an Order that continues to control today.  *See*

Order Concerning Aug. 28, 2007 Hr'g at 3-4, Sept. 5, 2007 (DE # 597).  Indeed, after

considering the parties' briefing and "extensive oral argument," and after reviewing "two large

three-ring binders, totaling approximately four inches of [unredacted] documents," the Court

held that NPC's redactions were proper and that the PSC was not entitled to the irrelevant and

non-responsive information it doggedly pursues:

> The Magistrate Judge found that these redactions primarily were
> proper.  What appears to cause the Plaintiffs concern is that in
> many cases they are given a document which will have a small
> amount of text with a good deal blacked out and then a number of
> pages totally blacked out.  From his review of the sample
> documents, the Magistrate Judge is forced to agree with the
> Defendants.  They have not redacted information involving the two

---

[2] This is the second time the PSC failed to comply with Local Rule 37.01.  *See* Pl.'s Supplemental Briefing Regarding Reclast and Zometa, Dec. 28, 2007 (DE # 948).   NPC clearly highlighted the PSC's failure to comply with Local Rule 37.01 in its Opposition to that motion to compel.  *See* Mem. in Opp'n to Pls' Supplemental Briefing Regarding Reclast® and Zometa® and December 10, 2007 Letter Submission, Jan. 14, 2008 (DE # 1065).

FILED UNDER SEAL

> products in this case, Zometa and Aredia, but they have deleted information which concerns other drugs of the programs and other programs. *The Magistrate Judge has to conclude that, in fact, this material concerning other drugs, products, and procedures is not relevant nor likely to lead to relevant material and therefore is properly redacted.*

*See* Order Concerning Aug. 28, 2007 Hr'g 3-4 (emphasis added). If the PSC's reiteration of this argument is simply an attempt to seek reconsideration of the Court's September 5, 2007 Order, the PSC is far out of time and has not provided any reason, let alone citation to a single authority, that would entitle it to the second bite of the apple it seeks. *See, e.g.,* Fed. R. Civ. P. 60 (setting forth the narrow circumstances upon which reconsideration may be granted, none of which are present in this case).[3]

The PSC's wholesale request for all redacted documents, in contravention of the Court's Order, also ignores NPC's reasonable offers to consider the PSC's concerns on a document-by-document basis. *See* Letter from Johnston to Valad, June 17, 2008 (DE # 1440-3). The Court likewise acknowledged that NPC is "available to resolve any questions the PSC has [about redactions]." *See* Order Concerning Aug. 28, 2007 Hr'g at 9. NPC's redaction log is clearly sufficient to enable the PSC to determine which, if any, redacted documents it would like to discuss. *Id.* at 4 ("it is clear that the log is adequate."). NPC remains willing to consider the PSC's discrete inquiries about particular documents identified in NPC's log.

Pursuant to its prior Order on this issue, the Court should once again deny the PSC's request for the production of unredacted documents on a global basis.

---

[3] The PSC's most recent attempt to obtain unredacted documents, without direct citation to the Court's controlling Order on this issue or any argument meriting reconsideration, constitutes a waste of the valuable time and resources of the Court and NPC.

**FILED UNDER SEAL**

### B.    The Dear Doctor Letter Issue.

NPC produced the lists of recipients for the Dear Doctor letters (dated September 2004 and May 2005) almost nine months ago.  The PSC has also deposed no fewer than fourteen separate NPC witnesses on this subject, asking 408 separate questions about the Dear Doctor letters.  Among those deponents were Dr. John Hohneker (who signed the letters) and most of the project team members who were involved in drafting the letters and who acted as ultimate decision-makers concerning the letters.[4]  None of these witnesses were ever instructed not to answer questions about the letters.

The PSC complains about a single instruction not to answer a narrow question at the deposition of Dr. Lynne McGrath that would have required her to divulge privileged information.  *See* PSC Mem. in Supp. of its Mot. to Compel Discovery Responses 10-11, June 24, 2008 ("Mem. in Supp.") (DE # 1443).  Other than that single instruction, Dr. McGrath testified at length about this subject, answering 139 separate questions about the Dear Doctor letters during her deposition.  Dr. McGrath testified as to the persons at NPC who would have had responsibility for the Dear Doctor letters, including Robyn Konecne-Sterner (deposition pending); John Hohneker (deposition taken Feb. 20, 2008); and Dionigi Maladorno (deposition taken Mar. 19, 2008).  *See* McGrath Dep. 26:10-27:20; 121:14-122:8; 126:11-127:1.  Dr.

---

[4] *See, e.g.*, Deposition of Anne Altmeyer, Mar. 14, 2008 at 54:3-9, 93:6-16, 163:24-164:21, (Ex. 1); Deposition of Geoffrey Cook, Apr. 17, 2008 at 15:22-16:2, 90:22-92:22, 101:13-102:6, 107:13-17, 110:10-111:4 (Ex. 2); Deposition of Deborah Dunsire, Mar. 6, 2008, at 97:20-98:6, 99:19-100:8, 168:3-170:8, 170:14-171:3, 173:20-174:18 (Ex. 3); Deposition of Stefano Fratarcangeli, May 22, 2008, at 143:10-25, 171:8-12 (Ex. 4); Deposition of Yong Hei, Apr. 3, 2008, 119:11-120:8, 121:23-122:10 (Ex. 5); Deposition of John Hohneker, Feb. 20, 2008, at 83:7-85:3, 86:22-90:5, 90:19-91:2, 95:4-100:9, 108:24-109:7, 111:16-116:8, 117:10-118:9, 137:7-25 (Ex. 6); Deposition of Linda Lantwicki, Feb. 27, 2008 at 75:13-76:11 (Ex. 7); Deposition of Reed McClung, Dec. 6, 2007, at 108:16-109:17, 143:25-144:19, 198:19-200:10 (Ex. 8); Deposition of Lynne McGrath, Jan. 25, 2008 at 25:17-30:25, 107:17-111:2, 114:2-9, 118:18-122:8, 123:4-124:2, 126:11-129:8, 149:2-163:16, 184:25-185:12 (Ex. 9); Deposition of Nicholas Sauter, Mar. 4, 2008, at 76:6-22 (Ex. 10); Deposition of Peter Tarassoff, Apr. 10, 2008 at 140:4-141:18 (Ex. 11); Deposition of Peter Tarassoff, Apr. 18, 2008, at 206:15-207:14, 218:17-221:8 (Ex. 12); Deposition of Rosa Linda Weiss, Mar. 11, 2008, at 100:11-101:9, 110:17-19, 128:10-131:16, 132:20-134:19 (Ex. 13); Deposition of Richard Weitzman, May 30, 2008 at 163:11-165:10 (Ex. 14); Deposition of Diane Young, June 5, 2008 at 33:19-39:17, 226:24-227:19 (Ex. 15).

FILED UNDER SEAL

McGrath also testified as to the persons at NPC who would have been responsible for communicating directly with the FDA regarding the Dear Doctor letters, including Prem Narang (deposition pending); Annmarie Petraglia (deposition scheduled for July 30, 2008); and Robyn Konecne-Sterner (deposition pending). *See* McGrath Dep. 108:12-25. Dr. McGrath answered specific questions about who was involved in drafting the language of the 2005 letter, referring to John Hohneker, Al Bess, Dionigi Maladorno, and Prem Narang (*see* McGrath Dep. 157:8-22), and how that language was developed (*see* McGrath Dep. 157:23-158:10). She informed the PSC that the Medical Affairs team had responsibility for determining the recipient list of the 2004 letter, which would have included Dr. Tarassoff and Dr. Maladorno. *See* McGrath Dep. 149:18-150:13. She also informed the PSC that there was discussion with the American Dental Association to determine the list of recipients for the 2005 letter. *See* McGrath Dep. 155:10-156:4. Suggesting that this single instruction not to answer somehow deprived the PSC of critical information on this topic is unfounded.

NPC has not, as the PSC suggests, refused to provide information about how the letters were generated, and NPC will provide additional testimony on these subjects at upcoming 30(b)(6) depositions already noticed by the PSC so that additional costs will not be incurred.[5]

## C.    Marketing and Advertising and Sales and Profit Issues.

The PSC misrepresents the scope of the dispute regarding this category of information. NPC has produced thousands of documents from both the sales and marketing functions relevant to this case. By way of example only, included in the production were training materials, promotional pieces, educational materials, press releases, and communications with the field force. NPC has responded to multiple discovery requests specifically seeking sales and

---

[5] Dr. McGrath's deposition took place on January 25, 2008, and the PSC has not sought to compel testimony at any time between that date and the present. The PSC also failed to raise this issue with NPC prior to its June 11, 2008, letter.

FILED UNDER SEAL

marketing information.[6]  In addition, the PSC took the deposition of Emily Chee on February 15, 2007, who provided specific testimony about the unit sales of Aredia® and Zometa®. Furthermore, exhibits were entered during Ms. Chee's deposition that provided state-by-state breakdowns of the unit sales of the drugs dating back to 2002.  The PSC has also taken the depositions of Reed McClung, who was designated as NPC's 30(b)(6) deponent on sales and marketing issues, on December 6, 2007, and James Niebanck, who at one point led the Zometa® marketing and brand team, on June 12, 2008.  NPC has been cooperative and more than willing to provide the PSC with multiple witnesses throughout this litigation, and the PSC has had ample opportunity to obtain testimony on the subjects of sales and marketing of both Aredia® and Zometa®.

Despite what the PSC says in its motion, however, what is really at issue here is profit information and sales forecasts.  The Court has previously held that the PSC is not entitled to the information that is actually in dispute here, sales forecasts and profit reports for Aredia® and/or Zometa®, and the PSC is certainly not entitled to it without briefing on the relevance of this information at this stage of the case.  This information is not relevant until the damages phase of the litigation.  *See* Hr'g Tr. 89:11-15, Jan. 22, 2007 (DE # 298) (Ex. 20):

> The Court: "I'm not going to get into their sales and profits until we get further down the pike.  I mean, at some point if you start getting into punitive and such, I think you'd be entitled to them, but I'm not going there right now."

Hr'g Tr. 90:7-13:

> Latimer: "[T]here has been at least to my knowledge, no statement of relevance at this point.  And in fact, I think what would apply suggests exactly as Your Honor has just suggested, that sales, profits, financial

---

[6] *See* NPC's Resp. to Pl.'s First Req. for Produc. of Docs., Request Nos. 20, 21 and 36, Dec. 14, 2005 (Ex. 16); NPC's Resp. to PSC's First Req. for Produc. of Docs., Request Nos. 1-5, Feb. 5, 2007 (Ex. 17); NPC's Resp. to PSC's Second Req. for Produc. of Docs., Request Nos. 1-3, Feb. 9, 2007 (Ex. 18); NPC's Resp. to PSC's Third Req. for Produc. of Docs., Request Nos. 5-8, 10(b), 12-14, Nov. 1, 2007 (Ex. 19).

FILED UNDER SEAL

information, be deferred until after some merit discovery has taken place."

   The Court: "Yeah, I'm gonna hold up on that, I'm gonna hold off on that."

Nothing material has changed since the Court first resolved this issue. Punitive damages issues are not yet ripe, and may never become so in many cases given recent New Jersey state-court authority affirming that punitive damages are not available absent a showing of fraud on the FDA but also holding that Courts are preempted from deciding the issue of fraud on the FDA. *McDarby v. Merck & Co., Inc.*, 2008 WL 2199871, at *41 (N.J. Super. Ct. App. Div. May 29, 2008) (provision of New Jersey Product Liability Act, allowing punitive damages to be awarded if manufacturer knowingly withheld or misrepresented information required to be submitted to the FDA, impinged upon federal statutes and regulations, and thus such a provision allowing punitive damages was impliedly preempted). Plaintiffs have offered no basis for the Court to reconsider its prior decision on this issue.[7]

### D.    The X-Rays in the Clinical Trial Issue.

The PSC has never made a specific discovery request seeking these x-rays from the twenty-six clinical trials patients referred to in ZA-0792201 (Ex. 21) until filing this motion. In its letter dated June 11, 2008, the PSC demanded "x-rays of subjects' hips and jaws from clinical trials." A letter demand, however, is not a discovery request. As such, the PSC's attempt to compel this material, that was never the subject of a discovery request, is entirely improper.[8] Moreover, as NPC explained in its previous correspondence with the PSC, it does not believe

---

[7] Moreover, it is clear that the PSC is attempting an end-run around this Court's Order by arguing that such information is discoverable for reasons other than to prove punitive damages. If this were in fact the case, such information would be discoverable at the early stages of nearly every case.

[8] As set forth above, Local Rule 37.01(b)(2), which requires the movant to quote the discovery request at issue, was designed to prevent just this type of misguided motion to compel material that is not the subject of a pending request.

FILED UNDER SEAL

that these x-rays are even relevant to the claims at issue in this litigation, as they do not provide

an appropriate view of the jaws of the clinical trials patients for evaluating signs of ONJ.  Diane

Young testified about the PSC's Exhibit 4058 (attached as Ex. 22), which was an e-mail

exchange discussing bone scans taken during some of the Zometa® clinical trials (010, 011, 039).

*See* Young Dep. 168:9-169:6.  Certainly the burden of producing these x-rays for all clinical

trials participants, which will be significant in terms of the cost of retrieval and copying,

outweighs the marginal relevance of this material in these cases.  The PSC appears to concede

this point in its Motion by suggesting, for the first time, that it would be willing to accept x-rays

for less than all of the participants in these clinical trials.  NPC is willing to produce the x-rays of

the twenty-six clinical trial participants identified by the PSC at the PSC's expense if NPC can

locate these x-rays.

     **E.**      **The Survey Issue.**

     The PSC failed to request marketing survey documents in the MDL.  Once again, since

there is no outstanding discovery request at issue, the PSC's request that NPC be compelled to

produce these documents is improper.  Had the PSC complied with Local Rule 37.01(b)(2) and

properly listed the specific discovery requests at issue, NPC would have been able to inform the

PSC that it had never served discovery requesting this information, and this issue would not be

before the Court.

     Regardless of whether the PSC had specifically requested these surveys, NPC already

produced them, to the extent they exist.  The PSC is obviously aware of this because it has

introduced such surveys as exhibits during the depositions of at least eight separate NPC

employees.[9]  In addition, NPC provided specific bates number references within the production

---

[9] *See* Altmeyer Dep. Ex. 2839, 2844, 2880, Mar. 14, 2008 (attached as Ex. 23, 24, and 25); Cook Dep. Ex. 3462,
April 17, 2008 (attached as Ex. 26);  Lantwicki Dep. Ex. 2406, 2408, 2414, 2422, Feb. 27, 2008 (attached as Ex. 27,
28, 29, and 30);  Deposition of Katarzyna Sablinska, April 15, 2008, at Exhibit 3322 (attached as Ex. 31);  Tarassoff

**FILED UNDER SEAL**

to information concerning surveys in NPC's First Supplemental Responses to Plaintiffs' First Requests for Production of Documents in the New Jersey litigation dated May 19, 2008 (*See* NPC's First Supplemental Resp. to Pls.' First Req. for Produc. of Docs. Request Nos. 34, 73, 74, May 19, 2008 (Ex.35)).  Even though this information was not requested in the MDL, NPC has pointed the PSC to those documents in its letter of June 17, 2007 (¶11).  Further, the PSC has the same capabilities as NPC of searching the document production for the information it seeks, and can easily locate this information within the production number.  (*See*, *e.g.,* documents at the following Bates ranges: ZA-0846771—778 (Ex. 36); ZA-0749886—908 (Ex. 37); ZAEM-02297220—229 (Ex. 38)).  NPC is not presently aware of any additional information that would be responsive to a request for marketing surveys, had such a request been propounded by the PSC.

### F.     Issues Related to Electronic Mail and Electronic Databases.

In its Order dated May 9, 2008, the Court set June 20, 2008 as the deadline for the PSC to file motions regarding general written fact discovery in the MDL.  In its motion to compel, the PSC has not asked this Court to resolve any issues with respect to the electronic mail or electronic databases produced by NPC in the MDL.  The PSC simply seeks to file a "placeholder," in essence asking this Court to void its own previous discovery and scheduling Orders without mentioning, let alone meeting, the standards of Fed. R. Civ. P. 16.  By failing to file a motion asking the court to do so, the PSC has missed the deadline.  Accordingly, the Court should deem any such issue waived.

The PSC suggests that this Court should defer to the resolution of issues on electronic mail and electronic databases by a New Jersey state court, applying New Jersey discovery rules,

---

Dep. Ex. 3245, April 10, 2008 (attached as Ex. 32);  Weitzman Dep. Ex. 3918, May 30, 2008 (attached as Ex. 33); Young Dep. Ex. 4070, June 5, 2008 (attached as Ex. 34).

**FILED UNDER SEAL**

rather than exercising its own discretion to determine these issues under the federal rules. The

PSC states, "these issues are being exhaustively reviewed in the New Jersey litigation" and

"ought to be left to the Court directly handling it so as not to duplicate work and waste judicial

sources." Mem. in Supp. 13. The PSC's suggestion, if accepted, would negate this Court's

pretrial orders. Moreover, it would void the goals of the federal MDL system, "an important

aspect" of which "is to prevent predatory discovery, especially of sensitive documents, ensuring

that litigants use discovery properly as an evidence-gathering tool, and not as a weapon. Indeed,

an express purpose of consolidating multidistrict litigation for discovery is to conserve judicial

resources by avoiding duplicative rulings," particularly in parallel state court litigation. *Winkler*

*v. Eli Lilly & Co.,* 101 F.3d 1196, 12020 (7th Cir. 1997). It is inappropriate for a federal court to

defer to a state court on discovery matters, particularly in the context of multi-district

consolidated litigation. *See In re Columbia/HCA Healthcare Corp., Billing Practices Litig.,* 93

F. Supp. 2d 876, 880 (M.D. Tenn. 2000) (noting that a federal court with jurisdiction over

complex multidistrict litigation may issue injunctions to protect the integrity of its pre-trial

rulings, including discovery orders, where "plaintiffs were resorting to the state courts for the

specific purpose of evading" its discovery rulings).

Contrary to the PSC's statement that "these issues are being exhaustively reviewed in the

New Jersey litigation," Mem. in Supp. 13, the New Jersey court is not presently adjudicating any

issue related to electronic mail and electronic databases. The New Jersey litigation is still in its

preliminary stages, with the parties still discussing and negotiating the parameters of the

protective order, the defense fact sheet, the schedule, and deadlines, among other items. With

respect to issues related to electronic mail and electronic databases, the parties are in the "meet

and confer" stage and are attempting to resolve these issues in a mutually acceptable and

amicable manner. NPC anticipates that this process will continue into the coming months and

FILED UNDER SEAL

that the New Jersey plaintiffs' concerns will be resolved.  This Court should not permit the parties' "meet and confer" negotiations in New Jersey to nullify its scheduling Orders, particularly its May 9, 2008 Order.

The PSC has taken advantage of numerous opportunities to raise discovery issues and concerns in the MDL, including the filing of several motions to compel discovery, *i.e.,* PSC's Mot. to Compel Novartis Discovery Requests, January 5, 2007 (DE # 230); PSC's Notice of Pls' Position Regarding Continuing Discovery Requests, March 6, 2007 (DE # 326) ("PSC's Notice"); PSC's Mot. to Compel Discovery and for Sanctions and for Attorney's Fees for Violation of this Court's Discovery Order, July 20, 2007 (DE # 508); and Letter from R. Beatie to M.J. Brown, December 10, 2007 (DE # 848).  However, the PSC never raised with the Court any concerns about the production of databases, and only once raised issues with electronic mail production in PSC's Notice, which essentially asked for electronic mail from all NPC employees beyond the core group identified by NPC.  *See* PSC's Notice at 5-6.  The Court, in its Order Concerning Mar. 8, 2007 Conference, Mar. 12, 2007 (DE # 342), addressed this request for more electronic mail by cautioning the PSC, stating, "[A]t some point, there has to be a limitation on the amount of material involved.  The productions already run in the millions of pages.  The Plaintiffs have to be careful that they do not overwhelm themselves with documents."  Order Concerning Mar. 8, 2007 Telephone Conference at 6-7, Mar. 12, 2007 (DE # 342).

The PSC's statements that NPC must produce "all" of the electronic databases and electronic mail that it seeks, *see* Mem. in Supp. Ex. A, 2 para. 3, 9, is simply not an accurate statement of the law of discovery.  Contrary to the PSC's allegations, NPC's electronic mail and electronic database production meets its obligations pursuant to the federal rules of civil procedure.  Pursuant to the Federal Rules of Civil Procedure, NPC is only obligated to produce those records that:  (1) are responsive to the requests; (2) are not privileged; (3) are relevant to

**FILED UNDER SEAL**

the claim or defense of any party (Fed. R. Civ. P. 26(b)(1)), and; (4) can be made available without imposing undue burden and expense on NPC (Fed. R. Civ. P. 26(b)(2)(B), (C)).  The PSC is not entitled to have all of the electronic mail or electronic databases it seeks simply because it demands them.  *See, e.g.*, *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 452-53 (D.D.C. 2002) ("Courts can limit discovery to 'that which is proper and warranted in the circumstances of the case.'  Courts should balance the need for discovery against the burden imposed on the person ordered to produce documents.") (internal citations omitted).[10]

With respect to the production of electronic information generally, The Sedona Conference Working Group's recommendations are noteworthy because they establish guidelines for the identification, collection, and production of electronic documents that meet the goals of discovery while avoiding undue burden on the producing party.  *See The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, Comment 4.b. (at 44-45), Comment 6.a. (at 70-71), Comment 6.b. (at 72) (2005), *available at* http://www.thesedonaconference.org/content/miscFiles/7_05TSP.pdf.  Foremost, the Sedona recommendations recognize "[i]t is neither reasonable, feasible, nor required under Rule 34 to produce every file or message that might potentially be relevant to every issue in the litigation."  *Id*. at Comment 4(b).  "It is the responsibility of the producing party," here NPC, "to determine what is responsive to discovery demands and to make adequate arrangements to preserve and produce relevant information."  *Id.* at Comment 6.a.  Further, Sedona recognizes, as

---

[10] *See also Powers v. Thomas M. Cooley Law School*, No. 5:05-CV-117, 2006 WL 2711512, at *5 (W.D. Mich. Sept. 21, 2006) ("[Rule 26(b)(2)] not only permits but requires the court to curtail discovery efforts . . . when the balance of burden and expense outweighs the information's likely benefit, taking into account a number of factors, such as the needs of the case and the importance of the discovery to the issues at stake in the litigation."); *Marker v. Union Fid. Life Ins. Co.,* 125 F.R.D. 121, 124 (M.D.N.C. 1989) (stating that despite "some modicum of relevance," the propriety of a discovery request depends upon "the more critical factor [of] whether the need for the information, considering its relevancy and the nature of the case, outweighs the burdensomeness of the request."); *Green Constr. Co. v. Kansas Power and Light Co.,* 732 F. Supp. 1550, 1554 (D. Kan. 1990) ("Although KPL has demonstrated the claims histories may have some relevance, the relevancy is outweighed by the burden the request places on Seaboard.").

FILED UNDER SEAL

one of the "[i]mportant steps in achieving the goal of reasonably limiting discovery," that the producing party may collect "data from repositories used by key players rather than generally searching through the entire corporate computer system," and "defin[e] the set of data to be collected by applying reasonable selection criteria, including search terms." *Id*. at Comment 6.b. In this regard, the Sedona recommendations recognize that it is "reasonable, for example, to limit searches for messages to the e-mail accounts of key witnesses in the litigation, for the same reasons that it has been regarded as reasonable to limit searches for paper documents to the paper files of key individuals." *Id*. at Comment 4(b).

In a decision predating the Sedona guidelines, the court in *Zubulake v. UBS Warburg,* 217 F.R.D. 309, 316-24 (S.D.N.Y. 2003), with respect to electronic mail, recognized that a party need not produce everything, but only what is reasonably accessible and can be accomplished without imposing undue burden or expense on defendants. *Zubulake* further recognized that a defendant can comply with its discovery obligations by producing relevant and responsive documents from employees who are the "key players." *Zubulake v. UBS Warburg,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *Zubulake v. UBS Warburg,* 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004).

Pursuant to these guidelines, NPC produced the following relevant corporate databases and provided detailed explanations about them to the PSC:

- **ARGUS and SINA**:  NPC produced relevant data extracted from ARGUS and SINA in loadable ASCII delimited format and offered NPC IT professionals to provide assistance to plaintiffs if its technical consultants were unable to import this information into its database system.

  o **ARGUS:** NPC produced the 31 fields from within ARGUS that contain information provided to the United States Food and Drug Administration for Aredia® and Zometa® pertaining to ONJ (*i.e.,* osteonecrosis of the jaw) (defined using the 18 MeDRA terms used by the FDA to identify potential reports of ONJ) and fields that contain information relating to the process of providing that information to the FDA.

FILED UNDER SEAL

- o **SINA:** NPC produced relevant information in this database that tracks all potential adverse events related to Aredia® and Zometa®.

- **MEDICUS**: NPC provided relevant field information from MEDICUS relating to requests for information by physicians relating to Aredia® and/or Zometa® and ONJ. The data were provided as an Excel spreadsheet, which can be imported into any commercially available database software.

- **NOVEL**: NPC provided, in PDF form, the information contained in NOVEL that pertains to Aredia® and/or Zometa® and ONJ. NOVEL is a bibliographic database. It was NPC's understanding that plaintiffs were satisfied with the production.

- **COMPASS/EDGE**: NPC produced relevant field information for records that pertain to Aredia® and/or Zometa® in these databases in loadable ASCII delimited format. COMPASS/EDGE contains information on calls by NPC Oncology sales specialists to physicians in which Aredia® and/or Zometa® was a subject of the call.

- **REDI/PREDI/CREDI:** NPC produced relevant information that pertains to Aredia® and/or Zometa® and ONJ from these three electronic document management systems. NPC electronically extracted data from these three systems and produced images in tiff format.

  - o **CREDI** contains documents and data from clinical trials.

  - o **PREDI** contains documents and data from pre-clinical trials.

  - o **REDI** contains regulatory submissions, components of regulatory submissions, and correspondence with health authorities.

NPC also produced electronic mail pursuant to the guidelines outlined above, as previously explained to the PSC almost two years ago by letter on September 26, 2006 (*see* Letter from Latimer to Valad, Sept. 26, 2006 (DE # 230)):

- Through its counsel, NPC met with employees in the Oncology Business Unit ("OBU") who had some level of responsibility for Aredia® and/or Zometa®. Without waiving attorney-client privileges or work product protections, NPC states that during these meetings, NPC identified individuals who had potentially responsive hard-copy and electronic documents and e-mail ("documents"). Through counsel, NPC met with employees identified as possibly possessing potentially responsive documents. Through counsel, NPC ultimately identified sixty persons at NPC who were likely to possess potentially responsive documents. These employees produced to counsel hard copy documents that met a single,

**FILED UNDER SEAL**

broad criterion for potential responsiveness:  anything to do with Zometa®
and/or Aredia®.  Counsel reviewed these documents for relevance and
privilege, and NPC produced non-privileged, responsive hard-copy
documents from these employees, identified by name as "custodians."  In
addition, counsel sent a request to the person responsible for maintaining
NPC's "Archives," its repository of hard-copy documents, to identify,
preserve and produce potentially responsive documents.  These documents
were produced as a custodian, "Archives".[11]  *Id.* at 3.

- NPC also preserved the electronic documents of the sixty employees and
  has searched for potentially relevant documents from their "home share"
  (network hard-drive equivalent) using search terms designed to capture
  responsive documents.  *Id.*  NPC reviewed and produced those documents.

- NPC also preserved the e-mail of those sixty employees.  NPC identified
  and produced responsive, non-privileged e-mail – estimated to comprise
  nearly 5.0 million pages – from a core group of eighteen of these
  employees.  The eighteen were chosen according to the following criteria:
  Each of them is most likely to have sent or received e-mail potentially
  relevant to this case based on his/her (1) job title, (2) period of time in the
  position, in particular whether that period of time overlaps the key years at
  issue in the litigation, and (3) department in which he/she was employed.
  In order to identify the broadest number of potentially responsive e-mails
  pursuant to its discovery obligations, NPC used the following terms,
  including those from the Medical Dictionary for Regulatory Activities
  ("MedDRA")[12], to search the e-mail:  zometa; zoneta; aredia or aridia;
  bisphosphonate or bisphosphonates or bisphosphonate*; zoledron*;
  pamidronate or pamidronates; cgp23339 or cgp-23339 or "cgp 23339";
  cgp42446 or cgp-42446 or "cgp 42446"; onj; "maxillofacial operation" or
  maxillofacial operations"; "jaw operation" or "jaw operations";
  mandibulectomy; "jaw lesion excision" or "jaw lesion excisions"; "oral
  surger*"; "aseptic necrosis bone" or "aseptic necrosis bones";
  osteonecrosis; "bone infarction"; sequestrectomy; "bone debridement";
  "primary sequestrum"; "secondary sequestrum"; "tertiary sequestrum";
  osteomyelitis; buzz or (z adj buzz) or z-buzz; zol or czol or czol*; zom or
  zom* or zomate*; aae581* or (aae adj "581") or aae-581*; z-fast or (z adj
  fast) or zfast*; zo-fast or (zo adj fast) or zofast*; zenith or "z.e.n.i.t.h"; and
  azure*.  *Id*. at 3-4.

This process resulted in the production, at *de minimis* cost to the PSC (approximately

$1,500), of nearly five million pages of e-mail, including tens of thousands of e-mails from

---

[11]  Similarly, "Core Team" files are comprised of documents maintained as a distinct collection, and thus is being
produced as a custodian identified as "Core Team" files.

[12]  MedDRA is used by the Food and Drug Administration as the basis to define terms in its AERS (adverse event)
database.

**FILED UNDER SEAL**

individuals involved with Aredia® and Zometa® who were not among the core group. For example, NPC produced 14,000 e-mails in which John Hohneker, Vice President, United States Medical Affairs, was the author, recipient, or copyee, and 17,000 emails for Robert Spaet, Principal Fellow, Pathology Preclinical Safety, both of whom were deposed in the MDL. The PSC has also taken the deposition of a number of NPC employees (both current and former) who are not among the core group using hundreds of documents, including Anne Altmeyer (March 14, 2008), Gregory Burke (April 30, 2008), Stefano Fratarcangeli (May 22, 2008), Carsten Goessl (April 5, 2008), Joanne Machalaba (May 28, 2008), James Niebanck (June 28, 2008),Katarzyna Sablinska (April 15, 2008), Robert Spaet (February 19, 2008), Richard Weitzman (May 30, 2008), and Rosa Linda Weiss (March 11, 2008). Given the voluminous production by NPC, there is no basis to conclude that there are additional responsive documents, the relevance of which outweighs the burden and expense of production to NPC.

The PSC has not articulated what, if any, information it expects to obtain from any additional production that is necessary to prove any component of its claims that would justify the burden and expense associated with the production of e-mail from forty-two additional employees. *See Teeters v. Lason, Inc.*, No. 01 C 216, 2001 WL 1230629, at *3-4  (N.D. Ill. Oct. 5, 2001) (request for additional discovery denied when party failed to designate the specific kind of discovery it required:  "[V]ague assertions and speculative statements fail to demonstrate that additional discovery is necessary to resolve this motion.").[13]

If NPC is required to go beyond its obligations as set forth in the discovery rules, which the PSC once more demands, NPC will incur significant and unreasonable costs and burden, and

---

[13] *See also Spurlock v. Whitley*, 79 F. App'x 837, 839, 2003 WL 22474617, at *1 (6th Cir. Oct. 29, 2003) (denial of plaintiffs' motion for additional discovery because they had only engaged in a cursory review of what had been produced despite having had several discovery extensions and an abundant opportunity to review the production); *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 102 (2d Cir. 2008) (plaintiffs' demands for more discovery properly denied; their motion was "an unlimited and unfocused request for many thousands of additional documents, made without any attempt to review what was already available to them [within the available MDL record]").

FILED UNDER SEAL

discovery will be substantially delayed.   Based on the number of emails produced from the eighteen core employees, the PSC's demand for an additional production of the emails of approximately forty-two current and former NPC employees could conceivably require NPC to review and produce in excess of eleven million additional pages of documents.  This will impose an unreasonable burden and great expense to NPC, with no offer of contribution from the PSC. *See The Sedona Principles; Best Practices Recommendations & Principles for Addressing Electronic Document Production,* Comment 4.b. (at 44-45) (2005) ("It is neither reasonable, feasible, nor required under Rule 34 to produce every file or message that might potentially be relevant to every issue in the litigation.").[14]

Accordingly, the Court should deny the PSC's requests for electronic mail and electronic databases for failing to meet the Court's deadline to file motions about written factual discovery despite providing the PSC numerous opportunities to do so, and because NPC has fulfilled its obligations pursuant to Fed. R. Civ. P. 26(b) by producing relevant electronic databases and electronic mail to plaintiffs.

### G.    Recently Received Discovery.

Any criticism the PSC expresses about NPC's recent responses to discovery requests is borne out of the PSC's own delay and imprecision.  NPC provided responses to Plaintiffs' Steering Committee's Fourth Set of Interrogatories to NPC and Plaintiffs' Steering Committee's Seventh Set of Document Requests to NPC on June 17, 2008, giving the PSC five days in advance of filing its Motion to raise any issues about the responses, which the PSC failed to do.[15]

---

[14] *See also The Sedona Conference Journal: Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery,* at 196-99 (August 2007) ("The exponential growth in the volume of electronically stored information" has rendered "conventional discovery" processes and methods incapable of handling and "poorly adapted to much of today's litigation.").

[15] NPC was under no obligation to respond to these requests because they were untimely served.  Fact discovery was set to close on March 14, 2008 and NPC's responses to these discovery requests would not have been due until after

FILED UNDER SEAL

In the Court's Order dated May 9, 2008, the deadline for discovery motions regarding general written fact discovery in the MDL was set for June 20, 2008. The PSC chose to wait until May 21, 2008, a full twelve days after the May 9, 2008 Order, to serve NPC with three additional, voluminous sets of discovery requests. At that time, the PSC knew that motions to compel were due before NPC's responses were due. NPC has already taken up the issue of the PSC's most recent discovery requests, including their duplicative nature, in its Motion for a Rule 16(b) Order Setting a Deadline for the Completion of Fact Discovery (dated June 23, 2008) (DE # 1419). NPC also properly objected to individual discovery requests. Despite the often repetitive, imprecise, and overly broad nature of these requests, NPC provided the PSC with timely responses to all three sets of discovery on June 23, 2008. NPC cannot be held responsible for the PSC's inability to "review and consult" the material furnished in these responses because there was only one day in which to do so and meet the deadline to file its motion to compel.[16] The PSC made the choice to delay serving additional discovery on NPC knowing that motions were set to be filed at the end of June, and failed to meet the deadline for motions to compel. Therefore, the PSC should not be allowed to hold these issues open indefinitely for future motions to compel.

**III.    <u>CONCLUSION</u>**

For the reasons set forth above, this Court should deny the PSC's motion to compel.

---

that date under the Federal Rules. Despite the fact that the PSC's requests were untimely, NPC provided responses to those requests on June 17, 2008.

[16] NPC agreed to the PSC's request for an extension to file its motion to compel, moving the date to June 24, 2008.

**FILED UNDER SEAL**

Respectfully submitted,

July 11, 2008

s/ Katharine R. Latimer_____
Joe G. Hollingsworth
Katharine R. Latimer
klatimer@spriggs.com
Robert E. Johnston
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW
Washington, DC  20005
Telephone:  (202) 898-5800
Facsimile:  (202) 682-1639

*Attorneys for Defendant Novartis*
*Pharmaceuticals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 11th day of July 2008 served a true and correct copy of

the foregoing Novartis Pharmaceuticals Corporation's Opposition to Plaintiffs' Steering

Committee's Motion to Compel Discovery Responses, by United States Mail, postage prepaid,

on:

C. Patrick Flynn                         John J. Vecchione, Esq.
Flynn & Radford                          Valad & Vecchione, PLLC
320 Seven Springs Way                    3863 Plaza Drive
Suite 150                                Suite 200
Brentwood, TN 37027                      Fairfax, Virginia 22030
(615) 370-9448                           (703) 352-4800


                                         s/ Katharine R. Latimer
                                         Katharine R. Latimer

559598v1

FILED UNDER SEAL

# Exhibit 1

FILED UNDER SEAL

1      U.S. DISTRICT COURT

2      MIDDLE DISTRICT OF TENNESSEE

3      NASHVILLE DIVISION

4      DOCKET NO.  3:06-MD-1760

5

6      IN RE:           :

7                       :

8      AREDIA and ZOMETA    :

9      PRODUCTS LIABILITY   :  VIDEOTAPED

10     LITIGATION (MDL NO   :  DEPOSITION OF:

11     1760)            :  ANNE ALTMEYER

12                      :

13

14

15         ***CONFIDENTIAL***

16

17         T R A N S C R I P T of Deposition

Proceedings in the above-entitled matter, as taken

18     by and before MARY G. VAN DINA, Certified Court

Reporter and Notary Public of the State of New

19     Jersey, at GIBBONS, P.C., One Gateway Center, Newark

New Jersey, on March 14, 2008, commencing at 8:30

20     a.m.

21

22

23

24

25     HUDSON REPORTING & VIDEO          1-800-310-1769

FILED UNDER SEAL

1    Q.    On the first page towards the bottom --

2    A.    Uh-huh.

3    Q.    -- there's a reference, "We need a slide

4    show that shows physicians' groups that DDL was sent

5    to."

6         Do you see that?

7    A.    Yes, I do.

8    Q.    What is DDL?

9    A.    Dear Doctor letter.

10        MR. GERMANY:  And that exhibit Bates

11   range was ZAEM-01351614 through 1615.

12        (Exhibit 2821, Document, Bates Nos.

13   ZAEM-00243010 through 13, is received and marked for

14   identification.)

15   Q.    I show you an e-mail that I've marked as

16   Exhibit 2821.

17   A.    Uh-huh.

18   Q.    The top part of that thread is an e-mail

19   from Alexandra Kirner --

20   A.    Uh-huh.

21   Q.    -- to you.  Correct?

22   A.    Correct.

23   Q.    The second part of the e-mail is an

24   e-mail from you to Alexandra Kirner to you with a

25   copy to others.  Correct?

FILED UNDER SEAL

1    ask?

2        A.    Michael Scott.

3        Q.    Who is Michael Scott?

4        A.    He was actually our U.S. Marketing

5    person at that time.

6        Q.    What role, if any, did you have in the

7    development of the "Dear Dentist" letter?

8        A.    As a reviewer.

9            THE REPORTER:  I'm sorry.

10       A.    Reviewer.

11       Q.    As a reviewer, does that mean you're

12   involved in the substantive portions of the letter,

13   or are you simply commenting on stylistic issues and

14   things of that nature?

15       A.    For the "Dear Doctor" letter, I don't

16   remember what my comment were.

17           (Exhibit 2845 Document, Bates No.

18   ZA-0787982, is received and marked for

19   identification.)

20       Q.    I show you an e-mail that's been marked

21   as Exhibit 2845.

22           That is an e-mail from you to Michael

23   Scott with a copy --

24       A.    Uh-huh.

25       Q.    -- to others.  Correct?

FILED UNDER SEAL

1      Q.     Third bullet -- bullet point:  "Data

2   mining and meta-analyses on the clinical trial

3   database based on approved statistical analysis

4   plan."

5            Do you know if any of that has been

6   done?

7      A.     I don't even recall what that was

8   referring to.

9      Q.     Okay.  If you wanted to find out about

10  that, who would you have asked --

11     A.     The person who --

12     Q.     -- on the ZIM team?

13     A.     The person who put this deck together.

14     Q.     Okay.  But if you wanted to find out if

15  anybody was doing any data-mining and meta-analysis

16  on the clinical trial database, who was the person on

17  the clinical committee who would do that kind of

18  work?

19     A.     Our clinician.

20     Q.     Who is that?

21     A.     Nick Sauter or Dionigi Maladorno.

22     Q.     If you will, turn to the next page.

23     A.     Okay.

24     Q.     The bottom bullet point is talking about

25  the "Dear Doctor" and "Dear Dentist" communication.

FILED UNDER SEAL

1    Do you see that?

2        A.    You're referring to page 576?

3        Q.    Yes.

4        A.    Okay.  The last bullet.  Okay.

5        Q.    Yes.  And that last bullet says

6    "reviewing market --"

7        A.    Yes.

8        Q.    "-- research data to evaluate the

9    effectiveness of our "Dear Doctor" and "Dear Dentist"

10    communications and acting on that review as

11    appropriate and necessary."

12            Do you recall earlier in your

13    deposition, we discussed the results of a -- a market

14    research data review that came in in August, after

15    the letter was sent out in May?

16        A.    Uh-huh.

17        Q.    Do you know if there was ever an

18    additional one done after that?

19        A.    I recall the "Dear Dentist" letters

20    being sent out.  I don't recall anything

21    specifically, but I'm not aware.

22        Q.    If you wanted to find out about that,

23    who on the Zim Team would you have asked?

24        A.    I would ask maybe Peter Tarasoff.

25        Q.    On the next page, it's a list of -- it

164

FILED UNDER SEAL

# Exhibit 2

FILED UNDER SEAL

1

2

IN THE UNITED STATES DISTRICT COURT FOR

3

THE MIDDLE DISTRICT OF TENNESSEE

4

AT NASHVILLE

5

6  IN RE:

7  AREDIA and ZOMETA PRODUCTS LIABILITY

LITIGATION

8

9                No. 3:06-MD-1760

10  (MDL No. 1760)

11  This Document Relates To All Cases

12  --------------------------------------------

13

14                ***CONFIDENTIAL***

15                April 17th, 2008

16                8:43 a.m.

17

18        Deposition of GEOFFREY COOK, held at

19  the offices of Gibbons, PC, One Gateway

20  Center, Newark, New Jersey, pursuant to

21  Notice, before Jeremy Frank, a Notary Public

22  of the State of New York.

23

HUDSON REPORTING & VIDEO, INC.

24  124 West 30th Street, 2nd Fl.

New York, New York 10001

25  Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1          Cook

2          Are you familiar with that

3    document?

4      A.   Yes.

5      Q.   Did you play any role in

6    developing that document?

7      A.   Yes.

8      Q.   Okay.

9          I know that there were a couple of

10   white papers is what I'm going to refer to

11   them developed by Novartis with the assistance

12   of an advisory board or maybe perhaps more

13   than one advisory board that provided

14   information to doctors, oral surgeons on the

15   issue of osteonecrosis the jaw.

16         Are you familiar with those

17   documents?

18     A.   Yes.

19     Q.   Did you play a role in developing

20   those?

21     A.   Yes.

22     Q.   There was a dear doctor letter in

23   approximately September 2004.

24         Did you play a role in developing

25   that document?

FILED UNDER SEAL

1               Cook

2       A.    No.

3       Q.    There was an, I'm going to call it

4   a dear dentist letter that was sent out in

5   May 2005.

6               Did you play any role in

7   developing that?

8       A.    I don't recall.

9       Q.    In the summer of 2006 there was

10  another letter that went out at least to

11  doctors, perhaps to oral surgeons, dentists

12  and other health care providers.

13              Did you play a role in developing

14  that?

15      A.    I don't recall.

16      Q.    In terms of the product labels for

17  either Aredia or Zometa, did you play any role

18  in developing the content of the product

19  labels?

20      A.    I did not.

21      Q.    Did you play any role in the

22  wording of the product label?

23      A.    No, I did not.

24      Q.    Okay.

25              In 2003 there was a Novartis

FILED UNDER SEAL

1          Cook

2     Epstein have in this Novartis Emergency

3     Management team?

4          A.   He did not play a day-to-day

5     operational role, but he did receive regular

6     updates from Dr. Dunsire.

7          Q.   Did you ever participate in any of

8     the updates that were provided to him?

9          A.   Not to my recollection.

10          Q.   I show you a document that's

11     described as a draft cover note to FDA dated

12     July 8th, 2004.

13          (Exhibit 3431, draft cover note,

14          marked for identification, as of this

15          date.)

16          Q.   Are you familiar with that

17     document?

18          A.   The specifics of this document,

19     no, but I'm familiar with the format.  I have

20     seen other documents like this one when label

21     changes are made.

22          Q.   I show you a letter dated

23     July 15th, 2004, its just addressed to dear

24     doctor as 3432.

25          (Exhibit 3432, dear doctor letter,

FILED UNDER SEAL

1               Cook

2        marked for identification, as of this

3        date.)

4        Q.    Are you familiar with that letter?

5        A.    Yes.

6        Q.    This is a dear doctor letter that

7    was sent to oncologists and others.

8               Who are the others?

9        A.    My recollection is it was sent to

10    oncologists, hematologists and oral surgeons,

11    there may have been others as well.

12        Q.    Is that your handwriting on the

13    letter?

14        A.    I don't believe so, it doesn't

15    appear like my handwriting.

16        Q.    Did the NEM team make the decision

17    to send this letter?

18        A.    Yes.

19        Q.    Why was that decision made?

20        A.    The decision was in conjunction

21    with discussions with the regulatory

22    authorities and the updating of a label.

23        Q.    Talking about the FDA?

24        A.    Yes.

25        Q.    The FDA wanted the letter sent --

FILED UNDER SEAL

1        Cook

2        MR. JOHNSTON:  Objection, misstates

3    the testimony.

4    Q.    -- or do you know?

5    A.    Specifics of whether there was a

6    discussion between the FDA and Novartis about

7    communicating the label change.

8    Q.    Did you participate in those

9    discussions?

10    A.    No, I did not.

11    Q.    Did you participate in the

12    decision to whom the letter should be sent?

13    A.    That was a medical decision in

14    terms of who, where the letter should be

15    distributed.

16    Q.    Did you participate in those

17    discussions?

18    A.    Most likely, but I don't recall

19    specifics.

20    Q.    Was it discussed whether or not to

21    send the letter to dentists?

22    A.    I don't recall.

23        (Exhibit 3433, Taking Care of

24    Yourself While Living With Cancer

25    pamphlet, marked for identification, as

FILED UNDER SEAL

1          Cook

2     A.   Its used in response to inquiries.

3     Q.   Would it be fair to say that your

4   colleagues who were doing similar things in

5   other parts of the world were being instructed

6   that they weren't to pick up the phone and

7   call a media representative and provide the

8   information in this document?

9     A.   The purpose of the document was

10   for responding to inquiries, so someone would

11   have to call you and solicit the information.

12     Q.   Okay.

13          MR. GERMANY:  I'll show you a

14        letter dated September 24th, 2004.  Its

15        addressed Dear Doctor, we will mark that

16        as 3435.

17          (Exhibit 3435, dear doctor letter,

18        marked for identification, as of this

19        date.)

20     Q.   Did you play any role in preparing

21   that letter?

22     A.   I don't recall the specifics, but

23   I certainly probably would have reviewed it.

24     Q.   Okay.

25          Again, your review would not have

FILED UNDER SEAL

1                Cook

2    been for substantive matters but more matters

3    of style and clarity?

4        A.   Mm-hmm.

5        Q.   Is that correct?

6        A.   Consistency, style, clarity, yes.

7            MR. GERMANY:  I show you an e-mail

8    dated September 30th, 2004.  Mark that as

9    3436.

10           (Exhibit 3436, e-mail, marked for

11   identification, as of this date.)

12       Q.   That is from you to other members

13   of the NEM team, correct?

14       A.   Correct.

15           MR. GERMANY:  I show you an e-mail

16   dated October 1st, 2004.  I have marked

17   it as 3437.

18           (Exhibit 3437, e-mail, marked for

19   identification, as of this date.)

20       Q.   That is an e-mail from you again

21   to the members of the NEM team.

22       A.   That is correct.

23       Q.   Okay.

24           What you're doing there is passing

25   along information that was obtained from some

FILED UNDER SEAL

1          Cook

2    changes to key prescriber groups including

3    oncologists, hematologists, urologists,

4    dentists and dental surgeons," correct?

5        A.    Again because I don't know if this

6    is the final document or not, I'm not, I

7    couldn't say that that is absolutely correct.

8        Q.    What do you think might be

9    incorrect about it?

10        A.    I'm not saying I think its

11    incorrect or not correct, I'm just not certain

12    whether it was final or not.

13        Q.    Had there been a letter sent to

14    dentists as of November 22nd, 2004?

15        A.    To my knowledge, no.  We would

16    have to check the 2004 distribution dear

17    doctor letters.

18        Q.    On page seven under action plan

19    you have a bullet point, "Preparing

20    spokespeople to manage inquiries."

21          Who are you talking about there?

22        A.    That would be internal people who

23    are allowed to speak to the media who are

24    subject matter experts such as a physician, an

25    internal physician.

FILED UNDER SEAL

1           Cook

2    bullet points reads, "Novartis has sent a

3    letter detailing the labeling changes to key

4    prescriber groups including oncologists,

5    hematologists, urologists, dentists and dental

6    surgeons."

7           Correct?

8        A.   Yes, it does.

9        Q.   All right.

10          And as of November 23rd, 2004

11   there had not been a letter sent detailing the

12   labeling changes to dentists.

13          Is that correct?

14          MR. JOHNSTON:  Objection, misstates

15      his testimony.

16       A.   Again, I'm going have to, I would

17   need to go back and check on the distribution

18   of the dear doctor letter whether it included

19   dentists or not.

20       Q.   Who would know, who would you

21   check with to determine whether it includes

22   dentists or not?

23       A.   Medical is responsible for

24   distribution of the letter, so someone in the

25   medical group would give that information.

FILED UNDER SEAL

1              Cook

2    Q.   Dr. Tarassoff?

3    A.   Dr. Tarassoff certainly could find

4    it.

5         MR. GERMANY:  I show you an e-mail

6    dated December 2nd, 2004, I will mark it

7    as 3440.

8         (Exhibit 3440, e-mail thread,

9    marked for identification, as of this

10   date.)

11        MR. JOHNSTON:  Mr. Germany, before

12   you ask any questions, let's staple that

13   so that we don't lose track of those

14   pages.

15   Q.   The first e-mail is one from you

16   to Dr. Dunsire with copies to Mr. Goldfarb and

17   Ms. Lantwicki, correct?

18   A.   That's correct.

19   Q.   How did you come into the

20   information that is set out in this e-mail?

21        MR. JOHNSTON:  Objection, vague and

22   compound.

23   A.   My day-to-day interaction with the

24   team, it appears.

25   Q.   With the NEM team or the brand

FILED UNDER SEAL

# Exhibit 3

FILED UNDER SEAL

1

2        IN THE UNITED STATES DISTRICT COURT FOR

3          THE MIDDLE DISTRICT OF TENNESSEE

4              AT NASHVILLE

5      IN RE:

6      AREDIA and ZOMETA PRODUCTS LIABILITY

7      LITIGATION

8              No. 3:06-MD-1760

9      (MDL No. 1760)

10     This Document Relates To All Cases

11     -----------------------------------------------

12

13

14      CONFIDENTIAL DEPOSITION OF DEBORAH DUNSIRE, M.D.

15          Cambridge, Massachusetts

16          Thursday, March 6, 2008

17

18          Reported by:

19      Patricia M. McLaughlin, CSR

20

21

22

23

24

25     HUDSON REPORTING & VIDEO            1-800-310-1769

1

FILED UNDER SEAL

1              DEBORAH DUNSIRE, M.D.

2      A    Yes, that appears so.

3      Q    And this was after the advisory board meeting

4            in San Antonio; is that correct?

5      A    That is so.

6      Q    According to this summary that you sent to

7            management, the advisory board in San Antonio

8            suggested a need for further education of

9            oncologists; is that correct?

10     A    Um-hum.

11     Q    Was that done?

12     A    I believe that around the time of the package

13           insert change we had gone prospectively to

14           oncologists and subsequent to this also asked

15           the sales representatives to communicate with

16           the oncologists on a day-to-day basis to

17           ensure that they were alerting oncologists to

18           the change in the PI and the observations of

19           osteonecrosis.

20     Q    And you're talking about the PI change that

21           was in the fall of 2003?

22     A    Yeah.

23     Q    Was there a "Dear Doctor letter" sent with

24           that PI change?

25     A    I don't recall.

FILED UNDER SEAL

1          DEBORAH DUNSIRE, M.D.

2     Q    Do you have an understanding of when a "Dear

3          Doctor letter" is sent with a PI change and

4          when it is not?

5     A    The rules around that would be best

6          elucidated by a regulatory professional.

7     Q    According to these notes, the advisory board

8          suggested a need for further education of

9          patients.  Was that done?

10    A    A group of patient advocacy organizations was

11         drawn together subsequent to this meeting,

12         and I do not remember when.  Early

13         discussions had happened with the

14         International Myeloma Foundation, and as

15         you're I'm sure aware, companies don't

16         typically have the ability to reach out

17         directly to patients, so normally go through

18         the third-party, the learned intermediary of

19         the patient advocacy organizations.

20             So in addition to conversations with the

21         International Myeloma Foundation and the

22         Multiple Myeloma Research Foundation, an

23         advisory board of all related patient

24         advocacy groups was convened, but I don't

25         recall the exact date.  But it was in the

FILED UNDER SEAL

1          DEBORAH DUNSIRE, M.D.

2     subsequent earlyish part of the subsequent

3     year, but as I said, I don't remember the

4     date.

5          Subsequent to that, all of those

6     advocacy organizations had put up a report of

7     that meeting or some communication on their

8     patient websites.

9   Q   Did Novartis ever put up any information for

10      patients on Zometa about osteonecrosis on its

11      website?

12  A   I don't recall.

13  Q   It's your best recollection, as you sit here

14      today, that the meetings with the patient

15      advocacy groups happened in the first half of

16      2004?

17  A   I can't be accurate on the date, but that's

18      my belief.

19  Q   The minutes also indicate a need for further

20      education of the dental community.  Was that

21      done?

22  A   At a point in time -- and again, I don't know

23      the exact date -- a "Dear Doctor letter" was

24      sent out to all oncologists, hematologists,

25      urologists, who were prescribers of Zometa,

FILED UNDER SEAL

1        DEBORAH DUNSIRE, M.D.

2      and included in that was the oral

3      maxillofacial community as recommended by

4      Drs. Ruggiero and Marx, I think, to touch

5      people who were most likely to see

6      osteonecrosis of the jaw or indeed conduct

7      the surgeries that appeared to exacerbate or

8      precipitate osteonecrosis of the jaw.

9   Q   Was there ever a further education of

10     dentists?

11  A   My recollection is that there was a letter

12     that went out to dentists later on, but the

13     timing is not crystal clear in my memory.

14  Q   And as I am reading this e-mail that you sent

15     to management, what you've stated in it was a

16     need for further education of the dental

17     community, correct?

18  A   That's what the words say.  The intention

19     behind those words was to include the people

20     who were treating surgically, particularly

21     the people who were conducting the procedures

22     which were communicated to us by the oral

23     maxillofacial surgeons potentially causing

24     the osteonecrosis to the jaw, which were

25     mainly oral maxillofacial surgeons.

FILED UNDER SEAL

1              DEBORAH DUNSIRE, M.D.

2    A   As far as I recall, it was.

3    Q   Do you recall that in September of 2004, in

4        conjunction with the September, 2004,

5        labeling change there was what's known as a

6        "Dear Doctor" letter that was sent out?

7    A   Right.

8    Q   Do you recall that?

9    A   Yes.

10   Q   What was the purpose of sending out that

11       "Dear Doctor" letter?

12   A   At that time the labeling for Zometa and

13       Aredia had been changed to change the

14       geography in the labeling of the reference to

15       osteonecrosis of the jaw from the adverse

16       events section to the precautions section.

17            And the "Dear Doctor" letter is a

18       mechanism of ensuring that a labeling change

19       is proactively brought in a timely way to the

20       attention of physicians, so they know such a

21       change has been made and are informed of the

22       reasons for it.

23   Q   And "Dear Doctor" letters are typically

24       distributed to prescribing physicians; is

25       that correct?

FILED UNDER SEAL

1      DEBORAH DUNSIRE, M.D.

2    A   Typically, they are.  This particular "Dear

3        Doctor" letter included non-prescribers and

4        the oral and maxillofacial surgeons, given

5        that they were the people who had been seeing

6        osteonecrosis of the jaw.

7    Q   Is it your recollection that in May of 2005 a

8        "Dear Dentist" letter was sent out by

9        Novartis Pharmaceuticals Corporation?

10   A   Yes.

11   Q   Can you explain why that letter was sent out

12       in May of 2005?

13   A   We had been considering a communication to

14       the broader dental community beyond oral and

15       maxillofacial surgeons for some time, and

16       during the Oncology Drug Advisory Committee

17       meeting, one of the panel members had asked

18       or had suggested that that be done, and it

19       confirmed our considerations.

20          So during March of 2005, we began the

21       drafting of that letter, and  I believe it

22       was to go to dentists and dental hygienists.

23   Q   And is it your understanding that both the

24       "Dear Doctor" letter in September of '04 and

25       the "Dear Dentist" letter in 2005 were the

1    DEBORAH DUNSIRE, M.D.

2    product of cooperative work between Novartis

3    Pharmaceuticals Corporation and the Federal

4    Food and Drug Administration?

5    A   Yes.

6    MR. GERMANY:  I object to the form.

7    MR. RUBIN:  You can answer.

8    A   Yes.

9    MR. RUBIN:  I have no further questions.

10    MR. GERMANY:  I have a few follow-up,

11    questions, Doctor.

12    REDIRECT EXAMINATION

13    BY MR. GERMANY:

14    Q   Did you participate in the writing of the

15    "Dear Doctor" letter?

16    A   No, I did not.

17    Q   Do you know who did?

18    A   It was generally written by the medical

19    professionals.  In this instance, it was

20    likely that Dr. Peter Tarassoff and Linda

21    Weiss were the key authors.  It would have

22    been reviewed by the regulatory

23    professionals.

24    Q   Do you know who signed it?

25    A   I believe it would be signed by Dr. John

FILED UNDER SEAL

1          DEBORAH DUNSIRE, M.D.

2          Hohneker as the head of medical affairs for

3          the U.S.

4      Q   Do you know who authored the "Dear Dentist"

5          letter?

6      A   The same professionals.

7      Q   Do you know who signed it?

8      A   I do not recall.  Most likely, it would be

9          Dr. Hohneker.

10     Q   To your knowledge, did the FDA ever request

11         that Novartis make any changes in the

12         labeling?

13     A   There was a point when, after the first

14         labeling change in September of '03, we were

15         discussing a labeling supplement with the

16         FDA, and as a part of that, they requested

17         some language changes to the adverse events

18         section.  I don't remember the specifics.

19     Q   Do you know what audience the Journal of Oral

20         and Maxillofacial Surgery is directed to?

21     A   It's directed toward dental professionals who

22         have an interest in or practice in oral and

23         maxillofacial surgery.

24     Q   Does that include dentists?

25     A   I would have to see their distribution list.

FILED UNDER SEAL

1    DEBORAH DUNSIRE, M.D.

2    who would see any such case but had not seen

3    a vast number of cases.

4  Q   Did the NEM, to your knowledge, do any sort

5    of analysis of the adverse event reports that

6    were coming in to determine what percentage

7    of patients were first seen by a dentist with

8    their problems before being referred to an

9    oral surgeon?

10    MR. RUBIN:  I object to that question as

11    beyond the scope of my redirect and compound.

12  Q   You may answer my question.

13  A   The clinical safety and epidemiology

14    personnel, who were engaged in gathering the

15    data on the cases from the reporting

16    physicians, tried to establish a full history

17    of the patients but oftentimes were not able

18    to.  So there was an incomplete dataset to be

19    able to do such analysis.

20  Q   You testified that a "Dear Doctor" letter

21    went out with the labeling change in

22    September, 2004, correct?

23  A   Yeah, it would have been contiguous or in the

24    same time frame.

25  Q   In fact, the updated labeling would have

FILED UNDER SEAL

1           DEBORAH DUNSIRE, M.D.

2      accompanied the "Dear Doctor" letter?

3    A   Yes.

4    Q   Do you know why there was no "Dear

5      Doctor" letter in September, 2003?

6    A   The change was an observation made on the

7      very few number of cases.  It was added to

8      the adverse events section, and at that time

9      we directed our sales representatives to talk

10      to the physicians.

11          When the change was made to add it to

12      the precautions section, we made the

13      determination that we would not allow the

14      time to pass until the sales representatives

15      had talked to every physician but would

16      rather send the "Dear Doctor" letter in

17      addition to having the sales representatives

18      discuss with each physician as they saw them.

19    Q   I want to be sure I understand your

20      testimony.  It is your testimony that sales

21      personnel were instructed by Novartis to

22      proactively bring up the issue of the label

23      change with prescribing physicians?

24    A   That is my recollection.

25    Q   And that was true both of the labeling change

174

FILED UNDER SEAL

# Exhibit 4

FILED UNDER SEAL

1       IN THE UNITED STATES DISTRICT COURT

         MIDDLE DISTRICT OF TENNESSEE

2           AT NASHVILLE

3

4  IN RE:          NO. 3:06-MD-1760

              JUDGE CAMPBELL

5  AREDIA and ZOMETA PRODUCTS

  LIABILITY LITIGATION      MAGISTRATE JUDGE

6             BROWN

7  (MDL No. 1760)

8  This Document Relates to:

  ALL CASES

9

10

11

        VIDEOTAPED DEPOSITION OF

12      STEFANO FRATARCANGELI

13

        Taken at the

14      Hotel Nikko Mexico

    #204 Colonia Polanco Chapultepoe

15     Mexico City, Mexico

     on Thursday, May 22, 2008,

16  beginning at approximately 8:35 a.m.

17

18

     Appearances Noted Within

19

20

21

22     BETHANY CAMMACK

    PROFESSIONAL COURT REPORTING, LLC

23    Certified Shorthand Reporter

     Mississippi CSR No. 1526

24    Post Office Box 320928

    Jackson, Mississippi  39232-0928

25

FILED UNDER SEAL

1    e-mail from you to Annmarie Petraglia and Prem

2    Narang, correct?

3        A.   That's correct.

4        Q.   Who is Annmarie Petraglia?

5        A.   Annmarie Petraglia was working in the DRA

6    team responsible for Zometa.

7        Q.   Who was Prem Narang?

8        A.   Prem Narang was the head of DRA for

9    oncology.

10       Q.   In your e-mail you write, "Dear Annmarie

11   and PK, Here I definitely need your inputs."  From

12   reading the e-mail below, can you tell us why you

13   needed input from Annmarie and Prem?

14       A.   Sure.  Just give me a minute, please.

15       Q.   Sure.

16       A.   Well, because Ana Keller, who was DRA

17   responsible for a group of her -- for international

18   coordination and communication to all countries,

19   was asking -- is asking in this e-mail clear

20   direction based on a Dear Doctor letter that was

21   going to be released in the U.S.

22           So he sent that to me, but I

23   definitely turned that to DRA for their inputs

24   because I didn't have any of the answer to the

25   question that Ann had.

FILED UNDER SEAL

1                FURTHER EXAMINATION

2    BY MR. GERMANY:

3        Q.  Mr. Johnston asked you some questions

4    about Exhibit 3702.  I want you to the turn to

5    slide 29.  Well, first of all, the date of this

6    document is October 28, 2004, correct?

7        A.  Correct.

8        Q.  And there had been a Dear Doctor letter

9    sent out September 20, 2004 advising prescribers of

10   the change in the labeling with regard to

11   osteonecrosis, correct?

12       A.  I don't remember the date.

13       Q.  ONJ Messages, these are messages that were

14   intended to be delivered by Novartis employees to

15   prescribing physicians?

16       A.  I don't know which part is this.  I think

17   it's from Yong Hei, right?  (Reviewing document.)

18   Yes.

19       Q.  So these were messages to be delivered to

20   prescribing physicians, correct?

21            MR. JOHNSTON:  Objection, vague.

22            THE WITNESS:  They were message that,

23   you know, the medical people were handling

24   regarding ONJ.

25   MR. GERMANY CONTINUED:

FILED UNDER SEAL

# Exhibit 5

FILED UNDER SEAL

1        IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF TENNESSEE

3                AT NASHVILLE

4

5

    IN RE:

6

    AREDIA« and ZOMETA«

7    PRODUCTS LIABILITY

    LITIGATION

8                    Case No. 3:06-MD-1760

    (MDL) NO. 1760

9

    THIS DOCUMENT RELATES TO:

10    ALL CASES

11    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13      CONFIDENTIAL VIDEOTAPED DEPOSITION OF

14

15          YONG HEI, M.D., Ph.D.

16

17              April 3, 2008

                8:31 a.m.

18

        Four Seasons Hotel Westlake

19      2 Dole Drive, Georgia Room

        Westlake Village, California

20

21       Morning Session Reported by

22      Megan M. Grossman, CSR 12586

23      Afternoon Session Reported by

24      Christine C. Gordon, CSR No. 7709

25    HUDSON REPORTING & VIDEO          1-800-310-1769

1    to the prescribers.

2        Q   Would they do that proactively?

3        A   At that time, once label -- if it's after

4    label change, it would have been done proactively.

5        Q   After what change in the label?

6        A   So adding ONJ into the label.

7        Q   Adding it as a post marketing --

8        A   Yes.

9        Q   -- event?

10       A   Yes.

11       Q   Would there be documents prepared that

12   instructed the sales force what to tell the doctors?

13       A   There would be.  That would be the specific

14   effort by the sales force in the U.S.

15       Q   Okay.  Does that come from marketing or

16   medical affairs?

17       A   Normally, it's joint efforts because the

18   content could come from the medical affairs.  Medical

19   letter, though -- the letter, the dear doctor letter

20   always come from the medical.

21       Q   I want to talk a minute about what -- the

22   education of the sales force.  I have seen documents

23   entitled "Field Communications."

24       A   Uh-huh.

25       Q   Would that be the way that would be

FILED UNDER SEAL

1    communicated?

2       A   Field normally means the sales force and

3    clinical liaisons, those kind of individuals.

4       Q   The medical letter is what I would call a

5    dear doctor letter?

6       A   Correct.

7       Q   Do you know when that was sent?

8       A   I don't recall timing.  I know it was sent.

9       Q   But in any event, whenever it was sent, a

10   recommendation was made on December 5, 2003 by the

11   advisory board selected by Novartis, that there needed

12   to be education of oncologists; correct?

13      A   Yes.

14      Q   When was the white paper ready?

15      A   I remember it was ready for distribution at

16   the ASCO conference.  I don't know which year.

17      Q   Was the white paper mailed out to anyone?

18      A   I don't remember if it was mailed.  I

19   remember in ASCO there would be a whole pile of those

20   letters to be given to individuals for -- if they are

21   asking for it.

22      Q   So it's your understanding, at least

23   initially, the white paper was provided only if asked

24   for?

25      A   For the ASCO conference, I think that was the

FILED UNDER SEAL

1    case.  There were specific rules in ASCO and FDA as to

2    what you can give out proactively.  That was a medical

3    clinical issue, which is handed out by the medical

4    affairs side of the booths in the conference where

5    you -- the instruction is that you would only answer

6    questions in response to customers' inquiry.

7        Q   And that would be Dr. Tarasoff's area?

8        A   It would be, yes.

9        Q   Now, the advisors also suggested the

10   education of patients.  What was done in that regard?

11       A   I remember there was a patient brochure

12   produced about this.

13       Q   When was that done?

14       A   I don't know the timing.

15       Q   How was it distributed?

16       A   I think I remember one suggestion was to have

17   that in the doctors' office so patient can pick up

18   those brochures.

19       Q   Did that require any sort of FDA approval?

20       A   The patient education material, I don't

21   recall the process of approval, whether or not it

22   requires FDA's approval.

23       Q   Lastly in this area, the advisors suggested

24   education of the dental community.

25       A   Yes.

FILED UNDER SEAL

1    Q   Was that done?

2    A   The -- I believe, yes.

3    Q   How?

4    A   The dear doctor letter would be sent to them.

5    Q   Who was it sent to?

6    A   The dentist, the oral surgeons.

7    Q   There was a letter sent in September 2004.

8    Do you know if that went to dentists, oral surgeons,

9    or both?

10    A   I was not responsible for that effort.

11    Q   Dr. Coleman -- you have talked with us about

12    Dr. Coleman earlier, somebody that was an important

13    part of your clinical trials.

14    A   Yes.

15    Q   And he recommended, according to these

16    minutes, that the patient get the leaflet from the

17    oncologist so that the patient could then take the

18    leaflet to their dentist; correct?

19    A   Yes.

20    Q   So the necessary dentistry procedures could

21    be completed before bisphosphonate therapy; correct?

22    A   Yes.

23    Q   Do you remember as of December 2003 whether

24    the label recommended that patients about to start

25    bisphosphonate therapy have their dental procedures

FILED UNDER SEAL

# Exhibit 6

FILED UNDER SEAL

1

          U.S. DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

         NASHVILLE DIVISION

3          DOCKET NO.  3:06-MD-1760

4    IN RE:       :

                :

5    AREDIA and ZOMETA   :

   PRODUCTS LIABILITY  :

6    LITIGATION (MDL NO  :  DEPOSITION OF:

   1760)        :  JOHN HOHNEKER

7              :

8          ***CONFIDENTIAL***

9

10       T R A N S C R I P T of Deposition

11 Proceedings in the above-entitled matter, as taken

12 by and before MARY G. VAN DINA, Certified Court

13 Reporter and Notary Public of the State of New

14 Jersey, at GIBBONS, P.C., One Gateway Center, Newark

15 New Jersey, on February 20, 2008, commencing at 8:55

16 a.m.

17

18

19

20

21

22

23

HUDSON REPORTING & VIDEO, INC.

24 124 West 30th Street, 2nd Fl.

New York, New York 10001

25 Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1        Q.    I'm going to show you a document that

2    I've marked as Exhibit 2203.  The Bates range is

3    ZAEM-001513814 through 816.

4              (Exhibit 2203, Bates Nos. ZAEM-001513814

5    through 816, is received and marked for

6    identification.)

7        Q.    Do you recognize that document?

8        A.    I want to look through it first.

9        Q.    Sure.  Take as much time as you need.

10       A.    Okay.

11       Q.    Are you familiar with that document?

12       A.    Obviously, I've -- my name is on here.

13   I don't know if this is a final copy or -- the

14   document looks -- looks familiar to me, and that I

15   must have -- I'm a signatory here on it, but I don't

16   know if this is a final document that actually -- you

17   know, what was the disposition of the document.

18       Q.    Who wrote the document?

19       A.    I can't answer that at this time.  I

20   don't know exactly who wrote the document for -- for

21   the specific thing.

22             I think this is a "Dear Doctor" letter

23   that we -- that we have sent out, and our "Dear

24   Doctor" letters are a combination of written by the

25   IPT, the Zometa IPD, and submitted to the FDA for

83

FILED UNDER SEAL

1    feedback before they are distributed.

2           So if this -- if this is indeed one of

3    those "Dear Doctor" letters that we have sent out,

4    that that would be the way the authorship would be

5    devised.  That's how we would construct the letter in

6    conjunction with the FDA.

7       Q.    You did not write the letter?

8       A.    As I mentioned before, for our "Dear

9    Doctor" letters, a team will compose it, I will

10   review it, and I'm the authorship on it.

11      Q.    The exhibit that you have in front of

12   you, did you write any of it?

13      A.    To answer your question, in terms of did

14   I actually write and compose the entire letter

15   here -- the letter here, the answer is no.

16      Q.    Did you compose any portion of it?

17      A.    I may have reviewed -- you know, in my

18   role, I would review it and give comment on it, but

19   the ultimate decision is -- is made from the Global

20   Project Team in conjunction with collaboration with

21   the FDA.

22      Q.    Can you identify any portion of that

23   letter which you can say under oath today you wrote?

24          MR. RUBIN:  Objection.  Asked and

25   answered.

84

FILED UNDER SEAL

1      A.    At this time, I cannot remember or

2  indicate specifically where I made comment or if I

3  even actually made edits to this.

4      Q.    Dr. Hohneker, did you review any

5  documents in preparation for your deposition?

6      A.    Specifically, did I review any documents

7  for this -- for the deposition on my own, no.

8      Q.    Were you asked to review any documents

9  in preparation for this deposition?

10     A.    Asked?  No.

11     Q.    Have you read any of the depositions

12  taken in this case?

13     A.    No.

14     Q.    Have you seen the video of any of the

15  depositions taken in this case?

16     A.    No.

17     Q.    I show you an exhibit I've marked as

18  2204.  I'm sorry.  The Bates range is ZA-0577883

19  through 884.

20         (Exhibit-2204, Bates Nos. ZA-0577883

21  through 884, is received and marked for

22  identification.)

23     Q.    Is that your markings on that exhibit?

24     A.    No, I don't know.

25     Q.    If you'll look at the end of the

FILED UNDER SEAL

1    paragraph that begins with ONJ, there's some

2    handwriting there.

3          Do you recognize that as being your

4    handwriting?

5    A.    No.

6    Q.    Okay.

7    A.    I --

8    Q.    I want to show you a document I've

9    marked as -- I'm sorry.  I gave you the wrong one.

10   I've already written on that one.  Thank you.

11   A.    Do you want this one back?  I don't know

12   if that's a different one.

13   Q.    That's the one you need.

14         MR. RUBIN:  He gave me the wrong one.

15         THE WITNESS:  Okay.

16   Q.    I've handed you a document that's been

17   marked as Exhibit 2205.  The Bates range is

18   ZAEM-02837019 through 20.

19         (Exhibit 2205, Bates Nos. ZAEM-02837019

20   through 20, is received and marked for

21   identification.)

22   Q.    Do you recognize that document?

23   A.    Yes, it appears to be the -- the actual

24   "Dear Doctor" letter.

25   Q.    On the second page, there is a hand --

FILED UNDER SEAL

1    there's a little logo there, a hand with a pen

2    through it.  Do you see that?

3        A.    Yes.

4        Q.    What does that mean?

5        A.    That means that the signatory --

6    signature.  We tend not to put our actual signatures

7    there out there because it could be forged and used

8    for identity theft and for various reasons.

9        Q.    Did you write any portion of this

10   letter?

11       A.    Again, as I mentioned, the process by

12   which we do "Dear Doctor" letters is the team

13   constructs the letter, and we'll send it to the FDA

14   because it's a formal collaborative process there.  I

15   will -- may have reviewed and given comment but,

16   ultimately, the team decides with the FDA about what

17   the actual final product is.

18       Q.    Can -- can you identify for me any

19   portion of the final product that you, yourself,

20   wrote?

21       A.    I don't remember.  I don't -- I can't do

22   it at this time because I don't remember what my

23   specific comments on the letter were.

24       Q.    In the first sentence of the letter, you

25   write the doctor and say, "Novartis is fully

FILED UNDER SEAL

1    committed to assuring timely dissemination of safety

2    information about their products to the healthcare

3    community."

4              What do you mean by the statement "fully

5    committed"?

6         A.    I think as it's written.

7         Q.    Does "fully committed" mean regardless

8    of what it costs?

9         A.    I think it is written as it is, and

10   I'm -- I'm not going to interpret -- I can't

11   interpret what other people may see that as.

12             I'm saying that we are committed to

13   getting the timely dissemination of information to --

14   to the healthcare community.

15        Q.    Correct me if I'm wrong, you do not know

16   what the IPT team that constructed this letter meant

17   by "fully committed"?

18        A.    No, I can't speculate on -- on what the

19   IPT meant by that.

20             MR. RUBIN:  You need to keep your voice

21   up.

22        A.    I can't speculate on what the IPT --

23        Q.    It goes on to say:  "Assuring timely

24   dissemination of safety information."

25             What does "timely" mean in this letter?

2/20/2008  Hohneker, John (In Re: Aredia & Zometa Lit) CONFIDENTIAL

FILED UNDER SEAL

1      A.    I think it's -- it's fairly

2    straightforward.  It means timely dissemination.

3      Q.    Okay.  Does "timely" mean within 30 days

4    of receiving the information?

5          MR. RUBIN:  Objection.

6      A.    Yeah, I couldn't -- I can't give a

7    specific time frame.  They would do it in a timely

8    manner in which we get the information.

9          We have to be -- since, you know, as

10   we -- our package insert has information in it, we

11   get -- once we have information that is appropriate,

12   and we have some knowledge around it, we will

13   communicate that to the healthcare community within a

14   timely manner.  I think that what it's saying.

15     Q.    Well, what I'm trying to understand is,

16   as the person who sent this letter out and was a part

17   of the team that put it together, is there a way to

18   measure whether something is timely or not in an

19   objective manner?

20         MR. RUBIN:  Objection:  Object to the

21   form of the question.  It's a hypothetical question

22   to the witness.

23     A.    Yeah, I think it's very difficult to

24   define --

25     Q.    You're not able to do --

FILED UNDER SEAL

1      A.     -- in this context.

2      Q.     You're not able to do that for me today?

3      A.     Timely is written as here.  To put

4    parameters around it, I'm not able to do that around

5    today.

6      Q.     You mentioned labeling and package

7    inserts as a way of disseminating safety information

8    about your products.

9           Were there other ways of disseminating

10   safety information about your products?

11     A.     As I mentioned, upon unsolicited

12   requests from physicians about our products, through

13   our medical information, we will communicate

14   information, further information on our product via

15   those mechanisms.

16     Q.     And that would require a specific

17   inquiry from a physician?

18     A.     Yes.

19     Q.     Other than through your labeling

20   information and specific inquiries by prescribing

21   physicians, is dissemination of safety information

22   carried out in any other fashion by Novartis?

23     A.     Those are the predominant mechanisms by

24   which we do it.

25           The package insert and "Dear Doctor"

FILED UNDER SEAL

1    letters are regulatory constructs in which we can get

2    the information to prescribing physicians.

3        Q.    What are the non-predominant methods?

4        A.    I mean, those are the -- those are the

5    two methods.

6        Q.    So that -- so that I'm clear, the

7    methods are through the labeling information and

8    through a response to a specific question from a

9    treating physician?

10        MR. RUBIN:  Objection.  Misstating the

11    witness' testimony.

12        A.    Can you repeat that, please?

13        Q.    Sure.  The two methods that Novartis

14    uses to assure timely dissemination of safety

15    information about their products to the healthcare

16    community is through labeling information and

17    responding to specific inquiries from prescribing

18    physicians?

19        MR. RUBIN:  That he is aware of.

20        MR. GERMANY:  Yeah.

21        A.    That I'm aware of.

22        Q.    Okay.  When did you first learn about

23    the spontaneous reports of osteonecrosis of the jaw

24    in cancer patients who had received bisphosphonates

25    as a component of their therapy?

FILED UNDER SEAL

1    FDA's approval of our proposed changes and all those

2    documents, I'd probably have to refer you to

3    Regulatory on that with Lynn McGrath.

4        Q.    Was there a "Dear Doctor" letter sent

5    out with the changes in the post-marketing experience

6    portion of the label?

7        A.    I don't remember.

8        Q.    Can you tell me the criteria used in

9    Novartis Oncology in deciding whether to send a "Dear

10   Doctor" letter with a label change or to not send a

11   "Dear Doctor" letter with a label change?

12       A.    I'm -- I cannot -- I'm not the best one

13   to answer that question.  I think that would be

14   better addressed by our Regulatory Department because

15   it is -- as I mentioned earlier, "Dear Doctor"

16   letters and label changes is done in conjunction with

17   the FDA.  So I would direct you to our Regulatory

18   person Zometa.

19       Q.    Do you recall there being any

20   discussions about whether to send a "Dear Doctor"

21   letter at the time the changes were made in the

22   post-marketing experience section of the label?

23       A.    I don't remember if there were

24   discussions or not at this time.  I don't remember

25   off the top of my head.

FILED UNDER SEAL

1     Q.    What is the purpose of the "Dear Doctor"

2     letter?

3     A.    I think it's -- I think, in my view,

4     the -- the purpose of the "Dear Doctor" letter is to

5     inform prescribers of changes in the label, to help

6     guide them manage the patients that are receiving --

7     or that they're prescribing the drug that the letter

8     is addressing.

9     Q.    Is that important?

10    A.    Excuse me?

11    Q.    Is that important?

12    A.    It's sort of a -- to who?  I mean --

13    Q.    Is that important to Novartis?

14         MR. RUBIN:  Objection.  Hypothetical

15    question.

16    A.    It's -- it's sort of a vague question

17    for me to say is it important.  We think -- as I

18    mentioned, the "Dear Doctor" letters are to inform

19    prescribers about, you know, the -- how to correctly

20    administer a product and its all -- and its efficacy

21    and safety issues.

22         I think it is important that prescribers

23    read the package inserts of drugs and are

24    knowledgeable about the drugs that they are

25    prescribing.

96

FILED UNDER SEAL

1      Q.    Are you aware of any studies done within

2    Novartis Oncology to determine the effectiveness, in

3    terms of communicating the -- the desired information

4    from a "Dear Doctor" letter to a prescribing

5    physician?

6      A.    Can you repeat the question for me?

7      Q.    Sure.

8      A.    I want to make sure I understand it.

9      Q.    Are you aware of any studies done within

10    Novartis Oncology to determine the effectiveness in

11    terms -- in terms of communicating the desired

12    information from a "Dear Doctor" letter to a

13    prescribing physician?

14      A.    Off the top of my head, I'm not aware of

15    those studies.

16      Q.    I want to show you an exhibit that's

17    been marked as number 2206.  The Bates range is

18    ZA-0733435 through 436.

19          (Exhibit 2206, Bates Nos. ZA-0733435

20    through 436, is received and marked for

21    identification.)

22      Q.    Are you familiar with that document?

23      A.    I don't remember all of the details in

24    the document, but I see that, you know, it has my

25    signature on it.

97

FILED UNDER SEAL

1    Q.    Did --

2    A.    So it looks very similar to a previous

3    document -- document you have shown me.

4    Q.    And I believe that previous document

5    would have been number 2205.

6    A.    Correct.

7    Q.    Do you know which of these two actually

8    went to the doctors?

9    A.    No, I don't know off the top of my head.

10    Q.    Do you know which doctors, and by that I

11    mean, not by name, but by areas of practice this

12    September 24, 2004 "Dear Doctor" letter went to?

13    A.    I'm trying to think who it went to.

14        I think we definitely sent it to

15    oncologists, prescribers, and I think, initially, as

16    I am trying to recall, we also may have sent it to

17    oral maxillofacial surgeons as well.

18    Q.    Was it sent to dentists?

19    A.    You know, I can't recall if this letter

20    was sent to dentists.

21        In the previous discussion that we had

22    this morning, you mentioned the ODAC meeting.

23        I think some suggestions that came out

24    of that meeting was have we sent it to dentists.  I

25    forget the date of that ODAC meeting, but if this is

FILED UNDER SEAL

1    the letter that we sent after that, I think we did

2    send the letter to dentists as well, but I'm blanking

3    on the dates of --

4        Q.    The ODAC meeting was March 4, 2005.

5    Does that help you answer the question?

6        A.    Yeah, so I think that this one -- if

7    March -- March 2005 was, in fact, the date of the

8    ODAC meeting, then this letter went to the

9    oncologists and the oral maxillofacial surgeons, I

10   think.

11       Q.    If you --

12       A.    That's the best I can recall right now.

13       Q.    If you wanted to confirm not only what

14   groups, but which persons the letter went to, who

15   would you ask?

16       A.    I think Peter would -- Peter Tarasoff

17   would know that information.

18       Q.    Is -- do you know why, assuming it's

19   true that it was not sent to dentists, do you know

20   why it was not sent to dentists?

21       A.    The initial letter?

22       Q.    Yes, the September 24, 2004 letter.

23       A.    In general, the "Dear Doctor" letters go

24   to prescribers, and dentists are -- are not

25   prescribers of Zometa or Aredia.

99

FILED UNDER SEAL

1          I think, if we did send it to oral

2    maxillofacial surgeons, I think we did that because

3    that's where there were reports coming from those

4    surgeons, and so we wanted to make sure we sent it to

5    that group of patients -- that group of physicians as

6    well.

7          Q.    Beyond that, is there a reason it was

8    not sent to dentists?

9          A.    Not that I can --

10         Q.    Do dentists do tooth extractions?

11         A.    I'm -- I'm not an expert in the dental

12    area.

13         Q.    You're telling the jury you don't know

14    if dentists do tooth extractions?

15              MR. RUBIN:  Objection.  Argumentative.

16         A.    I'm saying I'm not ---I'm not.  How do I

17    answer this question?  I'm trying to think.

18              The -- probably some dentists probably

19    do dental extractions.

20              I don't know, within that profession, if

21    they're authorized to do dental extractions, so

22    that's where I'm answering the question, as opposed

23    to I know oral facial -- oral facial surgeons, that's

24    what they're authorized to do.

25         Q.    The letter refers to dental procedures,

100

FILED UNDER SEAL

1    the medical liaisons came under my responsibility.

2         So there was a transition time where she

3    had both, and then she was just head of Patient

4    Advocacy.

5         Q.    And that is not under your area --

6         A.    No.

7         Q.    -- of responsibility?

8         A.    No.

9         Q.    Drew Midwinter?

10        A.    Business Analysis.

11        Q.    Mary Naughton?

12        A.    You know, I don't know what Mary -- I

13   don't know -- I don't know what her role -- it may

14   have been Operations, but I'm uncertain.  I do not

15   know.

16        Q.    Paul Pochtar?

17        A.    Yeah, Pochtar, Managed Markets.

18        Q.    Managed Markets?

19        A.    Managed Markets.

20        Q.    Vicky Rawlinson?

21        A.    Human Resources.

22        Q.    Anthony Venditti?

23        A.    Marketing.

24        Q.    I'm going to go back to the "Dear

25   Doctor" letter.  Why don't we look at 2205?

FILED UNDER SEAL

1          Were there -- as a part of putting this

2     letter together, do you remember there being any

3     discussions about the fact that the letter should

4     focus on cancer patients without mentions

5     osteoporosis?

6          A.    I don't remember specifically

7     discussions around that topic.

8          Q.    I show you a document that's been marked

9     as Exhibit 2208.  The bates range is ZAEM-00452401

10    through 409.

11            (Exhibit 2208, Document, Bates Nos.

12    ZAEM-00452401 through 409, is received and marked for

13    identification.)

14         Q.    Are you familiar with that document?

15         A.    Off the cuff, I'm not familiar with it.

16    I haven't seen this document in a while but,

17    apparently, it has my signature on it.  So I

18    apparently have come in contact with it before.

19         Q.    Okay.  Do you know why this letter was

20    prepared?

21         A.    Um --

22         Q.    Go ahead.

23         A.    Okay.  I'm still thinking of the

24    question.  Why this letter was prepared.

25            I want to read through the letter

FILED UNDER SEAL

1      A.    Off the top of my head, I really don't

2   want to speculate on what that group was.

3      Q.    Do you know if it was Novartis's idea to

4   send this letter out?

5      A.    Again, I would have to direct to the

6   team and -- about -- to get the accurate answer to

7   that question.

8      Q.    Do you know if the FDA asked Novartis to

9   send this letter, or one like it, to dental health

10  professionals?

11     A.    No.  Again, I'm not the person that

12  would be best to answer that question.  A regulatory

13  person on the project, Lynn McGrath, would be the

14  best one to answer that.  She gets all those

15  communications.

16     Q.    Dr. Hohneker, how do you find out that a

17  "Dear Doctor" letter is being proposed?

18     A.    I would find it from -- the team members

19  would -- in my maybe day-to-day interactions with,

20  you know, our working with the team, they may mention

21  it's on review, or we got correspondence in that

22  regard, but it's in the context of, you know,

23  day-to-day -- day-to-day work.

24     Q.    Did you provide any of the language --

25  at this point, I'm focusing strictly on the letter,

FILED UNDER SEAL

1    not the documents which accompanied it.

2         Did you provide any of the language in

3    the letter?

4    A.    Yeah, I don't know offhand what -- if I

5    composed or edited it.

6         As I said earlier, I think, all the

7    letters, generally, the team composes them.  I may

8    have reviewed it, but I can't identify what those

9    areas are.

10   Q.    But, today, if I wanted to ask you

11   questions about specific portions you may have

12   drafted, you cannot identify those for me?

13   A.    I think that would be correct.

14   Q.    There is reference on page 2 of the

15   letter, under the first bullet point:  "Expert panel

16   recommendations for the prevention, diagnosis and

17   treatment of osteonecrosis of the jaws:  2004."

18        Are you familiar with that document?

19   A.    Um, I'm not familiar with all its

20   contents and the details of the document, but I'm

21   aware that at -- in general, that document exists.

22   Q.    Did you have any role in the drafting of

23   that document?

24   A.    I don't remember.  I may have been sent

25   a draft to give comment on it, but I -- I don't know

FILED UNDER SEAL

1    explicitly when in the -- when or if.

2        Q.    In the third bullet point, there's

3    identified a patient brochure, "Taking Care of

4    Yourself While Living With Cancer, Dental Health and

5    Osteonecrosis of the Jaw."

6            Are you familiar with that brochure?

7        A.    Not offhand.

8        Q.    What area within Novartis Oncology would

9    be responsible for the preparation of a brochure of

10   that type?

11       A.    I don't -- I don't know the answer to

12   that right offhand, um -- I don't --

13       Q.    Do -- I'm sorry.  Go ahead.

14       A.    Yeah, I just don't.

15       Q.    Going back to the September 24, 2004

16   letter, do you recall getting any phone calls from

17   any physicians or oral surgeons who received that

18   letter?

19       A.    For which letter?

20       Q.    The September 24, 2004 letter.

21       A.    No, I don't recall any specific phone

22   calls.

23       Q.    Would you have handled those

24   yourselves -- yourself, or would that have been

25   referred to Dr. Tarasoff?

FILED UNDER SEAL

1          A.     If they're -- if they call me directly,

2     I may have taken -- I may have take the call, the

3     message and I may have deferred it to -- to Peter,

4     but I don't remember if I received such calls.

5          Q.     In the letter dated -- this May 5, 2005,

6     there's a call at a 1-800 number, but I guess we ran

7     out so now we have 1-888 numbers at the end of the

8     letter.

9          A.     Right.

10         Q.     It says, "You can call Novartis Oncology

11    Medical Services if you have questions."

12         A.     Right.

13         Q.     Who was the person at Novartis Oncology

14    Medical Services that would have handled those

15    inquiries in late 2005?

16         A.     Right, I think Peter would be the best

17    one to answer that question.  I can't specifically

18    tell you who would be taking those calls.

19         Q.     That would have been his area of

20    responsibility to decide who took those calls?

21         A.     To answer your question, that call -- we

22    do have a call center.

23             I don't know offhand if that number is

24    to that call center and who in that call center

25    answers those calls, or if -- if they're triaged to

114

FILED UNDER SEAL

1    someone on Peter's team at that time.  So that's why

2    I think I would be better to ask Peter the specifics

3    about who actually what that call number goes to.

4         Q.    Do you know if there's a record made of

5    those calls?

6         A.    I don't know offhand.

7         Q.    This letter is also signed by Dr. Bess.

8    Do you see that?

9         A.    Yes.

10        Q.    For what purpose is he shown as also

11   signing the letter?

12        A.    He's the signatory on that because he

13   was head of Clinical Safety and Epidemiological,

14   CS&E, and they take all the spontaneous reports

15   through the MedWatch, and I think he's on here

16   because his team would then be the team taking those

17   adverse reports.

18        Q.    If you will, look at the second page of

19   Exhibit Number 2205, and I believe that also provides

20   a contact point to report serious adverse events.

21        A.    Uh-huh.  That's what it appears to be.

22        Q.    Given that, is there some reason

23   Dr. Bess's name did not appear on the September 24,

24   2004 letter that you know of?

25        A.    I don't know the answer to that

FILED UNDER SEAL

1    question.  Generally, we only have -- I'm the only

2    signatory on the "Dear Doctor" letters, but I

3    can't -- don't specifically --

4        Q.    Why is it that you're the person that

5    signs them?

6        A.    Because I'm -- that's -- I oversee the

7    medical group, and that would be the reason in the

8    U.S.

9            MR. RUBIN:  Counsel, can we take a short

10   break?

11           MR. GERMANY:  Sure.

12           MR. RUBIN:  Thank you.

13           THE VIDEOGRAPHER:  The time is now 1:47,

14   and we're going off the record.

15           (A brief recess is taken.)

16           THE VIDEOGRAPHER:  The time is now 1:54.

17   We're back on the record.

18       Q.    Dr. Hohneker, do you know whether

19   dentists, oral surgeons, periodontists,

20   prosthodontists, dental hygienists and other dental

21   healthcare professionals can play a vital role in

22   identifying ONJ?

23       A.    I am not an expert in that area about

24   who actually can identify ONJ.  I can't -- I don't

25   know.

FILED UNDER SEAL

1      Q.     Has anyone at Novartis ever told you

2   that dentists, oral surgeons, periodontists,

3   prosthodontists, dental hygienists and other dental

4   health professionals can play a vital role in

5   identifying ONJ?

6      A.     I can't explicitly remember someone

7   telling me that, but we obviously sent a letter to

8   dental healthcare professionals to alert them of

9   these -- of ONJ and to be aware of it.

10     Q.     Do you know when the IP team -- IPT team

11  concluded that dentists, oral surgeons,

12  periodontists, prosthodontists, dental hygienists and

13  other dental health professionals could play a vital

14  role in identifying ONJ?

15     A.     Let me phrase it in terms of the IPT.

16     Q.     Yes.

17     A.     When they decided that it would be --

18  that we should communicate to them information, I

19  don't know if they specifically said -- played a

20  vital role in that, but in terms of getting

21  information to dental healthcare professionals, my

22  understanding is that -- in reflecting about this is

23  that -- I think after the ODAC meeting and during the

24  ODAC meeting, that there was a suggestion from FDA

25  and dialogue during the meeting had questioning about

FILED UNDER SEAL

1    had we sent, you know, or notified dentists.

2          We took that feedback from FDA.  There's

3    not a formal request from FDA that I'm aware of to

4    send it to dentists, but after that meeting, I think

5    we went above and beyond by sending a letter to

6    healthcare professionals on this topic, particularly

7    on the fact that they're not prescribers of Zometa or

8    Aredia, which would be the customary place of where

9    we send "Dear Doctor" letters to.

10        Q.    When did, if you know, Novartis first

11   have an understanding that ONJ was in the mouth?

12          MR. RUBIN:  Objection, if you're asking

13   for his testimony on behalf of the corporation.

14        A.    Yeah, I mean, I don't think I can answer

15   that question about when Novartis as a whole became

16   aware that ONJ was in the mouth.

17        Q.    When did you become aware that ONJ was

18   in the mouth?

19        A.    I don't remember the specific time of

20   when I became aware.  I can't put a date on that.

21        Q.    You did not read anything or hear

22   anything about osteonecrosis of the jaw when you were

23   in medical school?

24          MR. RUBIN:  Objection to the form of the

25   question.  Argumentative.

FILED UNDER SEAL

1      Q.    Can you identify any specific portion of

2   this letter that you drafted?

3      A.    That I personally drafted?

4      Q.    Yes, sir.

5      A.    I can't identify those areas

6   specifically.

7      Q.    Going back to 2211, if, in fact, this

8   particular letter was sent out by Novartis, would it

9   have to be first approved by the FDA?

10         MR. RUBIN:  Objection.  You're asking

11   for speculation from the witness and also misstates

12   the factual record in this case about this letter.

13      A.    Could you repeat the question, please?

14      Q.    Sure.  If, in fact, this particular

15   version of this letter was sent out, do you know

16   whether or not it would have to first be approved by

17   the FDA?

18         MR. RUBIN:  Same objection.

19      A.    If this is a "Dear Doctor" letter, a

20   "Dear Doctor" letter by regulatory confines, it would

21   have to get approved by FDA.

22      Q.    Do you know whether this is a "Dear

23   Doctor" letter within the regulatory confines?

24      A.    I'm not certain at this time.  I don't

25   think so, but I don't know for sure.

FILED UNDER SEAL

# Exhibit 7

FILED UNDER SEAL

1

2

IN THE UNITED STATES DISTRICT COURT FOR

3

THE MIDDLE DISTRICT OF TENNESSEE

4

AT NASHVILLE

5

6    IN RE:

7    AREDIA and ZOMETA PRODUCTS LIABILITY

LITIGATION

8

9              No. 3:06-MD-1760

10   (MDL No. 1760)

11   This Document Relates To All Cases

12   ---------------------------------------------

13

14

15

16      CONFIDENTIAL DEPOSITION OF LINDA LANTWICKI

17            New York, New York

18         Wednesday, February 27th, 2008

19

20            Reported by:

21          Jeremy Frank, MPM

22

23

HUDSON REPORTING & VIDEO, INC.

24   124 West 30th Stree, 2nd Fl.

New York, New York 10001

25   Tel: 212-273-9911  Fax: 212-273-9915

1

FILED UNDER SEAL

1          Lantwicki

2    earlier today to be that you took Dr. Oliver

3    Jung's place as senior project manager?

4          A.   Eventually.

5          Q.   Eventually.

6               That happened in May of 2005 or

7    did it happen before that?

8          A.   He left the team before that,

9    before Anne joined, but I can't recall the

10   exact date.

11         Q.   Is Anne Anne Altmeyer?

12         A.   Yes.

13         Q.   Do you know why you were sent this

14   information about the ONJ dear doctor letter?

15         A.   I would be assuming, no.

16         Q.   Okay.

17              Who is Germo Gericke?

18         A.   I don't know, I have seen the name

19   recently though, I don't know as to this

20   letter.  I have seen the name recently though.

21         Q.   But you don't know who he is?

22         A.   No.

23         Q.   Or what he does?

24         A.   No.

25         Q.   Do you know whether he is in the

FILED UNDER SEAL

1              Lantwicki

2    U.S. or in Switzerland?

3        A.    No, I don't.

4        Q.    Did you have anything to do either

5    with the substance of the dear doctor letter

6    or mailing it out?

7        A.    No.

8        Q.    Did you have anything to do with

9    the identification of the persons to receive

10   the dear doctor letter?

11       A.    No.

12       Q.    As of September 20th, 2004, were

13   you to be copied on all e-mails dealing with

14   the subject of ONJ?

15       A.    No.

16       Q.    Did that ever change?

17       A.    No.

18       Q.    Do you know -- strike that.

19            Was there a policy or -- strike

20   that.

21            Was there any sort of guideline

22   formal or informal in place as to when you

23   were to be copied on e-mails dealing with the

24   subject of ONJ?

25       A.    No.

76

FILED UNDER SEAL

# Exhibit 8

FILED UNDER SEAL

1

2

3    .   IN THE UNITED STATES DISTRICT COURT FOR

4

5    .   THE MIDDLE DISTRICT OF TENNESSEE

6

7    .   AT NASHVILLE

8

9        IN RE:

10       AREDIA and ZOMETA PRODUCTS LIABILITY

11   .   LITIGATION

12

13                  No. 3:06-MD-1760,

14       (MDL No. 1760)

15       This Document Relates To All Cases

16       --------------------------------------------

17

18

19                  CONFIDENTIAL

20            VIDEO TAPED DEPOSITION OF REED McCLUNG

21               New York, New York

22             Thursday, December 6th, 2007

23

24              Reported by:

25              Jeremy Frank, MPM

26

27

28   .   HUDSON REPORTING & VIDEO, INC.

29       124 West 30th Street, 2nd Fl.

30   .   New York, New York 10001

31       Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1        McClung

2    marketing group becomes aware of any research

3    or clinical trials that are being conducted or

4    any results of those being conducted come

5    through our regulatory processes.  So

6    basically that's where the sales and marketing

7    group, you know, really are confined to only

8    speaking about what has been agreed to within

9    the product monograph.

10        You know, in fact, we on an

11    ongoing basis continue to give instruction to

12    the field that they must, you know, out of

13    compliance to federal regulatory and Novartis

14    policies stay within that product monograph

15    and within label.

16    Q.    What do you mean when you say stay

17    within label?

18    A.    Basically they can only

19    communicate and its their obligation to

20    communicate what is within the product label

21    or product information that's been identified

22    by regulatory medical affairs and the FDA.

23        If I can come back to an earlier

24    question, the other way when we launch a new

25    product that we cascade information to

108

FILED UNDER SEAL

1          McClung

2    physicians about new products, and again

3    Novartis isn't the only one to do it, but

4    clearly there is a dear doctor letter that

5    goes out to the health care professionals.

6    There is medical alerts that go out from the

7    FDA, there are journals that are published

8    that communicate the latest information.

9    There is web sites and all other facets of

10   communication where this information about a

11   new product or a new label is made available.

12          So again, its very widely

13   available that I, I just wanted to make sure

14   that you didn't think we only do it through

15   the sales and marketing organization.  But its

16   done all across the organization through

17   across all of our functions.

18       Q.   In the course of testing the

19   product does the company use animal testing?

20          MR. RUBIN:  Objection, beyond the

21       scope.  There will be other witnesses who

22       will be testifying about development of a

23       drug.

24       A.   I have to say I don't know that as

25   firsthand knowledge.

FILED UNDER SEAL

1          McClung

2          We are going off the record.

3          (Whereupon, an off-the-record

4      discussion was held.)

5          THE VIDEOGRAPHER:  This marks the

6      beginning of videotape number four.  The

7      time is 2:28 p.m.  Back on the record.

8      Q.    Mr. McClung, in Plaintiff's

9  Exhibit 2 would you turn to the page numbered

10  three.

11          MR. RUBIN:  Just for the record,

12      the copy that we have has the Bates

13      numbers cut off as well as the witness'.

14      If you have a Bates number, Mr. Beatie,

15      if you can read that so we have it for

16      the record.

17          MR. BEATIE:  ZAEM-001403349.

18          MR. RUBIN:  Thank you.

19      A.    The deck that you gave me has

20  multiple page threes.

21      Q.    Right.

22      A.    So I'm unclear which page that we

23  want to look at in.

24      Q.    Its the e-mail to Jeff Young, to

25  Young Jeff from JFK, John F. Kouten.

143

FILED UNDER SEAL

1              McClung

2       A.    Can I ask the date to make sure?

3       Q.    May 15th, 2005, 10:24 p.m.

4       A.    Okay.

5       Q.    Do you have the document?

6       A.    Yes, I do.

7       Q.    This refers to a dental dear

8    doctor letter in the first paragraph.

9       A.    Yes.

10      Q.    It also refers to an NEJM which I

11   assume is the New England Journal of Medicine

12   letter --

13      A.    I see that.

14      Q.    -- also in the first paragraph.

15      A.    Yes.

16      Q.    Are you familiar with those two

17   documents?

18      A.    Not off the top of my head, no,

19   sir.

20      Q.    Who is John F. Kouten?

21      A.    Based on the documents, sir, I

22   would say he's the principal of JFK

23   Communications, Inc.

24      Q.    What is that?

25      A.    I don't know, sir.

FILED UNDER SEAL

1              McClung

2     ONJ and bisphosphonates intravenous

3     bisphosphonates was published in 2002 and

4     2003, was it not?

5              MR. RUBIN:  Objection, beyond the

6         scope.

7         A.   I believe I reviewed documentation

8     that there was early reports after the 2002

9     launch of Zometa of the first bisphosphonate

10    ONJ with, I believe it was Aredia.

11        Q.   Can you explain to me why it

12    wasn't until 2005 that Novartis developed an

13    urgent need to educate its people about that?

14             MR. RUBIN:  Objection, assumes

15        facts not in evidence and misstates the

16        entire factual record in this case.

17        A.   I can't accurately answer that,

18    sir.

19        Q.   Who would have been in charge of

20    developing a program for educating your staff,

21    your personnel, your sales staff or your sales

22    and marketing staff to be able to discuss ONJ

23    and Zometa with the prescribing physicians?

24        A.   As soon as the FDA in coordination

25    with the regulatory and medical affair groups

FILED UNDER SEAL

1          McClung

2     identified any adverse event that would change

3     the label of Zometa, the information would be

4     reflected in a new product information label.

5          That information, as I have said

6     earlier would then come into the marketing

7     organization and the cross functional team at

8     the PRT which includes marketing, medical

9     affairs, legal, compliance, et cetera, would

10    review the new terminology, the new wording in

11    the label.

12         At that point that information

13    would be disseminated to the sales force

14    through the proper marketing sales force

15    communications, and then at that point, based

16    on the communications there would be and again

17    I said this earlier, there would be a

18    widespread multiple level communications via

19    the sales force, face-to-face the physicians

20    but also through the corporate office at

21    Novartis Pharmaceuticals Corporation U.S.

22    Oncology sending out dear doctor letters.

23         The FDA would also send out med

24    alerts letting physicians know that there is a

25    change to the label.  And any materials that

FILED UNDER SEAL

1          McClung

2     were in the field would be destroyed so

3     ultimately there would be multiple ways that a

4     physician would be informed of any label

5     changes.

6          So I guess what I'm saying in

7     summary is as soon as we got a label change

8     from the FDA and our med affairs people and

9     regulatory, we would be begin the process of

10    communicating that information.

11        Q.    You wouldn't take the information

12    to the public until you had a label change

13    directed by the FDA?

14        A.    We are not allowed under the

15    federal regulations to communicate information

16    that is not within our product information and

17    label.

18        Q.    So if people taking the drug are

19    contracting a fatal condition or dying from a

20    condition caused by the drug, you can't go

21    spontaneously to the medical profession and

22    say, "Don't use the drug or don't use the drug

23    under these conditions?"

24        MR. RUBIN:  Objection.

25        Q.    You are barred from doing that by

FILED UNDER SEAL

# Exhibit 9

FILED UNDER SEAL

1         IN THE UNITED STATES DISTRICT COURT FOR

2            FOR THE MIDDLE DISTRICT OF TENNESSEE

3               AT NASHVILLE

4

5     IN RE:                : NO. 3:06-MD-01760

6                           :

7     AREDIA AND ZOMETA PRODUCTS   : CONFIDENTIAL VIDEOTAPE

8     LIABILITY LITIGATION        : (30)(B)(6)DEPOSITION

9                        :    OF:

10    (MDL NO. 1760)           :    LYNNE MCGRATH, M.D.

11    This Document relates to:   :

12    ALL CASES                :

13    - - - - - - - - - - - - - - -

14

15            TRANSCRIPT of the stenographic notes of

16    the proceedings in the above-entitled matter, as

17    taken by and before LINDA M. HOFFMANN, a Certified

18    Court Reporter and Notary Public of the State of New

19    Jersey, held at the office of GIBBONS, P.C., One

20    Gateway Center, Newark, New Jersey, on Wednesday,

21    January 25, 2008, commencing at 9:03 in the forenoon.

22

23

24

25

1

FILED UNDER SEAL

1    yes, I am involved in providing that information.

2        Q.    You mentioned earlier there are six

3    persons, I believe you said, that work under you.  Is

4    there someone who works under you who has

5    responsibility with regard to Item 2-F?

6        A.    There are people that work for me that

7    have responsibility for that aspect of other drugs,

8    but not for Zometa.

9        Q.    You would have the responsibility with

10   regard to Zometa?

11       A.    Yes, um-hum.

12       Q.    Doctor, if you would please direct your

13   attention to the next page, Item 4-A.

14            Is that one of the topics that you've

15   been designated to testify on today?

16       A.    Yes.

17       Q.    And did you have involvement in the

18   sending of Dear Doctor and Dear Dentist letters with

19   regard to Aredia and Zometa?

20       A.    I was not directly involved in that.  I

21   wasn't working there at the time.

22       Q.    Okay.  Help me understand, then, the

23   time period over which you had responsibilities for

24   Aredia and Zometa.

25       A.    Um-hum.

FILED UNDER SEAL

1    Q.    What -- what time period would that be?

2    A.    I was responsible for Aredia and Zometa

3    starting in October, 2005.

4    Q.    Have there been any Dear Doctor letters

5    since that time?

6    A.    No, there has not been.

7    Q.    Going back to the 2003 time period until

8    the time that you had responsibility --

9    A.    Um-hum.

10   Q.    -- for Dear Doctor letters for Aredia

11   and Zometa, in that prior period, who was responsible

12   for it at Novartis?

13   A.    It would have been the person in -- in

14   Regulatory Affairs in collaboration with Medical and

15   Safety to make that determination.

16   Q.    Do you know who that person is?

17   A.    In Regulatory Affairs?

18   Q.    Yes, ma'am.

19   A.    There were -- I think it was Robin

20   Konecke.

21   Q.    Can you spell that for us?

22   A.    K-O-N-E-C-K-E.

23   Q.    And is Ms. Konecke, or Dr. Konecke,

24   still at the -- at the company?

25   A.    No, she's not.

FILED UNDER SEAL

1      Q.    In her absence, who was at Novartis at

2   the time, who is still there today, that, to your

3   knowledge, would have had some responsibility over

4   the Dear Doctor letters?

5      A.    From Regulatory Affairs?  I'm not sure

6   anyone that would have been directly involved is

7   still there.  From Medical, if you're asking Medical,

8   I think John Hohneker is still there.  I mean, I know

9   he's still there.  I think he had some

10  responsibility.

11     Q.    Dr. Hohneker had responsibility over the

12  letters because he signed some of them, or maybe all

13  of them.  Is that correct?

14     A.    Yes.

15     Q.    Anyone else who would have had

16  responsibilities during that time period over the

17  Dear Doctor letters?

18     A.    I believe Dionigi Maladorno was involved

19  in the discussion.  He's from Safety, Clinical

20  Safety.

21     Q.    Anyone else?

22     A.    That's still there.  I think that's it.

23  Those are the only people I'm aware of.

24     Q.    Now, we're going to drill down a little

25  deeper with regard to the Dear Doctor letters, and

FILED UNDER SEAL

1    I'm going to ask you some of the same questions.  If

2    you're not personally involved in that area during

3    the time frame the Dear Doctor letters were sent, I'd

4    ask you to let me know who was.

5         Have you been called today, Doctor,

6    designated to testify with regard to Item 4-B?

7         A.    Yes.

8         Q.    And that relates, that regards the

9    approving of the wording and the decision to send the

10   Dear Doctor letters?

11        A.    Um-hum.

12        Q.    In your role at Novartis, have you ever

13   been involved with a Dear Doctor letter that was sent

14   regarding Aredia and Zometa where you worked with the

15   persons, or knew about the persons that had the power

16   to approve the wording and the decision to send the

17   letter?

18        MR. RUBIN:  Objection.  Vague and

19   compound.  And also, Dr. McGrath, you need to give

20   verbal responses.

21        A.    Oh, okay.

22        MR. RUBIN:  For the court reporter.

23   Thank you.

24        Q.    I can try to ask the question a little

25   better, Doctor.  Let me go back and make sure I

28

FILED UNDER SEAL

1    understood your previous answer because I may not

2    have.

3            During the time that you've had

4    involvement with Dear Doctor and Dear Dentist letters

5    at Novartis, has one actually been sent with regard

6    to Aredia and Zometa?

7        A.    No.

8        Q.    For the Dear Doctor and Dear Dentist

9    letters that have been sent since 2003 with Aredia

10   and Zometa, who would know about the persons who had

11   the power to make the decision to send the letter?

12           MR. RUBIN:  Time frame?  There were --

13   there were several letters here, so I think we really

14   need to break the time frame down.

15       Q.    If you know, Doctor, you can answer my

16   question.

17           From 2003 to present.

18       A.    Um-hum.  The question is?

19       Q.    The question is who at Novartis would

20   know who had the power to approve the wording of the

21   letters and make the decision to send the letters?

22           MR. RUBIN:  Counsel, excuse me.

23   Dr. McGrath has been designated as the 30(b)(6)

24   witness to provide answers to those topics for which

25   she's been designated.  I want to make sure that's

FILED UNDER SEAL

1    clear for the record.  Some of your questions are

2    going to her personal knowledge, which is separate

3    and distinct, in some cases co-extensive with, the

4    corporation's knowledge.

5         You can answer the question now if you

6    remember it.  If you would like to have it read back,

7    we can do that.  In fact, it's probably a good idea.

8    A.    Yeah, what's the actual question?

9         (Whereupon, the court reporter reads as

10   requested.)

11   A.    I would be aware of who would have had

12   those decisions, made those decisions, yeah.

13   Q.    So you can speak to that issue today?

14   A.    Yes, yes.

15   Q.    Doctor, likewise, if you would please

16   look at Item 4-C.  Have you been designated by

17   Novartis to give testimony with regard to the topic

18   identified in 4-C?

19   A.    Yes.

20   Q.    And if I understand your prior

21   testimony, you have not personally been involved in

22   the drafting of Dear Doctor letters or any

23   discussions or preliminary meetings regarding them,

24   is that correct, for Aredia and Zometa?

25   A.    That is correct.

30

FILED UNDER SEAL

1    thereof, that have those discussions?

2        A.    The direct communication with FDA is my

3    responsibility.  And if there is a meeting, there

4    would be team members involved that would have

5    specific expertise that would be included in those

6    meetings.

7        Q.    When you say you have direct

8    responsibility for -- for that interaction with the

9    FDA, do you have that responsibility in your role as

10   a member of the Zometa Team?

11       A.    I would say yes.

12       Q.    And is there anyone else who has

13   responsibility for interaction or communication with

14   the FDA regarding the package in -- insert for Zometa

15   and Aredia, other than yourself?

16       A.    No.

17       Q.    Now, later today, Doctor, we're also

18   going to talk about the Dear Doctor letters that we

19   alluded to briefly this morning.  Is it also the case

20   that you have responsibility for communicating with

21   the FDA regarding the content of the Dear Doctor

22   letters?

23       A.    That would be my responsibility, yes.

24       Q.    And over what time period have you had

25   that responsibility?

FILED UNDER SEAL

1      A.    From October, 2005, till present.

2      Q.    During that period of time, have there

3    been discussions with the FDA regarding Dear Doctor

4    letters for Aredia and Zometa?

5      A.    No, there has not.

6      Q.    Has any such letter been issued?

7      A.    Since -- are you asking in that time

8    period?

9      Q.    During the time period that you were

10    responsible for them.

11      A.    No, there has not been.

12      Q.    Who had that responsibility prior to

13    October, 2005?

14      A.    In terms of the direct relationship with

15    FDA?

16      Q.    With regard to the Dear Doctor letters,

17    yes, Doctor.

18      A.    The regulatory responsibility to contact

19    FDA and be the direct spokesperson for Novartis to

20    FDA prior to my taking the job would have been Prem

21    Narang right after that -- right before me.  Before

22    that was Annmarie Petraglia.  Before that was Robin

23    Konecke.  And I think there were some interim people,

24    while there were some personnel changes, but I think

25    those were the key people.

FILED UNDER SEAL

1       Q.    And over what time period does that

2   cover, Doctor?

3       A.    I believe that covers back to 2003.  I

4   can -- I can -- if you have documents or something, I

5   could check, but I -- I believe it's true.

6       Q.    As best you recall, it's roughly 2003?

7       A.    Yeah, as best I can recall.

8             MR. RUBIN:  Excuse me, Counsel.  Can we

9   go off the record just 30 seconds?

10            THE VIDEOGRAPHER:  Going off the record.

11  The time is 11:56.

12            A F T E R N O O N   S E S S I O N

13            THE VIDEOGRAPHER:  We're back on the

14  record.  The time is 1:00.  This is tape four.

15            (P-3002, Letter dated July 19, 2006, 3

16  pages, is marked for identification.)

17      Q.    Doctor, I'm going to provide you an

18  exhibit that's been marked P-3002.

19      A.    Uh-hum.

20            MR. RUBIN:  Thank you.

21      Q.    Doctor, please take a moment to review

22  P-3002 and tell me if this is something you've seen

23  previously.

24      A.    Yes, I've seen this.

25      Q.    And what is this, Doctor?

FILED UNDER SEAL

1      A.    This is a letter to physicians providing

2   new information that -- on a practice guideline on

3   ONJ.

4      Q.    Would this be correctly characterized as

5   a Dear Doctor letter for Aredia and Zometa?

6      A.    I don't believe it is characterized as a

7   Dear Doctor letter.  I think it was sent to all

8   physicians, but I don't think this is the kind of

9   letter that was discussed with FDA or identified a

10  specific safety issue in the context of the way the

11  health authorities characterize a Dear Doctor letter.

12     Q.    Let's go back and define terms, then.

13           When I use the term "Dear Doctor

14  letter," what does that mean to you?

15     A.    A Dear Doctor letter meaning -- means to

16  me, as a Regulatory person, that it is a letter that

17  is required to distribute to physicians providing new

18  safety information.

19     Q.    So when you describe the term "Dear

20  Doctor letter," you're describing it in terms of

21  something that a regulatory agency has required the

22  drug-maker to send?

23     A.    Has -- that the health authorities have

24  been in discussion with us about sending.

25     Q.    Am I correct in understanding it has the

110

FILED UNDER SEAL

1     imprimatur of the health authorities?

2          A.    It is, Yes.  Um-hum.

3          Q.    How would you describe Exhibit P-2003 if

4     not a Dear Doctor?

5          A.    P-3002 you mean?

6          Q.    Thank you.  I'm sorry.  I misstated

7     that.  I'll say it again, Doctor.  Thank you very

8     much.

9               How would -- how would you describe

10    P-3002, if not a Dear Doctor letter?

11         A.    I would describe it as an informational

12    letter, volunteer informational letter provided to

13    physicians to provide updates in information.

14         Q.    How many such voluntary information

15    letters have been sent on behalf of Aredia and Zometa

16    since 2003?

17              MR. RUBIN:  Excuse me, since 2000 and --

18              COURT REPORTER:  '3.

19              MR. RUBIN:  '3, thank you.

20         A.    I don't know exactly.

21         Q.    Have you participated in the preparation

22    and sending of others?

23         A.    I would be involved in the review and --

24    and aware of them.  But I wouldn't necessarily be

25    involved in the preparation.

FILED UNDER SEAL

1    it.  Safety.

2        Q.    Have any such informational letters

3    similar to this exhibit gone out since July 19, 2006?

4        A.    I believe so.  But I'm not sure they

5    were sent out as Dear Doctor letters.  I can't verify

6    that.  But I am sure that we have sent information to

7    physicians.

8        Q.    Regarding Aredia and Zometa?

9        A.    Yes.

10       Q.    Describe for me what information has

11   been sent.

12           MR. RUBIN:  Objection, vague.

13       A.    The information, multiple pieces of

14   information are sent to physicians.

15       Q.    Well, let's go back then.  I asked you

16   if there had been communications similar in form to

17   this exhibit, P-3002, the voluntary information

18   letter.  And I believe you said yes.  Would you

19   please tell me what other similar communications have

20   been sent?

21       A.    There was a subsequent publication

22   regarding practice guidelines that I believe was

23   submitted, it was sent to physicians, but I'm not

24   sure that it was sent in this exact way.  But I

25   believe that communication -- that publication was

114

FILED UNDER SEAL

1    you inform them that you have sent this information

2    to the -- to the doctors?

3        A.    No.  It's required that they have it in

4    hand at time of first use.  So prior to using any

5    material, we submit it to DDMAC.

6        Q.    Was DDMAC involved in the discussions,

7    in any discussions regarding the content of what

8    would be included in P-3002?

9        A.    This particular letter would not -- I

10   can't say.  No, actually I don't -- I don't think

11   this letter would be sent to DDMAC, but it might have

12   been sent.  It doesn't really fulfill the

13   requirements for DDMAC letters.  It's

14   non-promotional.  Generally we submit everything to

15   DDMAC, so I wouldn't be surprised if it was

16   submitted, but I can't verify it, because it doesn't

17   fulfill the exact requirements for DDMAC submission.

18       Q.    Now, earlier, you described for me that

19   a Dear Doctor letter, using that as a term of art,

20   includes an imprimatur from the Regulatory body.  How

21   many Dear Doctor letters have been sent regarding

22   Aredia and Zometa and osteonecrosis of the jaw?

23       A.    Now, could you clarify what you mean by

24   imprimatur?

25       Q.    Describe for me the role of the

118

FILED UNDER SEAL

1    Regulatory body in the issuance of a Dear Doctor

2    letter as you've defined it.

3        A.    Generally that is reviewed by the health

4    authorities, the content of the Dear Doctor letter.

5    They put the Dear Doctor letter on their website so

6    it's in close cooperation with the FDA that we would

7    write a Dear Doctor letter.

8        Q.    And I summarized it using the word

9    "imprimatur."  It has the stamp, the approval the

10   connection with the Regulatory body.  Is that a fair

11   assessment of how it works?

12       A.    Yes.

13       Q.    How many such Dear Doctor letters have

14   been sent for Aredia and Zometa with regard to

15   osteonecrosis of the jaw?

16       A.    There were -- there was one Dear Doctor

17   letter, that is consistent with the definition we are

18   saying, that was reviewed by FDA and disseminated to

19   doctors, and one disseminated to dentists, for both

20   Aredia and Zometa.

21       Q.    One letter covered both products?

22       A.    No, there was an individual letter for

23   each.

24       Q.    Sorry, let me back up.

25            What was the date of the first Dear

119

FILED UNDER SEAL

1    Doctor letter?

2        A.    The date of -- I believe that was 2004?

3        Q.    September, 2004?  Would that --

4        A.    Yeah.

5        Q.    And that one letter spoke to both Aredia

6    and Zometa.  Correct?

7        A.    I believe so, yeah.

8        Q.    So one letter covered both products,

9    both Aredia and Zometa.  Correct?

10       A.    Yes, I believe so.  When I was saying

11    that there were two letters, we probably, as a

12    regulatory requirement, submitted a letter to each

13    NDA, so my role I would have communicated in, there

14    would have been two letters submitted to the health

15    authorities, but the same letter.

16       Q.    It's filed in two places in the NDA.

17       A.    Exactly.  Two different NDAs.

18       Q.    But one letter covered both products.

19       A.    Yes, yes.

20       Q.    And I should be reminding you about

21    that --

22       A.    I'm sorry.

23       Q.    -- so I'll try to do that, as well.  I

24    should do that, as well.

25            What was your role in the generation, if

FILED UNDER SEAL

1    any, of the September, 2004, Dear Doctor letter?

2        A.    I was not involved in that at the time,

3    but as the Regulatory person that took over in 2005,

4    I'm familiar with that information, and I went back

5    and reviewed the Regulatory record at the time I took

6    over the position as the Regulatory person for

7    Zometa.

8        Q.    To inform your understanding of the Dear

9    Doctor letter that was sent in September, 2004, what

10   did you do?

11       A.    I primarily -- excuse me.  I primarily

12   reviewed the Regulatory records and the

13   communications with FDA regarding that letter.

14       Q.    Would Prem Narang be the one who would

15   have had the responsibility at Novartis over the

16   September, 2004, Dear Doctor letter?

17       A.    Dr. Narang would have had the oversight,

18   but I believe the direct responsibility at that time

19   was Annmarie Petraglia.

20       Q.    Who else was involved with that at that

21   time?

22       A.    Again, it was the Safety person would

23   have been involved.  Clinical would have been

24   involved.  That was -- those would be the primary --

25   primary people that would have been involved.

FILED UNDER SEAL

1    Q.    And the names of those persons in that

2    time period?

3    A.    Names of those people.  I believe it

4    would have been Annmarie Petraglia.  Who else was

5    involved?  I would have to refresh my memory with the

6    actual documents, but I'm -- I'm sure Prem Narang was

7    involved from Regulatory.  And Dionigi Maladorno was

8    involved.

9    Q.    And what documents would you need to

10    look at to refresh your recollection?

11    A.    Probably that -- the key people that

12    would have been involved would have been the people

13    that were at the FDA meetings at that time, so there

14    are meeting minutes, documents that would have listed

15    the attendees, and those would be the

16    decision-makers.

17    Q.    How many meetings were there with the

18    FDA regarding Aredia and Zometa and osteonecrosis of

19    the jaw in 2004?

20    MR. RUBIN:  Objection.  Assumes facts

21    not in evidence.  It goes beyond the scope of the --

22    beyond the scope.

23    A.    I believe there was one meeting.

24    Q.    When was that one meeting?

25    A.    You're making me remember.  I think --

FILED UNDER SEAL

1    I'm going to say June, but I can't say for sure.  It

2    was middle of the year.  And the record is -- is

3    fairly well documented that I could find out.

4        Q.    Let me ask you the question a different

5    way, Doctor.

6            Am I correct in my understanding that

7    since you did not have any relationship with the Dear

8    Doctor letters and Aredia and Zometa at that time,

9    there could be other meetings that you would not be

10   aware of?  Would that be a fair statement, other

11   meetings with the FDA?

12       A.    No.

13           MR. RUBIN:  Objection, assumes facts not

14   in evidence about -- it assumes facts not in evidence

15   and beyond the scope.  Leave it at that.

16       Q.    You can answer, Doctor.

17       A.    Again, I reviewed all the records, and

18   we keep fairly rigorous records in terms of

19   documenting FDA meetings.  So the information that I

20   reviewed, as I recall it, there was one meeting.  And

21   I don't recall seeing any other documentation on

22   another meeting.  That was a face-to-face meeting.

23   Now, you could -- if you define a meeting as a call

24   from FDA, there were multiple calls.  But as an

25   actual fact of an FDA meeting, which would be an

FILED UNDER SEAL

1    entitled meeting, there would be one meeting that I

2    know of.

3        Q.    And what documents did you look at to

4    ascertain that there had been one meeting?

5        A.    There was a document that was meeting

6    minutes of that meeting.

7        Q.    Where did you find that document?

8        A.    We have a Regulatory record that we

9    maintain that has all that information.

10       Q.    Is that Regulatory record part of the

11   NDA for Aredia and Zometa?

12       A.    No.  I would say no.

13       Q.    Then physically where is that file kept?

14       A.    There is communication files that we

15   keep, and it would be in the communication files for

16   Zometa.

17       Q.    And is that where you looked, in the

18   communication file for Zometa?

19       A.    Yes.

20       Q.    Where is that file?

21       A.    There is -- it resides -- the paper copy

22   resides in the Regulatory archives.  And there are

23   some copies that are electronic that I can go through

24   and look.

25       Q.    Did you access the paper copies or

FILED UNDER SEAL

1    that's been marked as P-3003.

2        A.    Okay.

3        Q.    Doctor, my question on this document is

4    very --

5            MR. RUBIN:  Excuse me, Counsel.  Can we

6    just let -- for another 30 seconds, please, to look

7    at this?

8            MR. VALAD:  Certainly.  I thought if I

9    stated the question, it may assist her.

10           MR. RUBIN:  Okay.

11       Q.    My question is as regards the salutation

12   line, "Dear Doctor Team."  Is there some team that

13   works on Dear Doctor letters, or is that just saying

14   hello to the doctors on this e-mail?  If you know.

15       A.    There is, to my understanding, no doctor

16   team that I've heard referred to.  So I'm assuming --

17   and you could ask Peter Tarassoff, who authored the

18   letter, he would probably be the best person to

19   answer this, but I am not aware of any Dear Doctor

20   team.

21       Q.    So just so that I'm following your

22   answer, there's no standing committee or group

23   separate from what you've already described for us

24   that works on the Aredia/Zometa Dear Doctor letters.

25   Correct?

FILED UNDER SEAL

1     A.    That's true, yes.

2     Q.    For the Dear Doctor letter regarding

3  osteonecrosis of the jaw that went out in September,

4  2004 --

5     A.    Um-hum.

6     Q.    Who suggested that the letter be sent?

7     A.    My understanding is that came from FDA,

8  the suggestion.

9     Q.    And is there a specific person or group

10  at FDA who communicated that request to Novartis?

11     A.    The communication would have come from

12  the project manager, Dottie Pease at FDA, to the

13  Novartis responsible person at the time, that would

14  have been Annmarie Petraglia, and she would have

15  communicated the need to provide a draft Dear Doctor

16  letter for review.

17     Q.    And is that one of the documents that

18  you saw in review of the documents in the file?

19     A.    Yes.

20     Q.    What was the date of that document?

21     A.    I can't recall the exact date of the

22  document.  It was prior to the FDA meeting.

23     Q.    Was it in the first half of 2004?

24     A.    Probably, yeah, because it was a comment

25  that was made prior to the FDA meeting in June.

FILED UNDER SEAL

1      Q.    And then what did Novartis do -- I

2   believe you said it was a -- a Ms. or Dr. -- and

3   please correct me if I have that wrong -- Pease,

4   P-E-A-S-E?

5      A.    Dottie Pease.

6      Q.    And is she a doctor, do you know?

7      A.    I'm not aware that she is.

8      Q.    What was Novartis' response to

9   Ms. Pease's communication?

10      A.    Novartis would have -- well, the

11   documents show that -- that I have reviewed that they

12   immediately responded with a draft of the Dear Doctor

13   letter at the time that FDA requested they provide

14   it.

15      Q.    Do you have any information in coming to

16   that understanding besides the review of the

17   documents in the file?

18      A.    No.

19      Q.    In what form was the request from --

20   from the FDA, Miss Pease, communicated to Novartis?

21   Was it by e-mail or memo, or some other way?

22      A.    Based on -- my recollection of the

23   record is that there was a phone conversation which

24   Annmarie Petraglia related in an e-mail that said she

25   had a discussion with Dottie Pease and that she would

FILED UNDER SEAL

1    be providing the Dear Doctor letter to FDA.

2        Q.    And was the idea for the FDA to review a

3    draft of the letter from Novartis?

4        A.    Yes, that's fairly typical, yeah.

5        Q.    We had a little background noise on the

6    street.  Did you say that's typically the way these

7    things happen?

8        A.    Yes, yes, absolutely.

9            (P-3004, E-mail dated 7/7/2004, with

10   attachment, ZA-0704667-ZA0704668, is marked for

11   identification.)

12       Q.    Doctor, you've been provided with

13   P-3004.  Please take a moment to review it.

14       A.    Yes.

15       Q.    Is this something you've seen before,

16   Doctor?

17       A.    Yes, I have.

18       Q.    And when did you first see it?

19       A.    I saw it when I started the job in

20   Novartis Oncology in 2005.  And more recently, I've

21   reviewed the communications.

22       Q.    As part of your preparation for giving

23   testimony on the designated topics today?

24       A.    Yes.

25       Q.    When did you first have occasion to see

FILED UNDER SEAL

1      A.    Right.

2      Q.    Now, Doctor, you've described that the

3   Dear Doctor letter in 2004 went to a certain set of

4   medical practitioners.  Is that correct?

5      A.    There's -- is that the one -- there is

6   no specific exhibit for that one.  Okay.  Let me look

7   at the date.

8           MR. RUBIN:  Can we get the question read

9   back?

10          (Whereupon, the court reporter reads as

11  requested.)

12     A.    Yes, that's correct.

13     Q.    And to what group of providers was the

14  September, 2004, letter directed?

15     A.    It was directed to hematologists,

16  oncologists, and max -- maxillary facial surgeons,

17  oral maxillary surgeons, yeah.

18     Q.    And from what source did Novartis get

19  the lists of names and addresses to send the letters

20  to?

21     A.    I can't speak to that.  That would have

22  been Medical Affairs that would have done that.  I

23  can only speculate.  But no, they -- I don't -- I

24  haven't seen that in any records that I've reviewed,

25  of who exactly made that decision and how they got

FILED UNDER SEAL

1    the names.

2        Q.    Let me ask you generally, if you know,

3    does Novartis generally have a source for names and

4    addresses of people who receive -- who are to receive

5    Dear Doctor letters on other topics?

6        A.    I'm -- I'm sure there is a database in

7    Medical, but I'm not aware of who maintains it or how

8    that's managed.

9            MR. RUBIN:  For the record, testimony on

10   the distribution of the 1994 Dear Doctor letter was

11   given by Dr. Peter Tarassoff.

12           MR. VALAD:  2004, Counsel?

13           MR. RUBIN:  2004, sorry.

14           MR. VALAD:  The case would be somewhat

15   different if there were one in 1994.

16           (P-3005, Dear Doctor letter dated

17   September 24, 2004, 3 pages, ZA-0801832-ZA-0801835,

18   is marked for identification.)

19       Q.    Doctor, you've been provided Exhibit

20   P-3005.  Is this the September, 2004, Dear Doctor

21   letter we've been discussion --

22           MR. RUBIN:  Counsel, do you have another

23   copy by any chance?

24           MR. VALAD:  Did I send you one?  I'm

25   sorry.

FILED UNDER SEAL

1          MR. RUBIN:  Thank you very much.

2      Q.    Doctor, is this the September, 2004,

3    Dear Doctor letter that Novartis distributed?

4      A.    Yes.

5      Q.    And as one of the things that was

6    distributed with the letter, the copy of the package

7    in -- insert for Zometa was included.  Is that

8    correct?

9      A.    Yes.

10     Q.    Was the package insert for Aredia also

11   included?

12     A.    The letter states that the package

13   insert for both Aredia and Zometa were included, so

14   I'm assuming that it was.

15     Q.    To your knowledge, that's correct?

16     A.    Yes, yes.

17     Q.    And to your knowledge from the record,

18   is this the form that the Dear Doctor letter took in

19   September of 2004, as far as the first two pages?

20     A.    Yes.

21     Q.    And am I correct in my understanding

22   that the way the Dear Doctor letters are transmitted

23   is by U.S. mail?

24     A.    I can't verify that, no.

25     Q.    Do you know, was there any lag time

151

FILED UNDER SEAL

1    between the date of the letter and it actually being

2    transmitted?

3         A.    I can't specifically speak to that, if

4    there was a lag time.

5         Q.    You're unaware either way?

6         A.    No, I'm not aware either way.

7              (P-3006, Dear Doctor letter dated

8    September 24, 2004, 3 pages, is marked for

9    identification.)

10        Q.    Doctor, you've been provided with a Dear

11   Doctor letter that's three pages long, also dated

12   September 24th, 2004.

13        A.    Um-hum.

14        Q.    This was provided to me by my client, I

15   will represent to you.  It has been used in a

16   deposition in this case previously.  Have you ever

17   seen a Dear Doctor letter at Novartis in the form

18   that this one is in, three pages?

19            MR. RUBIN:  Before you answer,

20   objection.  This is not a document that was produced

21   by Novartis Pharmaceuticals Corporation in this

22   litigation.  We've had extensive correspondence on

23   this.  This was provided to you by your client, as

24   you've just said on the record.  And I object to the

25   use of this document at this deposition.

FILED UNDER SEAL

1       Q.    I'm just asking the question, Doctor, if

2    you've seen this three-page document before.

3       A.    I can't -- I can't say that I have, no.

4       Q.    Can you say that you have not seen it?

5       A.    I have not seen it.

6             MR. RUBIN:  Objection.

7       Q.    Just make sure I understand.  So you

8    have no knowledge of whether such a three-page letter

9    was ever sent by Novartis?

10            MR. RUBIN:  Objection.  Absolutely

11   misleading the witness with that --

12      Q.    I'm --

13            MR. RUBIN:  Let me finish my objection.

14            We've had extensive correspondence about

15   this letter.  It is not a document that was produced

16   in this litigation by Novartis Pharmaceuticals

17   Corporation.  The various fax legends on the top and

18   the bottom of this letter are not to or from

19   Novartis.  You've already said it came from your

20   client, whoever that is.  This is not a Novartis

21   document.  The witness has already testified she has

22   not seen this.  I object to any further questions

23   about this document.  It is misleading to the

24   witness.

25            MR. VALAD:  If the answer was what I

FILED UNDER SEAL

1    thought it was going to be, counsel, it was going to

2    be my last question.  My question is simply, does the

3    witness have any information about whether such a

4    letter was sent.

5            MR. RUBIN:  You have my objections.

6    Q.    You can answer, Doctor.

7    A.    I have no awareness that this letter was

8    sent.

9    Q.    Doctor, you've testified that there was

10   also a letter in the form of a Dear Doctor letter

11   that was sent in May, 2005?

12   A.    Yes.

13   Q.    To what portions of the medical

14   community was that letter sent?

15   A.    I believe that was sent to doctors and

16   dentists, and I believe that 2005 letter was also

17   submitted to -- sent out to patient advocacy groups.

18   Q.    So am I correct in my understanding the

19   September, 2004, letter was not sent to dentists, but

20   the May, 2005, letter was?

21   A.    That's my understanding, yes.

22   Q.    And who first suggested that Novartis

23   send a letter to dentists in May, 2005?

24   A.    I really don't know who first suggested

25   that.

154

FILED UNDER SEAL

1      Q.    In your review of the file, or

2    preparation for your testimony today, did you look at

3    any information regarding the sending of this May,

4    2005, letter?

5      A.    I did, but I don't recall any specific

6    e-mails or discussion regarding that letter.  I have

7    reg -- I have documentation that it was sent, but

8    I -- I don't recall any e-mails or documentation

9    discussing sending that letter.

10     Q.    And would you be the person today who

11   could spec -- who could testify as to the specific

12   recipients of the letter?

13     A.    I'm aware of the recipients of the

14   letter.

15     Q.    How the list was selected, those types

16   of things?

17     A.    I -- I believe there was a discussion

18   with the American Dental Association, and they

19   obtained a list of physicians -- of dentists.  That's

20   my recollection of information I've read.

21     Q.    So it's your understanding a list of

22   dentists was obtained from the American Dental

23   Association?

24     A.    I -- I can't say that it was obtained,

25   but I do recall discussions about contacting the

FILED UNDER SEAL

1    American Dental Association.  I'm not sure whether

2    they provided a list, or -- or how that happened, but

3    I do remember seeing e-mails regarding a discussion

4    with the American Dental Association.

5        Q.    Who wrote those e-mails?

6        A.    They were -- I can't recall exactly who

7    wrote those e-mails.

8        Q.    Were there discussions with the FDA

9    regarding this letter?

10       A.    I know the letter was submitted to FDA,

11   but I don't recall discussions with FDA regarding

12   that letter.

13       Q.    Do you recall whether or not, when you

14   reviewed the file, there were such communications in

15   the file?

16       A.    I don't recall any communications with

17   FDA.

18       Q.    Doctor, you've been provided an exhibit

19   that's been marked P-3007.

20            (P-3007, Dear Doctor letter dated May 5,

21   2005, ZA-0771411-ZA-0771413, is marked for

22   identification.)

23       Q.    Is that the Dear Doctor letter that went

24   out in May, 2005?

25       A.    It appears to be, yes.

FILED UNDER SEAL

1    Q.    And what enclosures or attachments were

2    included with that communication?

3    A.    The U.S. package inserts for Aredia and

4    Zometa.  And I -- it appears that there are

5    additional enclosures, expert panel recommendations,

6    patient brochure.  Listed on the second page are

7    enclosures.

8    Q.    Who at Novartis was involved in drafting

9    this Dear Doctor letter?

10    A.    Well, certainly the authors, John

11    Hohneker and Al Bess, and it would have been reviewed

12    by, again, Regulatory, and it would have been

13    reviewed by Dionigi Maladorno.

14    Q.    When you say Regulatory, do you mean

15    Miss Petraglia?

16    A.    And probably Prem Narang.  Although I

17    can't verify that Annmarie Petraglia was there in

18    May.  I'm not sure.  If she wasn't there, then

19    Dr. Narang would have assumed that responsibility.

20    Q.    Was anyone else involved in the

21    preparation of this letter from Novartis?

22    A.    Not specifically that I recall.

23    Q.    How was the language for what was said

24    in this letter developed by Novartis?

25    A.    The -- the language would -- would --

FILED UNDER SEAL

1    my -- my understanding of this is that the language

2    would have been based on the package insert, the

3    information in the package insert, and the

4    information that's listed here, the expert panel

5    discussions, and discussions with information that

6    was from CS&E on safety.

7        Q.    So Novartis would have drawn on, if I'm

8    understanding your last answer correctly, adverse

9    event data, safety data in developing this?

10       A.    And the labelling information.

11       Q.    Had the label for -- with regard to

12   osteonecrosis of the jaw changed from the drafting of

13   the September, 2004, letter and the May, 2005, Dear

14   Doctor letter?

15       A.    I don't believe -- I don't recall a

16   label change between September, 2000 -- 24th, 2004,

17   and May 2005.  I don't recall a specific label

18   change.

19       Q.    Do you recall specifically what prompted

20   the May, 2005, letter?

21       A.    No, I don't recall what specifically

22   prompted the letter.

23       Q.    Was there any concern at Novartis that

24   dentists were not completely informed as to the

25   osteonecrosis of the jaw side effect?

FILED UNDER SEAL

1    A.    I don't believe that they felt dentists

2  were not adequately informed.  It was probably just a

3  proactive measure to provide information as

4  extensively as possible.

5        MR. RUBIN:  Counsel, can we take a short

6  break?  Thank you.

7        THE VIDEOGRAPHER:  Going off the record.

8  The time is 2:46.

9        (A recess is taken.)

10        THE VIDEOGRAPHER:  We're back on the

11  record.  The time is 2:54.

12    Q.    Doctor, before the break, you had

13  mentioned that the May, 2005, Dear Doctor letter went

14  to doctors and dentists.  Specifically what doctors

15  did it go to?

16    A.    My understanding was the May, 2005,

17  letter went to dentists.

18    Q.    It went to dentists.  Did it go to any

19  doctors?

20    A.    I believe it went to dentists.

21    Q.    Dentist, only?

22        And did you mention that it went to

23  patient advocacy groups, the May, 2005, letter?

24    A.    No, I believe that was a later letter.

25  The May, 2005, letter went to dentists.  That was a

FILED UNDER SEAL

1    Dear Dentist letter.

2        Q.    Okay.  So the dentists are the only

3    universe that got the May, 2005 letter?

4        A.    Yes.

5        Q.    Does that include maxillofacial

6    surgeons?

7        A.    The original letter that went out in

8    September, 2004, went to maxillofaciary surgeons,

9    yeah.

10       Q.    Focusing on the May, 2005, letter, did

11   it also go to maxillofacial surgeons?

12       A.    I don't believe that it did.  They had

13   already been informed in the September letter.

14       Q.    And then with regard to advocacy groups,

15   did the September, 2004, Dear Doctor letter go to

16   advocacy groups?

17       A.    I don't think so.  I think that was a

18   later letter that went to advocacy groups.

19       Q.    A voluntary letter, not an official Dear

20   Doctor-type letter.  Is that correct?

21       A.    Yeah.

22           MR. RUBIN:  Objection, vague.

23       Q.    Doctor, with regard to the September,

24   2004, letter, why did Novartis feel it was necessary?

25           MR. RUBIN:  Can you read that back,

160

FILED UNDER SEAL

1    please?

2            (Whereupon, the court reporter reads as

3    requested.)

4        A.    There was discussion with FDA, and it

5    was determined that that would be the path forward on

6    communicating the addition of the Precautions section

7    to the public, the physicians.

8        Q.    Was sending the -- the Dear Doctor

9    letter a suggestion of the FDA?

10           MR. RUBIN:  Objection, asked and

11   answered.

12       A.    I believe it was, yes.

13       Q.    And then in May, 2005, what was the

14   purpose of sending that Dear Doctor letter?

15       A.    Well, in March, 2005, we had an ODAC

16   meeting, and I believe that the question came up

17   about -- a question about sending a letter to

18   dentists came up; and in discussions of follow-up

19   activities to the ODAC, there was a discussion about

20   sending a letter, and FDA suggested that we do send a

21   letter.  Although not a requirement, it was one of

22   the follow-up measures discussed, and we went forward

23   and did that proactively.

24           (P-3008, List of Dear Doctor letter

25   files, is marked for identification.)

FILED UNDER SEAL

1    Q.    Doctor, you've been provided with an

2    exhibit that's marked P-3008.  I'll represent to you

3    this is a list of files transmitted with a letter

4    regarding the Dear Doctor and Dear Dentist letters;

5    and those files are files that contain lists of names

6    with regard to doctors who received the letter.  Were

7    you involved at all in the preparation of those files

8    containing the names?

9         MR. RUBIN:  I'm going to object.  This

10   document doesn't appear to be anything that was

11   produced by Novartis in this litigation.  The

12   document was not -- I object on that ground, and I

13   object on lack of foundation as to what the source of

14   the document is or whether the witness has ever seen

15   this before.

16   Q.    Did you understand my question, Doctor?

17   A.    If you could reread the question.

18   Q.    I -- I -- I can ask it again.

19   A.    Okay.

20   Q.    In this litigation, Novartis has

21   produced some files with names of recipients of the

22   Dear Doctor and Dear Dentist letters.  Those files

23   are depicted here on this exhibit which I handed you.

24   A.    Um-hum.

25   Q.    Were you involved in any way of the

162

FILED UNDER SEAL

1    production of the information contained in those

2    files?

3        A.    No, I was not.

4        Q.    Do you know who was at Novartis?

5            MR. RUBIN:  Objection.  Among other

6    things, it's a privileged communication.

7        Q.    Without regard to communications with

8    lawyers, are you aware of anyone at Novartis, who's

9    not a lawyer, who was involved in the production of

10   that?

11           MR. RUBIN:  Objection.  Objection.  It's

12   a privileged communication.  Whether or not it's with

13   a lawyer, it's also work product and attorney/client

14   communication, and I'll instruct the witness not to

15   answer the question on those grounds.

16           MR. VALAD:  Very well, Counsel.

17           (P-3009, Document dated April XX, 2005,

18   ZA-0791874-ZA-0791875, is marked for identification.)

19       Q.    Doctor, you've been provided P-3009.  Is

20   this a document you've seen previously?

21           MR. RUBIN:  Before that, may I see the

22   witness' copy?  The copy I have is almost illegible.

23           Yeah, I'm going to object.  There are --

24   a copy that has been produced as -- as Plaintiff's

25   3009, has been marked as 3009, is illegible in many

FILED UNDER SEAL

1    Association.  So I believe it went to the entire list

2    of members of the ADA.

3       Q.    Are you aware of where a physician, or

4    anyone in the public, could locate a copy of the

5    package insert for Zometa and Aredia, other than the

6    Physicians' Desk Reference?

7       A.    Yes.  The -- the places that you could

8    get a package insert would be on the FDA website.

9    They're updated.  As soon as they're approved,

10    they're updated on the FDA website.  And in addition,

11    you could get it -- get them on the Novartis website.

12       Q.    That would be for both Zom --

13       A.    For both Aredia and Zometa.

14       Q.    Okay.  Are you familiar -- I'll take

15    those back.  Thank you.

16          Are you familiar with something called

17    the continuing correspondence file of the NDA?

18       A.    Yes, I am.

19       Q.    And what is the continuing

20    correspondence file of the NDA?

21       A.    The continuing correspondence file is

22    all the communications that Novartis sends to FDA and

23    all the correspondence that we re -- we receive from

24    FDA, and it's maintained in an archive with the NDA.

25       Q.    So if someone wanted to review the

FILED UNDER SEAL

1    official correspondence between Novartis

2    Pharmaceuticals Corporation and the FDA concerning

3    Aredia and Zometa, they could find that communication

4    in the continuing correspondence file of the

5    individual NDAs for those drugs?

6        A.    Yes, they could.

7        Q.    Okay.  Are Dear Doctor letters posted on

8    the FDA website?

9        A.    Yes, they are.

10        Q.    And is the FDA website publicly

11    available?

12        A.    Yes, it is.

13            MR. RUBIN:  I have no further questions.

14            MR. VALAD:  Give us just a second.  Go

15    off the record.

16            THE VIDEOGRAPHER:  Going off the record.

17    The time is 4:11.

18            (A discussion takes place off the

19    record.)

20            THE VIDEOGRAPHER:  We're back on the

21    record.  The time is 4:15.

22    REDIRECT EXAMINATION BY MR. VALAD:

23        Q.    I do have just a few questions, Doctor,

24    regarding the July, 2006, letter that counsel just

25    asked you about.

FILED UNDER SEAL

# Exhibit 10

FILED UNDER SEAL

1             U.S. DISTRICT COURT

             MIDDLE DISTRICT OF TENNESSEE

2             NASHVILLE DIVISION

             DOCKET NO.  3:06-MD-1760

3

     IN RE:              :

4                        :

     AREDIA and ZOMETA    :  CONFIDENTIAL

5     PRODUCTS LIABILITY   :  VIDEOTAPED

     LITIGATION (MDL NO   :  DEPOSITION OF:

6     1760)               :  NICHOLAS SAUTER

                         :

7

8

9

10             CONFIDENTIAL

11

12         T R A N S C R I P T of Deposition

13  Proceedings in the above-entitled matter, as taken

14  by and before MARY G. VAN DINA, Certified Court

15  Reporter and Notary Public of the State of New

16  Jersey, at GIBBONS, P.C., One Gateway Center, Newark

17  New Jersey, on March 4, 2008, commencing at 9:15

18  a.m.

19

20

21

22

23

     HUDSON REPORTING & VIDEO, INC.

24  124 West 30th Street, 2nd Fl.

     New York, New York 10001

25  Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1        MR. JOHNSTON:  Objection.  He's not

2    here to speak on behalf of Novartis.  Are you asking

3    him what he knows?

4        MR. GERMANY:  I'll rephrase the

5    question.

6    Q.    Tell me what initiatives you are

7    familiar with that have been undertaken by Novartis

8    on the issue of ONJ.

9    A.    Well, there are many -- many fold.

10        One is updates to the product label to

11    advise physicians about the occurrence of ONJ,

12    reports of ONJ in patients receiving Zometa or

13    Aredia.

14        There have been "Dear Doctor" and "Dear

15    Dentist" letters distributed.

16        There have been two documents that are

17    sometimes referred to as White Papers that

18    ultimately became publications.

19        One of them is in the Journal of

20    Oncology Practice, and the other one is the one with

21    Dr. Weitzman, the second paper.  We've done many

22    other initiatives.

23    Q.    Tell me the others you're familiar

24    with.

25    A.    Okay.  Novartis has been seeking to

76

FILED UNDER SEAL

# Exhibit 11

FILED UNDER SEAL

1          U.S. DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

3          NASHVILLE DIVISION

4          DOCKET NO. 3:06-MD-1760

5

6     IN RE:            :

7                       :

8     AREDIA and ZOMETA    :  VOLUME I

9     PRODUCTS LIABILITY   :  VIDEOTAPED

10    LITIGATION (MDL NO   :  DEPOSITION OF:

11    1760)            :  PETER TARASSOFF

12                     :

13

14

15          ***CONFIDENTIAL***

16

17          T R A N S C R I P T of Deposition

      Proceedings in the above-entitled matter, as taken

18    by and before MARY G. VAN DINA, Certified Court

      Reporter and Notary Public of the State of New

19    Jersey, at GIBBONS, P.C., One Gateway Center, Newark

      New Jersey, on April 10, 2008 commencing at 8:30

20    a.m.

21

22

23

      HUDSON REPORTING & VIDEO, INC.

24    124 West 30th Street, 2nd Fl.

      New York, New York 10001

25    Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1    A.    I don't know who OTN is.

2    Q.    Do you know who Jim Vann is?

3    A.    Jim Vann is the sales specialist.

4          (Exhibit 3237, Document, Bates Nos.

5    ZAEM-01114279, is received and marked for

6    identification.)

7    Q.    I show you an e-mail that's been marked

8    as Exhibit 3237.  Sorry.

9          At the bottom, there is an e-mail from

10   Linda Weiss to Margaret Linguri, Paul Pochtar with a

11   copy to you.

12         Do you see that?

13   A.    I do.

14   Q.    And in the e-mail, she writes:  "Late

15   yesterday, I received a phone call from Jim Vann in

16   Georgia informing me that OTN sent physicians their

17   own Zometa 'Dear Doctor' letter for ONJ with

18   guidelines that were stricter from those in the White

19   Paper."

20         Do you see that?

21   A.    I do.

22   Q.    Do you recall that?

23   A.    I don't, no.

24   Q.    Did you ever get a copy of the OTN

25   guidelines?

FILED UNDER SEAL

1      A.    I don't recall receiving a copy of those

2   guidelines.

3      Q.    Did you ever get a copy of the OTN "Dear

4   Doctor" letter?

5      A.    I don't recall the copy of that letter.

6      Q.    When the label was changed in the fall

7   of 2003 for Aredia and Zometa, was there a "Dear

8   Doctor" letter sent at that time?

9      A.    I -- I can't recall if they -- a "Dear

10  Doctor" letter was sent at that time.

11     Q.    When the label was changed again in the

12  fall of 2004, was there a "Dear Doctor" letter sent?

13     A.    I believe that a "Dear Doctor" letter

14  was sent at that time.

15     Q.    Do you know why one was sent at that

16  time?

17     A.    I don't know specifically why it was

18  sent at that time.

19     Q.    Who's Dr. Sol Epstein?

20     A.    He is a bone endocrinologist, I believe,

21  in the Philadelphia area.

22     Q.    Has he done any work for Novartis, to

23  your knowledge?

24     A.    I don't know.

25     Q.    Has he been an investigator for

FILED UNDER SEAL

# Exhibit 12

FILED UNDER SEAL

1          U.S. DISTRICT COURT

           MIDDLE DISTRICT OF TENNESSEE

2          NASHVILLE DIVISION

           DOCKET NO. 3:06-MD-1760

3

     IN RE:               :

4                         :

     AREDIA and ZOMETA      :   VOLUME II

5    PRODUCTS LIABILITY    :   VIDEOTAPED

     LITIGATION (MDL NO   :   DEPOSITION OF:

6    1760)               :  PETER TARASSOFF

                         :

7

8

9          ***CONFIDENTIAL***

10

11

12          T R A N S C R I P T of Deposition

13   Proceedings in the above-entitled matter, as taken

14   by and before MARY G. VAN DINA, Certified Court

15   Reporter and Notary Public of the State of New

16   Jersey, at GIBBONS, P.C., One Gateway Center, Newark

17   New Jersey, on April 18, 2008 commencing at 8:35 a.m.

18

19

20

21

22

23

24

25   HUDSON REPORTING & VIDEO          1-800-310-1769

FILED UNDER SEAL

1    the document and created by, and there's letters

2    there, P-O-R-R-I-G-E 1.

3         Do you see that?

4    A.    Yes, I do.

5    Q.    Who is that?

6    A.    This is Gerald Porrino, he is the

7    Knowledge Analyst -- he was the Knowledge Analyst at

8    that time for the group.

9    Q.    Okay.  And the document was approved by

10   you?

11   A.    That's correct.

12        (Exhibit 3260, Document, Bates Nos.

13   ZA-1039485 through 486, is received and marked for

14   identification.)

15   Q.    I'm going to show you what is labeled as

16   Version 4.1 of the Zometa 78 letter.  I've marked

17   that as Exhibit 3260.

18        According to this letter, it was created

19   on September 28, 2004.

20        Do you see that?

21   A.    Yes, I do.

22   Q.    At that point in time, the "Dear Doctor"

23   letter had gone out.  Correct?

24   A.    I don't recall for certainty what was

25   the exact date of the "Dear Doctor" letter.

FILED UNDER SEAL

1    Q.    September 24, 2004.  Is there any reason

2    the "Dear Doctor" letter was not included among the

3    references with this version of the Zometa 78 letter?

4    A.    I think the "Dear Doctor" letter would

5    have been sent out as an individual document on its

6    own to the prescribers of the drug.

7    Q.    Was the "Dear Doctor" letter ever

8    provided as a part of the Zometa 78 package?

9    A.    I can't recall with certainty if that

10    was the case.

11    Q.    Was the "Dear Dentist" letter ever

12    provided as part of the Zometa 78 package?

13    A.    I don't recall if that was provided as

14    part of that package.

15    MR. GERMANY:  We'll mark as Exhibit 3261

16    what's labeled as Version 4.2 of the Zometa 78

17    letter.

18    (Exhibit 3261, Document, Bates Nos.

19    ZA-1039487 through 488, is received and marked for

20    identification.)

21    Q.    And that was approved by you on

22    October 5, 2004.  Correct?

23    A.    That's correct.

24    (Exhibit 3262, Document, Bates Nos.

25    ZA-1039489 through 492, is received and marked for

FILED UNDER SEAL

1    received them.  We were receiving periodic updates

2    from him.  I don't recall the date.

3         Q.    Why was the decision made to include

4    that information in the letter for the first time in

5    July of 2005?

6         A.    Again, it was to provide this

7    information to healthcare providers who were asking

8    about this question.

9         Q.    Why was it not provided earlier?

10         MR. RUBIN:  Objection.  Asked and

11    answered.

12         A.    I don't recall why that would not have

13    been provided earlier.  It reflects our attempt to

14    get this information out as quickly as possible, as

15    soon as we became aware of it, to people, healthcare

16    providers asking about this topic.

17         Q.    I show you Version 8.1 of the letter.

18    I've marked it as 3264.

19         (Exhibit 3264, Document, Bates Nos.

20    ZA-1039501 through 506, is received and marked for

21    identification.)

22         Q.    And if you will, look at the last page

23    of that document, and that reflects that the "Dear

24    Dentist" letter was a part of the -- part of the

25    reference materials that went out with the letter as

FILED UNDER SEAL

1    of August 11, 2005.  Correct?

2        A.    That's correct.

3        Q.    And why was the "Dear Dentist" letter

4    added at that time?

5        A.    Well, to add to the information base

6    that we were providing to the unsolicited requests we

7    were receiving from healthcare providers.

8        Q.    Do you have any idea how many

9    unsolicited requests you received on the issue of

10   osteonecrosis?

11       A.    I don't know offhand, no.

12       Q.    Could that be determined?

13       A.    I believe so.

14       Q.    How would you go about determining that?

15       A.    By looking at our database.

16       Q.    The reference materials do not include

17   the "Dear Doctor" letter.  Correct?

18       A.    The reference materials?

19       Q.    Yes.

20       A.    In this particular document that

21   you're --

22            It does not.

23       Q.    Why not?

24       A.    Well, as part of this letter, healthcare

25   providers would have been provided a copy of the

FILED UNDER SEAL

1    package insert, where updates would have been made

2    known, the "Dear Dentist" letter, the "Dear Doctor"

3    letter points out the fact that there has been a

4    change to the prescribing information, so that

5    information would have been supplied to those

6    requesting information on osteonecrosis.

7        Q.    Is it your testimony that this letter

8    describes changes in the prescribing information?

9        A.    They would have gotten --

10          MR. RUBIN:  Objection.  That

11   mischaracterizes his testimony.  I think there's a

12   confusion here as to the word "letters," and "this

13   letter," counsel.

14          MR. GERMANY:  I'm waiting for him to

15   explain it.

16       A.    As a part of this letter, a package

17   insert would have gone out and the most recent

18   version of the prescribing information would have

19   been included with this letter.

20       Q.    Why is that not listed as a part of the

21   information in the letter?

22       A.    I'm sorry.

23       Q.    Why is that not listed as a part of the

24   information in the letter?

25       A.    Because the prescribing information is

FILED UNDER SEAL

1    supplied with the letter.

2        Q.    The letter does not state that the

3    prescribing information is being provided.  Correct?

4        A.    No, but the letter goes out with the

5    package insert.

6        Q.    If you will -- I show you what's been

7    marked as Exhibit 3265.  It's Version 11.  And the

8    approval date on that is 10/21/2005.

9            (Exhibit 3265, Document, Bates Nos.

10    ZA-1039519 through 525, is received and marked for

11    identification.)

12        Q.    If you will, turn to the third page of

13    the letter.

14        A.    Yes.

15        Q.    And there's a description of the M.D.

16    Anderson retrospective chart review?

17        A.    That's correct.

18        Q.    Under that, the first bullet point

19    says, "Time to development of ONJ, time-to-event data

20    was collected."

21            Do you see that?

22        A.    That's correct.

23        Q.    Was there a time-to-event analysis done?

24        A.    I believe that there was.

25        Q.    Why was the results of that not included

FILED UNDER SEAL

# Exhibit 13

FILED UNDER SEAL

1              U.S. DISTRICT COURT

               MIDDLE DISTRICT OF TENNESSEE

2              NASHVILLE DIVISION

               DOCKET NO.  3:06-MD-1760

3

    IN RE:              :

4                       :

    AREDIA and ZOMETA    :  CONFIDENTIAL

5   PRODUCTS LIABILITY   :  VIDEOTAPED

    LITIGATION (MDL NO   :  DEPOSITION OF:

6   1760)              :  ROSA LINDA WEISS

                        :

7

8

9

10             CONFIDENTIAL

11

12        T R A N S C R I P T of Deposition

13  Proceedings in the above-entitled matter, as taken

14  by and before MARY G. VAN DINA, Certified Court

15  Reporter and Notary Public of the State of New

16  Jersey, at GIBBONS, P.C., One Gateway Center, Newark

17  New Jersey, on March 11, 2008, commencing at 8:30

18  a.m.

19

20

21

22

23

    HUDSON REPORTING & VIDEO, INC.

24  124 West 30th Street, 2nd Fl.

    New York, New York 10001

25  Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1    Sloan-Kettering and at M.D. Anderson, are you

2    familiar with any chart reviews related to the issue

3    of osteonecrosis?

4        A.    I can't remember of any.

5        Q.    If you wanted to find out about this

6    UTS study or chart review, who would you ask?

7        A.    Someone from Scientific Operations.

8        Q.    Have you had any contact yourself with

9    UTSW?

10       A.    I don't recall.

11       Q.    The "Dear Doctor" letters related to

12   Zometa, do they come out of your office?

13       A.    No.

14       Q.    Where do they come from?

15       A.    I don't know.

16       Q.    Were you ever involved in the

17   preparation of those letters?

18       A.    No.

19       Q.    Were you ever involved in the review of

20   drafts of those letters?

21       A.    Yes.

22       Q.    In what way?

23       A.    I was one of several people that got a

24   copy and was asked to provide comment or correction.

25       Q.    Do you recall if you provided comment

FILED UNDER SEAL

1    or correction?

2        A.    No.

3        Q.    Who is Jeffrey Cook?

4        A.    A Novartis employee of the PR

5    Department.

6        Q.    Was he involved in the process of

7    reviewing and commenting on the "Dear Doctor"

8    letter?

9        A.    I don't remember.

10           (Exhibit 2749, Document, Bates Nos.

11    ADE-0002576 through 579, is received and marked for

12    identification.)

13        Q.    I show you an e-mail that's been marked

14    as 2749, and the top of that thread is an e-mail

15    from you to Ephraim Abam sending him some

16    information about more reports of cases.

17        A.    I'm not sure what this is about.  I

18    have to --

19        Q.    Okay.

20        A.    Okay.

21        Q.    That was a thread passing along some

22    information to Mr. Abam --

23        A.    Uh-huh.

24        Q.    -- about some additional case reports.

25    Correct?

FILED UNDER SEAL

1    Q.    Do you know who Jim Van is?

2    A.    He's a sales rep.

3    Q.    For Novartis?

4    A.    Yes.

5          (Exhibit 2757, Document, Bates No.

6    ZAEM-01120882, is received and marked for

7    identification.)

8    Q.    I show you an exhibit or an e-mail

9    that's been marked as Exhibit 2757.

10         That's an e-mail from you to Margaret

11   Linguri, Paul Pochtar, P-O-C-H-T-A-R, and

12   Dr. Tarassoff.  Is that correct?

13   A.    Yes.

14   Q.    Who is OTN?

15   A.    I don't recall what OTN stands for, but

16   it's a network of physicians.

17   Q.    Did you ever get a copy of the Zometa

18   "Dear Doctor" letter that OTN sent out?

19   A.    I don't recall.

20   Q.    What -- and Jim Van was a -- worked in

21   Georgia?

22   A.    Georgia, Alabama.  His territory covers

23   two states or parts of two states.

24   Q.    Do you know what follow-up action, if

25   any, was taken on this issue?

FILED UNDER SEAL

1    from an editing standpoint?

2        A.    Editing or to obtain the references

3    that were used for the slides as a backup document,

4    in case anybody wanted the references.

5        Q.    Did you participate in any meetings in

6    order to prepare you for telephone calls that your

7    department might get as a result of what happened at

8    the ODAC meeting?

9        A.    I don't recall.

10       Q.    There was a label change back in the

11   fall 2004.

12           Do you recall that?

13       A.    September 2004.

14       Q.    Right.  And a "Dear Doctor" letter went

15   out at that time.  Do you recall that?

16       A.    Yes.

17       Q.    Did you have any meetings to prepare

18   you to deal with phone calls that might be received

19   by your department as a result of the "Dear Doctor"

20   letter and/or the label change?

21       A.    I don't recall receiving training on

22   how to handle it.

23       Q.    Did you receive any sort of talking

24   points or suggested answers to questions?

25       A.    No.

FILED UNDER SEAL

1      Q.    Have you ever received information like

2   that?

3      A.    Not for my use.

4      Q.    Okay.  What -- in what capacity did you

5   receive that information?

6      A.    For training the field.

7      Q.    Were you responsible for training the

8   field?

9      A.    On Zometa package inserts, labeling,

10   yes.

11      Q.    Were you responsible for training the

12   field with regard to the September or October label

13   change?

14      A.    I was one of several people involved

15   with sales training on the changes in that --

16      Q.    Who else -- I'm sorry.

17      A.    -- document.

18      Q.    Who else was involved?

19      A.    Dr. Dunsire, several people on the

20   Zometa team.

21      Q.    What were the field representatives

22   told about whether to bring up the issue of the

23   label change with prescribers?  And this is in the

24   fall of 2003, when that label change occurred.

25          MR. RUBIN:  Objection.  Vague.

FILED UNDER SEAL

1    A.    I don't recall.

2    Q.    Were they told to bring up the fact

3    that there had been a label change with the

4    prescribers?

5    A.    I don't recall.

6    Q.    Were they told not to proactively bring

7    up the fact of a label change with the prescribers?

8    A.    I don't recall.

9    Q.    Would the instructions to the field

10   representatives have been in writing?

11         MR. RUBIN:  I'm sorry.  Could you read

12   back the question?

13         (The pertinent portion is read back by

14   the reporter.)

15   A.    We're going back to September 2003?

16   Q.    That time frame, yes.

17         MR. RUBIN:  September 2000 --

18   A.    4.

19   Q.    No, I'm talking about 2003, when that

20   label change occurred.

21   A.    The first one?

22   Q.    Yes.

23         MR. RUBIN:  Okay.

24   A.    I don't recall.

25   Q.    Did you --

FILED UNDER SEAL

1      A.    September 2004 is a little clearer in

2    my mind than September 2003.

3      Q.    Right.  There was a "Dear Doctor"

4    letter sent out in September of 2004.  Correct?

5      A.    Yes.

6      Q.    There was not a "Dear Doctor" letter

7    sent either in September or October 2003.  Correct?

8      A.    Correct.

9      Q.    Did you help prepare any written

10   materials that were distributed to field

11   representatives on the issue of the

12   September/October 2003 label change?

13     A.    I don't recall.

14     Q.    Are you aware of any such materials

15   prepared by whomever at Novartis?

16     A.    I'm sorry.  No.

17           (Exhibit 2764, Document, Bates Nos.

18   ZAEM-001395572 through 573, is received and marked for

19   identification.)

20     Q.    I show you an e-mail that I've marked

21   as Exhibit 2764.  That is an e-mail from you to

22   Jean-Claude Abougou --

23     A.    Yes.

24     Q.    -- answering some questions he had

25   posed to you.  Is that correct?

3/11/2008  Weiss, Rosa Linda (In Re: Aredia & Zometa Lit) CONFIDENTIAL

FILED UNDER SEAL

1     A.    Correct.

2           MR. GERMANY:  And the Bates range on

3     that e-mail is ZAEM-001395572 through 573.

4     Q.    I show you what's been marked as

5     Exhibit 2765.

6           (Exhibit 2765, Document, Bates Nos.

7     ZAEM-001679895 through 898, is received and marked for

8     identification.)

9     Q.    The top portion of that is an e-mail

10    from you responding to the e-mail from

11    Dr. Tarassoff.  Is that correct?

12    A.    Yes.

13    Q.    And you would have received this entire

14    thread.  Is that correct?

15    A.    I think so.

16    Q.    Well, it's numbered consecutively one,

17    two, three at the bottom and --

18    A.    Right, so I would have to go backwards

19    and forwards, but -- yes.

20    Q.    Do you recall there being a "Dear

21    Doctor" letter that went out to dentists in May of

22    2005?

23    A.    Yes.

24    Q.    Do you know whether or not anything had

25    ever been sent to dentists before that date by

FILED UNDER SEAL

1    Novartis?

2        A.    Do you include dentists?  Do you

3    include oral maxillofacial surgeons?

4        Q.    I'm speaking specifically of dentists,

5    not oral surgeons.

6            MR. RUBIN:  Objection.  Asking for

7    speculation.

8        A.    No.

9        Q.    I'm asking, do you know.

10       A.    I don't know.

11       Q.    Are you at all aware of the letter that

12   went out to dentists in November of 2005?

13       A.    Yes.

14       Q.    Okay.  Tell me how you came to know

15   about that.

16       A.    I was given a copy of the letter before

17   it was finalized for editorial comment.

18            One of the requirements, or one of the

19   topics for discussion, was to include a card for the

20   dentist that they could fill out, request additional

21   information.

22            The discussion of how that request for

23   additional information, and how to capture that we

24   responded in such a manner came to me as to whether

25   or not they could use the medical information

FILED UNDER SEAL

1    database in response to the BRC that came in

2    requesting for additional information.

3        Q.    Okay.  What was your conclusion?

4        A.    That it needed to be documented, in

5    terms of what we sent out and who we sent it out to.

6    So it would have to go into the medical information

7    database and catalog.

8        Q.    Was there any sort of tactical memo

9    prepared internally that was associated with the

10   mail-out of the "Dear Doctor" letter in May 2005?

11            MR. RUBIN:  Objection.  Vague.

12       A.    I'm not sure I understand the question.

13       Q.    You've never heard the phrase "tactical

14   memo"?

15       A.    A tactical memo to whom?

16       Q.    For in-house personnel at Novartis.

17       A.    I don't remember.

18       Q.    Did you ever receive the tactical memo?

19       A.    I don't remember.

20            (Exhibit 2766, Document, Bates No.

21   ZA-0937998, is received and marked for

22   identification.)

23       Q.    I show you an exhibit I've marked as

24   2766.  That's an e-mail from you to Allison Gallo?

25       A.    Yes.

FILED UNDER SEAL

# Exhibit 14

FILED UNDER SEAL

1          U.S. DISTRICT COURT

           MIDDLE DISTRICT OF TENNESSEE

2          NASHVILLE DIVISION

           DOCKET NO. 3:06-MD-1760

3

      IN RE:            :

4                       :

      AREDIA and ZOMETA    :  VOLUME I

5     PRODUCTS LIABILITY   :  VIDEOTAPED

      LITIGATION (MDL NO   :  DEPOSITION OF:

6     1760)            :  RICHARD B. WEITZMAN

                       :

7

8

9          ***CONFIDENTIAL***

10

11

12          T R A N S C R I P T of Deposition

13   proceedings in the above-entitled matter, as taken

14   by and before MARY G. VAN DINA, a Certified Court

15   Reporter and Notary Public of the State of New

16   Jersey, at GIBBONS, P.C., One Gateway Center, Newark

17   New Jersey, on May 30, 2008 commencing at 8:40 a.m.

18

19

20

21

22

23

     HUDSON REPORTING & VIDEO, INC.

24   124 West 30th Street, 2nd Fl.

     New York, New York 10001

25   Tel: 212-273-9911  Fax: 212-273-9915

**5/30/2008  Weitzman, Richard B. (In Re: Aredia Zometa) Confidential**

FILED UNDER SEAL

1      A.    I really don't know.

2      Q.    The last person on the carbon copy list

3   of this e-mail is a Jeff Riegel.  Do you see that?

4      A.    Yes.

5      Q.    Who is Jeff Riegel?

6      A.    Jeff Riegel was working on Zometa.  He

7   was an employee of ProEd, or was at that time, and

8   was working on Zometa for a time, but I believe that

9   they switched Jeff off of Zometa at some point during

10   my year there.

11      Q.    Did there come a period of time, Doctor,

12   when a decision was made, while you were on the ZIM

13   Team to mail -- pardon me -- to mail ONJ letters to

14   oncologists, dentists and patient advocacy groups?

15          MR. JOHNSTON:  Objection.  Vague.

16      A.    I know letters to those groups had been

17   mailed.  What I don't know is, if the time when they

18   were mail corresponded to the time when I was there.

19      Q.    Do you know if such a mailing was done

20   more than one time?

21      A.    I believe there was more than one

22   mailing.

23      Q.    Now, for clarity, some of these words

24   are very similar.  Let me go back in time --

25      A.    Okay.

FILED UNDER SEAL

1      Q.    -- to a period of time before your

2      tenure at Novartis --

3      A.    Okay.

4      Q.    -- and tell me if your understanding is

5      correct, and tell me if what I state is --

6      A.    Okay.

7      Q.    -- matches your understanding.

8           Do you have your understanding that

9      there was a "Dear Doctor" letter mailed in September

10     of 2004?

11     A.    So I know that a "Dear Doctor" letter

12     was mailed.  I can't confirm that it was that

13     September 2004, but it sounds reasonable.

14     Q.    Okay.

15     A.    But I don't know.

16     Q.    Do you have an awareness of a second

17     "Dear Doctor" letter to a different group of

18     practitioners being mailed in May of 2005?

19          MR. JOHNSTON:  Objection.  Vague.

20     A.    I'm not sure of the timing of the

21     mailing of these letters.

22     Q.    Okay.  My questions now pertain to time

23     periods after those two "Dear Doctor" letters.

24          So let me go back, so the record is

25     clear, and ask you what I asked you initially.  Did

FILED UNDER SEAL

1    you have an understanding that other than those two

2    letters, there was a period of time when ONJ letters

3    were going to be sent to oncologists, dentists and

4    patient advocacy groups?

5          MR. JOHNSTON:  Objection.  Vague.

6    A.    Again, I know that a set of letters was

7    sent.

8          I believe there was -- there was

9    actually more than one set, but I don't know the

10   dates of when these letters went out.

11   Q.    Doctor, do you recall, there came a

12   period of time when persons at Novartis saw the

13   poster depicting the results of Dr. Hoff's work at

14   M.D. Anderson regarding her ONJ study?

15   A.    I'm not sure I understand the question.

16   Q.    Do you recall there was discussion at

17   Novartis that some of the persons at Novartis had

18   seen Dr. Hoff's poster, and that the data on it were

19   not correct?

20         MR. JOHNSTON:  Objection.

21   A.    So -- yeah, we had seen Hoff's poster,

22   or a version thereof, before it was presented at the

23   scientific meeting -- I believe ASCO, I don't know

24   for sure -- and that some of the numbers internally

25   within the poster, to the best of my recollection,

FILED UNDER SEAL

# Exhibit 15

FILED UNDER SEAL

1        U.S. DISTRICT COURT

         MIDDLE DISTRICT OF TENNESSEE

2        NASHVILLE DIVISION

         DOCKET NO. 3:06-MD-1760

3

    IN RE:              :

4                       :

    AREDIA and ZOMETA     :  VOLUME I

5    PRODUCTS LIABILITY    :  VIDEOTAPED

    LITIGATION (MDL NO    :  DEPOSITION OF:

6    1760)              :  DIANE YOUNG

                         :

7

8

9        ***CONFIDENTIAL***

10

11

12        T R A N S C R I P T of Deposition

13  Proceedings in the above-entitled matter, as taken

14  by and before MARY G. VAN DINA, Certified Court

15  Reporter and Notary Public of the State of New

16  Jersey, at GIBBONS, P.C., One Gateway Center, Newark

17  New Jersey, on June 5, 2008 commencing at 8:40 a.m.

18

19

20

21

22

23

    HUDSON REPORTING & VIDEO, INC.

24  124 West 30th Street, 2nd Fl.

    New York, New York 10001

25  Tel: 212-273-9911  Fax: 212-273-9915

FILED UNDER SEAL

1          MR. JOHNSTON:  Doctor, will you try to

2    keep your voice up a little bit?

3          THE WITNESS:  Oh, sorry.

4          MR. JOHNSTON:  That's all right.

5          THE WITNESS:  Okay.

6      Q.    Did you have any -- I'll ask -- you made

7    a presentation to the FDA at the ODAC Meeting in

8    March of 2005.  Correct?

9      A.    That's correct.

10     Q.    Did you use a slide deck?

11     A.    Yes, I did.

12     Q.    Who prepared that?

13     A.    The slide deck was prepared by the

14   members of the team that were working on the issue.

15     Q.    And we're talking -- excuse me.

16          We're talking about the Novartis

17   Emergency Management Team?

18     A.    That's correct.

19     Q.    Following the meeting with the FDA in

20   July 2004, there was a second change to the label.

21   Correct?

22     A.    Yes.

23     Q.    What role, if any, did you play in -- in

24   that process?

25     A.    I attended a teleconference with the FDA

FILED UNDER SEAL

1    regarding the label change, and I reviewed the label.

2        Q.    Did you make any comments?

3        A.    I don't recall.

4        Q.    There was also sent, at that time,

5    what's known as a "Dear Doctor" letter.  Are you

6    familiar with that?

7        A.    Yes.

8        Q.    Do you know why the "Dear Doctor" letter

9    was sent?

10       A.    The "Dear Doctor" letter was sent to

11   inform members of the healthcare community,

12   hematologists, oncologists and oral surgeons,

13   regarding the -- the label changes.

14       Q.    Why was there was no "Dear Doctor"

15   letter sent in the fall of 2003?

16       A.    The goal was really to inform the

17   treating physicians who prescribed the product

18   regarding the -- the issue, so that they would be

19   aware of it.

20       Q.    Whose idea was it to send the September

21   2004 "Dear Doctor" letter?

22       A.    I do not recall exactly whose idea it

23   was to send the letter.

24       Q.    Was it the company or was it the FDA?

25           MR. JOHNSTON:  Objection.  Asked and

34

FILED UNDER SEAL

1    answered.

2         A.    I don't recall.

3         Q.    Can you tell me why there was no "Dear

4    Doctor" letter sent in the fall of 2003?

5         A.    I don't recall.

6         Q.    Can you tell me why the September 2004

7    "Dear Doctor" letter was not sent to dentists?

8         A.    It's regulation to send the "Dear

9    Doctor" letter to prescribing physicians and

10   physicians who would prescribe Zometa.

11        Q.    The letter was sent to oral surgeons.

12   Correct?

13        A.    Correct.

14        Q.    Do oral surgeons prescribe Zometa?

15        A.    No, they don't.  That was an extra step

16   on the part of the company.

17        Q.    Okay.  Why did the company not take the

18   extra step to send it to dentists?

19        A.    I am not sure why.

20        Q.    And at any of the Advisory Boards, as of

21   September 2004, pointed out the importance of

22   educating dentists about the subject?

23             MR. JOHNSTON:  Objection.  Vague.

24        A.    I don't recall the specifics of what was

25   recommend by which Advisory Board when.

35

FILED UNDER SEAL

1    Q.    Did dentists ever receive a "Dear

2    Doctor" letter?

3    A.    Yes.

4    Q.    When?

5    A.    That was in May of 2005.

6    Q.    Was that at the request of the FDA?

7    A.    This was a suggestion, yes, that came up

8    at the ODAC Meeting.

9    Q.    Had you considered the need to send a

10   "Dear Doctor" letter to dentists prior to the ODAC

11   Meeting?

12        MR. JOHNSTON:  Objection.  Vague as to

13   who.  Do you mean her or the company?

14        MR. GERMANY:  I said had she.

15   A.    I don't -- I don't recall specifically

16   what was in my mind at a -- you know, at a certain

17   time.

18   Q.    As a part of your presentation, you did

19   not suggest to the FDA that a "Dear Doctor" letter be

20   sent to the dentists.  Correct?

21   A.    No.  What we -- what had become

22   discussed, there had been considerations as to

23   informing dentists.

24        We had decided to provide a brochure to

25   patients to give to their dentists.

FILED UNDER SEAL

1           That was the strategy.  I

2    specifically -- I did not specifically present on

3    a -- a letter to dentists.

4        Q.    How were the patients to get this

5    brochure that they were then to take to their

6    dentists?

7        A.    From their oncologists.

8        Q.    And it was the intent to place the

9    burden on the patient to then get the brochure to

10   their dentist.  Correct?

11          MR. JOHNSTON:  Objection.

12   Argumentative.

13       A.    It was the intent to inform patients

14   about the potential issue and the need to have dental

15   care.

16       Q.    What was the potential issue?

17       A.    That cases of -- of ONJ had been

18   observed, so -- and that it was important to have

19   careful dental follow-up.

20       Q.    Cases of ONJ had been observed -- had

21   been observed in what population?

22       A.    In patients who had been treated with

23   Zometa and Aredia.

24       Q.    Did you play any role in the development

25   of that brochure?

FILED UNDER SEAL

1      A.    I per -- no, I personally did not.

2      Q.    During the ODAC Meeting, do you recall

3   whether or not any of the persons attending expressed

4   some concern about the effectiveness of getting the

5   information into the hands of dentists on the ONJ

6   issue?

7      A.    At -- by the ODAC, are you referring to

8   by the ODAC panel?

9      Q.    Yes.

10     A.    I recall a comment made in that regard.

11     Q.    Okay.  What, if anything, did Novartis

12   do to address that comment?

13     A.    Well, subsequently, the -- the "Dear

14   Dentist" letter was sent out.

15     Q.    My question is more specific.

16           Was there a concern as to whether or not

17   a "Dear Dentist" letter would be effective?  Do you

18   recall that?

19     A.    I don't -- I don't understand your

20   question.

21     Q.    Well, it's one thing to send out a

22   letter.  It's another to get somebody to read it and

23   act on it, and my question goes to whether there was

24   a concern as to whether the letter would be read and

25   acted upon.

FILED UNDER SEAL

1          MR. JOHNSTON:  Objection.  You're asking

2     if somebody at ODAC expressed that.

3          MR. GERMANY:  Yes.

4          MR. JOHNSTON:  Correct?

5          MR. GERMANY:  Yes.

6     A.    I do -- I don't recall.  I don't recall

7     that.

8     Q.    Did Novartis take any steps to determine

9     whether, in fact, the "Dear Dentist" letter that was

10    sent out in May of 2005 was effective or not?

11    A.    I don't -- I don't recall.

12    Q.    Do you know if a survey was done to

13    measure the effectiveness of the "Dear Doctor"

14    letter?

15    A.    I don't know.  I don't recall the

16    details of that.  That's not my area of

17    responsibility.

18    Q.    How or who decided that you would make

19    the presentation at the July 2004 FDA meeting?

20    A.    That was the NEM Team.

21    Q.    Did they also make the decision that you

22    would make the presentation at the March 2005 ODAC

23    Meeting?

24    A.    Yes.

25    Q.    Were there any practice sessions or

39

FILED UNDER SEAL

1    identification.)

2       Q.    I think we've seen two other versions of

3    this same document, but this is the work -- I believe

4    what you described as a work in process as part of

5    the preparations for the ODAC Meeting?

6       A.    That's correct.

7       Q.    I show you an e-mail I've marked as

8    Exhibit 4058.

9            (Exhibit 4058, Document, Bates No.

10   ZAEM-01348871, is received and marked for

11   identification.)

12      Q.    The top part of that thread is an e-mail

13   from you.  Is that correct?

14      A.    Yes.

15      Q.    Who is Jerry?

16      A.    Jerry Retwa was -- Jerry Retwa was a

17   clinical research manager who worked on the Zometa

18   pivotal studies.

19      Q.    Okay.  Were the films ever reviewed?

20      A.    The films were looked at.  There was --

21   I mean, the films were not reviewed in this way.

22           There was a question raised that we

23   should review the films, but it turned out that

24   the -- that the pictures that were taken were not

25   going to be adequate for what the advisor had

FILED UNDER SEAL

1    recommended.

2        Q.    Do you know why they would not be

3    adequate?

4        A.    It was a -- it was a technical reason

5    having to do with what views were -- what views were

6    captured.

7        Q.    I'm going to show you an e-mail thread

8    I've marked as 4059.

9            (Exhibit 4059, Document, Bates Nos.

10   ZAEM-01339261 through 61, is received and marked for

11   identification.)

12       Q.    You were a recipient of that e-mail?

13       A.    Yes.

14       Q.    And this is with regard to a March

15   Advisory Panel Meeting?

16       A.    It appears to be.

17       Q.    What sort of Advisory Panel?

18       A.    This was an Advisory Panel that was held

19   with experts to discuss specifics about ONJ, you

20   know, what the -- the working definition, the

21   staging.

22           This was, you know, more ongoing work in

23   terms of trying to characterize, better characterize

24   ONJ.

25       Q.    Who was putting on this meeting?

FILED UNDER SEAL

1    information?

2        A.    They were described in the literature,

3    and we obtained some through the Freedom of

4    Information Act.

5        Q.    And do you recall when the information

6    was obtained by the Freedom of Information Act?

7        A.    I do not recall precisely when that

8    information was obtained from the Freedom of

9    Information Act.

10       Q.    Do you believe that some information had

11   been obtained via FOIA by the time of the ODAC

12   Meeting?

13       A.    Yes.

14       Q.    At the time of the July 14, 2004 meeting

15   with FDA, had Novartis Pharmaceuticals Corporation

16   provided any information to healthcare providers

17   regarding treatment and prevention of osteonecrosis

18   of the jaw?

19       A.    The White Paper that had been prepared

20   after this Advisory -- multi-disciplinary Advisory

21   Meeting discussing the cases had been available for

22   distribution at the ASCO meeting in -- in June of

23   2004.

24       Q.    You were asked a number of questions

25   about "Dear Doctor" letters earlier.  Correct?

FILED UNDER SEAL

1     A.    Yes.

2     Q.    Was it your responsibility to decide who

3     to send "Dear Doctor" letters to?

4     A.    No, it was not.

5     Q.    Was it your responsibility to decide

6     when a "Dear Doctor" letter should be sent?

7     A.    No, it was not.

8     Q.    Whose responsibility were those

9     decisions?

10    A.    It would be the DRA, our Regulatory

11    colleagues.

12    Q.    Would individuals in DRA have the most

13    knowledge about when it is appropriate to send a

14    "Dear Doctor" letter?

15    A.    Yes.

16    Q.    Would individuals in DRA have the most

17    knowledge about the persons to whom "Dear Doctor"

18    letters should be sent?

19    A.    Yes.

20    Q.    In preparing for ODAC and at other times

21    NPC found a number of cases of suspected or possible

22    ONJ cases in its clinical trials in a retrospective

23    review.

24          Is that correct?

25    A.    That's correct.

227

FILED UNDER SEAL

# Exhibit 16

FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| TERRY ANDERSON, ABBIE BOWDEN, MARSHA BROWN, FRANCIS JO CALLOWAY, BETTY FOSTER, CAROL HILL, SALLY McCLEERY, DONNA OLSON, SAM OROZCO, JAMES PATTON, SALLY REINARDY, FRED FRAGOMENLI, DONALD ARBUCKLE, MARIE TALLEY, and BRENDA MELCHING, ) ) ) ) ) ) ) ) ) ) | No. 3:05-CV-00718 |
| Plaintiffs, ) ) | DISTRICT JUDGE CAMPBELL |
| v. ) ) ) | MAGISTRATE JUDGE KNOWLES |
| NOVARTIS PHARMACEUTICALS CORPORATION, ) ) ) | JURY DEMAND |
| Defendant. ) ) ) | |

DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUESTS
FOR PRODUCTION TO DEFENDANT

Defendant Novartis Pharmaceuticals Corporation ("NPC"), by and through counsel,

hereby makes the following response to Plaintiffs' First Requests for Production to Defendant.

**PRELIMINARY STATEMENT**

The terms "Aredia®" and "Zometa®" as used herein by NPC, refer to the FDA-approved

prescription medications at issue in this lawsuit: Aredia® (pamidronate disodium) and Zometa®

(zoledronic acid) for intravenous infusion as indicated for the treatment of hypercalcemia of

malignancy and to control skeletal related events in patients suffering from multiple myeloma

and certain other metastatic cancers.

FILED UNDER SEAL

19.     Produce all documents including, but not limited to, correspondence generated or adopted by Defendant since Defendant contemplated approval of the drug through the date of the Defendant's response to this request for production, which relates in any manner to the drug and which was generated or adopted for the purpose of distribution to any advertising agency, drug industry publication, health care provider, the Food and Drug Administration, or any prospective consumer.

**RESPONSE:**

NPC incorporates by reference its General Objections 1, 2, 3, 5, 6, 7, 8, 10, 11, and 12. NPC objects to this request on the grounds that it is overbroad and unduly burdensome and seeks information that is not relevant to this litigation. NPC also objects to this request on the grounds that it is vague and unintelligible as the terms "correspondence," "adopted by," "contemplated approval of the drug" and "adopted for" are not defined. Subject to and without waiving its objections, NPC states that documents responsive to this request may be found in the NDAs for Aredia® and Zometa® and in Categories 1, 2, 3, 4, and 5.

20.     Produce all documents including, but not limited to, internal memos, e-mails, videos, or other materials which were provided by the Defendant to its sales representatives that relate to the drug from date of approval of the drug by the FDA to date.

**RESPONSE:**

NPC incorporates by reference its General Objections 1, 2, 3, 7, 8, 11, and 12. NPC objects to this request on the grounds that it is vague, overbroad, and unduly burdensome, and seeks information that is not relevant to this litigation. Subject to and without waiving its objections, NPC states that documents responsive to this request may be found in the NDAs for Aredia® and Zometa® and in Category 3.

21.     Produce any and all documents which were generated during, for, or as a result of any meeting of the sales representatives of the Defendant which relate in any way to the drug.

**RESPONSE:**

NPC incorporates by reference its General Objections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12. NPC objects to this request on the grounds that it is vague, overbroad, and unduly burdensome, and seeks information that is not relevant to this litigation. Subject to and without waiving its objections, NPC states that documents responsive to this request may be found in the NDAs for Aredia® and Zometa® and in Category 3.

22.     Produce any and all documents evidencing that the Defendant has implemented a product recall and/or market withdrawal for the drug.

**RESPONSE:**

NPC objects to this request to the extent that it suggests that a product recall or market withdrawal of Aredia® and/or Zometa® was required and/or appropriate. Subject to and without

FILED UNDER SEAL

interrogatories are not due until January 6, 2006.  Should there be documents responsive to this request, NPC will supplement its response pursuant to Fed. R. Civ. P. 26(f).

35.         Produce the audited financial statement of the Defendant for the five years preceding your response to this request.

**RESPONSE:**

NPC incorporates by reference its General Objections 1, 2, 3, 7, 8, and 9.  NPC specifically objects to plaintiffs' request on the grounds that it seeks information that is not relevant to class certification.  NPC also objects to this request on the grounds that it is overbroad, unduly burdensome, and seeks information that is not relevant to this litigation.

36.         Produce all documents that evidence, illustrate, discuss, set forth or relate in any manner to the Defendant's number of sales of the drug, revenues produced by the drug and profit generated by the drug for the five-year period preceding your response to this request.

**RESPONSE:**

NPC incorporates its General Objections 1, 2, 3, 7, 8, 9, and 12.  NPC specifically objects to plaintiffs' request on the grounds that it seeks information that is not relevant to class certification.

Dated this 14th day of December, 2005.

Joe G. Hollingsworth
Donald W. Fowler
Katharine R. Latimer
Robert E. Johnston
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW, Ninth Floor
Washington, DC  20005
Telephone:  (202) 898-5800
Telecopier:  (202) 682-1639

FILED UNDER SEAL

# Exhibit 17

FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

|  |  |  |
|---|---|---|
| IN RE: AREDIA® AND ZOMETA® PRODUCTS LIABILITY LITIGATION (MDL No. 1760)<br><br>This Document Relates To:<br>ALL CASES | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:06-MD-1760<br><br>JUDGE CAMPBELL<br><br>MAGISTRATE JUDGE BROWN |

<u>DEFENDANT NPC'S RESPONSE TO PLAINTIFFS' STEERING COMMITTEE'S
FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO NPC</u>

Defendant Novartis Pharmaceuticals Corporation ("NPC"), by and through counsel,
hereby makes the following responses to Plaintiffs' Steering Committee's First Request for
Production of Documents to NPC.

<u>PRELIMINARY STATEMENT AND GENERAL OBJECTIONS</u>

The terms "Aredia®" and "Zometa®" as used herein by NPC, refer to the FDA-approved
prescription medications Zometa® (zoledronic acid) and Aredia® (pamidronate disodium) for
intravenous infusion indicated for, *inter alia,* the treatment of hypercalcemia of malignancy and
to control skeletal related events in patients suffering from multiple myeloma and certain other
metastatic cancers.

Plaintiffs have indicated that they are seeking certification of a class action asserting
medical monitoring claims (but not personal injury claims) on behalf of an as-yet-undefined
class of persons.  NPC currently has no information regarding who or how many purported
representatives that class may have and thus is unable at this time meaningfully to respond to
plaintiffs' discovery requests regarding class allegations or to tailor its discovery responses to
class-certification fact discovery.

FILED UNDER SEAL

## REQUESTS FOR PRODUCTION

<u>Request No. 1</u>:  Documents specifying the unit sales of the drug Aredia[®], by year from 2001 to present, broken out by each state in the United States.

Response:  NPC objects to this request as unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections and the general objections incorporated herein, NPC will produce responsive documents pursuant to the Document Production Protocol.

<u>Request No. 2</u>:  Documents specifying the unit sales of the drug Zometa[®], by year from 2001 to present, broken out by each state in the United States.

Response:  NPC objects to this request as unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to, and without waiving these objections and the general objections incorporated herein, NPC will produce responsive documents pursuant to the Document Production Protocol.

<u>Request No. 3</u>:  Documents specifying the dollar sales of the drug Aredia[®], by year from 2001 to present, broken out by each state in the United States.

Response:  NPC objects to this request as unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  NPC further objects to this request as premature because it seeks information that could only be relevant to punitive damages.  NPC also objects because dollar sales figures are irrelevant to the proper calculation of punitive damages.  In reliance on these objections and the Court's 1/25/2007 Order, NPC will not produce any documents in response to this request.

11

FILED UNDER SEAL

Request No. 4: Documents specifying the dollar sales of the drug Zometa®, by year from 2001

to present, broken out by each state in the United States.

Response: NPC objects to this request as unduly burdensome, irrelevant and not

reasonably calculated to lead to the discovery of admissible evidence. NPC further objects to

this request as premature because it seeks information that could only be relevant to punitive

damages. NPC also objects because dollar sales figures are irrelevant to the proper calculation of

punitive damages. In reliance on these objections and the Court's 1/25/2007 Order, NPC will

not produce any documents in response to this request.

Request No. 5: Documents specifying Novartis's best information as to the number of persons

using the drug Aredia®, by year from 2001 to present, broken out by each state in the United

States.

Response: NPC objects to this request as unduly burdensome, irrelevant and not

reasonably calculated to lead to the discovery of admissible evidence. NPC further objects to

this request as vague and ambiguous as to the phrase "best information." Subject to, and without

waiving these objections and the general objections incorporated herein, NPC will produce

responsive documents pursuant to the Document Production Protocol.

Request No. 6: Documents specifying Novartis's best information as to the number of persons

using the drug Zometa®, by year from 2001 to present, broken out by each state in the United

States.

FILED UNDER SEAL

# Exhibit 18

FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| IN RE: AREDIA® AND ZOMETA® PRODUCTS LIABILITY LITIGATION (MDL No. 1760) ) ) ) ) ) | No. 3:06-MD-1760 |
| This Document Relates To: ALL CASES ) ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE BROWN |

**DEFENDANT NPC'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' STEERING COMMITTEE'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO NPC**

Defendant Novartis Pharmaceuticals Corporation ("NPC"), by and through counsel, hereby makes the following responses to Plaintiffs' Steering Committee's Second Request for Production of Documents to NPC.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

The terms "Aredia®" and "Zometa®" as used herein by NPC, refer to the FDA-approved prescription medications Zometa® (zoledronic acid) and Aredia® (pamidronate disodium) for intravenous infusion indicated for, *inter alia,* the treatment of hypercalcemia of malignancy and to control skeletal related events in patients suffering from multiple myeloma and certain other metastatic cancers.

Plaintiffs have indicated that they are seeking certification of a class action asserting medical monitoring claims (but not personal injury claims) on behalf of an as-yet-undefined class of persons. NPC currently has no information regarding who or how many purported representatives that class may have and thus is unable at this time meaningfully to respond to plaintiffs' discovery requests regarding class allegations or to tailor its discovery responses to class-certification fact discovery.

FILED UNDER SEAL

Maladorno, Senior Director, Clinical Safety & Epidemiology; Lynne McGrath, Director, Drug

Regulatory Affairs; Annmarie Petraglia, Senior Associate Director, Drug & Regulatory Affairs;

Nicholas Sauter, Phase 2/3 Development, Oncology; Michael Scott, Product Director, Zometa;

and Diane Young, Vice President, Clinical Development. The volume of this e-mail is estimated

to be in excess of 3.5 million pages.

Upon information and belief, NPC states that the burden and expense of searching for,

recovering, and/or reviewing e-mail from other employees for responsiveness and privilege

outweighs the likely minimal benefit to be realized from such an effort; if on balance,

information sought by discovery is potentially relevant but the burden of obtaining or producing

such information greatly exceeds the burden on the producing party, discovery should be denied.

The volume of e-mail that would need to be reviewed for all persons who might have responsive

e-mail could well exceed 25 million pages, some meaningful percentage of which (given the

nature of how and to whom e-mail is transmitted) is duplication, and some meaningful

percentage of which is irrelevant to the dispute before the Court.

## REQUESTS FOR PRODUCTION

Request No. 1: Documents specifying Novartis's best information as to the number of persons

who used either the drug Aredia® or the drug Zometa®, from 1991 to present, broken out by each

state in the United States. Persons using both drugs are to be counted only once.

Response: NPC objects to this request as overbroad as to time, unduly burdensome,

irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. NPC

further objects to this request as vague and ambiguous as to the phrase "best information." In

addition, NPC objects to the extent that this request requires NPC to make a subjective

10

FILED UNDER SEAL

determination regarding the scope of the request. NPC has previously provided documents responsive to this request. *See* Responses to PSC's First Set of Requests for Production of Documents 1-2, and 5-6. Subject to, and without waiving these objections and the general objections incorporated herein, NPC states that it is not aware of any additional documents responsive to this request.

Request No. 2: Documents specifying Novartis's best information as to the number of prescriptions written for the drugs Aredia® and Zometa®, from 1991 to present, broken out by each state in the United States.

    Response: NPC objects to this request as overbroad as to time, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. NPC further objects to this request as vague and ambiguous as to the phrase "best information." In addition, NPC objects to this request as vague, ambiguous, and unintelligible as to the phrase "number of prescriptions written" in that Aredia® and Zometa® are not provided by prescription. NPC further objects to the extent that this request requires NPC to make a subjective determination regarding the scope of the request. In reliance on these objections, NPC states that it is not aware of any documents responsive to this request.

Request No. 3: Documents sufficient to specify the distribution channels or wholesalers through or by which the drugs Aredia® and Zometa® have been distributed in the United States, from their time of introduction to present.

    Response: NPC objects to this request as unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. NPC also objects to this

FILED UNDER SEAL

request on the grounds that the phrases "distribution channels" and "sufficient to" are vague and ambiguous.  In addition, NPC objects to the extent that this request requires NPC to make a subjective determination regarding the scope of the request.  Subject to, and without waiving these objections and the general objections incorporated herein, NPC will provide documents in its possession, custody, or control that contain the names of wholesalers and distributors of Aredia® and Zometa®.

Dated this 9th day of February, 2006.

*Robert E Johnston/SDB*

Joe G. Hollingsworth
Katharine R. Latimer
Donald W. Fowler
Robert E. Johnston
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W., Ninth Floor
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

FILED UNDER SEAL

# Exhibit 19

FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | |
|---|---|
| **IN RE:** | ) |
| | ) **No. 3:06-MD-1760** |
| **AREDIA® AND ZOMETA® PRODUCTS** | ) |
| **LIABILITY LITIGATION** | ) **JUDGE CAMPBELL** |
| | ) |
| **(MDL No. 1760)** | ) **MAGISTRATE JUDGE BROWN** |
| | ) |
| **This Document Relates To:** All Cases | ) |
| | ) |
| | ) |

**NOVARTIS PHARMACEUTICALS CORPORATION'S**
**RESPONSE TO PLAINTIFFS' STEERING COMMITTEE'S**
**THIRD SET OF DOCUMENT REQUESTS TO DEFENDANT**

Defendant Novartis Pharmaceuticals Corporation ("NPC"), by and through counsel,

makes the following responses to Plaintiffs' Steering Committee's ("PSC") Third Set of

Document Requests.

**PRELIMINARY STATEMENT**

NPC incorporates by reference the Preliminary Statement and objections contained in its

Second Supplemental Responses to Plaintiffs' First Set of Interrogatories.

**DOCUMENT PRODUCTION PROTOCOL**

NPC incorporates by reference the Document Production Protocol contained in its

Second Supplemental Responses to Plaintiffs' First Set of Interrogatories.

FILED UNDER SEAL

in Table 4-2. NPC cannot presently identify precisely which of the ADE records correspond to

these 610 case reports, although any case report involving "ONJ" or any of the 18 MedDRA

terms identified in the briefing book dated prior to December 7, 2004 should fall within the

scope of this request.


**REQUEST NO. 5:**

      Any and all documents containing data tracking the prescribing patterns for Aredia and
Zometa, whether by physician or otherwise, whether or not purchased from IMS Health or
similar companies.

      **RESPONSE:**

      NPC objects to this request as "data tracking prescribing patterns" is undefined, unclear,

and ambiguous, and therefore is not susceptible of a response.  Without waiving these or any

other objections, NPC refers plaintiffs to the deposition of Ms. Emily Chee and the exhibits

thereto, which may contain responsive information.


**REQUEST NO. 6:**

      Any and all "standard response letters" sent by Novartis mentioning or referring to
Aredia or Zometa in response to questions from the public or health care providers.

      **RESPONSE:**

      NPC objects to this request as vague and ambiguous because "standard response letter" is

not defined.  NPC further objects to this request to the extent it seeks documents that do not refer

to ONJ or other oral events.  Without waiving these or any other objections, NPC will produce

exemplars of letters responding to requests for information or inquiries about ONJ or other oral

events.  These exemplars are attached as attachment "B" to these responses.

FILED UNDER SEAL

**REQUEST NO. 7:**

Any and all scripts, formats, instructions, videos, teaching materials and/or directions of any kind to marketing representatives of Novartis or other employees of Novartis or its agents regarding what they are to say or represent to physicians or medical professionals regarding Aredia or Zometa from 1991 to the present.

**RESPONSE:**

NPC objects to this request as vague and overly broad. NPC further objects to the extent responsive information has already been produced. NPC also objects to the timeframe, "1991 to the present," which encompasses years before the first report of a condition now known as ONJ. Without waiving these or any other objections, NPC states that responsive documents can be found at the Bates-numbered documents listed in attachment "C" to these responses. Responsive documents may also be found in documents obtained from document custodian Steve Engelhardt. A list of Bates ranges for this custodian is attached as attachment "D" to these responses. As to videos, NPC is reviewing such materials and will produce responsive materials, to the extent any exist, after appropriate arrangements can be made for plaintiffs to review and/or copy such tapes and cost sharing is agreed upon.

**REQUEST NO. 8:**

Any and all audio, photographic or video recordings (in any format) representing conversations with physicians, health care providers, the FDA, patients or those infused with Aredia and/or Zometa which mention or concern Aredia or Zometa, including but not limited to such recordings of conversations with any plaintiff in a civil suit. This document request includes but is not limited to phone conversations from persons calling Novartis with a question or complaint about Aredia or Zometa.

**RESPONSE:**

NPC objects to this request as vague and overbroad, and as not being limited to the issues in this litigation-ONJ and other oral events. Thus, NPC will respond to this request as being

10

FILED UNDER SEAL

limited to the drugs Aredia® and Zometa® and ONJ and other oral events.  NPC will not provide

responsive documents that solely address other reported adverse events, such as renal

insufficiency.  To the extent NPC locates any responsive "audio, photographic or video

recordings," it will produce them to plaintiffs after appropriate arrangements can be made for

review and/or copying of such materials and cost sharing is agreed upon.  NPC is not presently

aware of any materials responsive to this request.

**REQUEST NO. 9**

    All correspondence or communications with any person who is now a plaintiff in a suit
against Novartis alleging that Aredia or Zometa causes ONJ or ONJ-related symptoms.

    **RESPONSE:**

    NPC objects to this request as unduly burdensome in that plaintiffs in this litigation are

better able to determine whether they sent to or received from NPC any "correspondence or

communication."  To the extent any responsive documents exist, they should be contained within

the ADE files associated with each plaintiff, as designated in response to Interrogatory #1 in

PSC's First Set of Interrogatories.

**REQUEST NO. 10**

    Produce the following electronic databases, in their native electronic format or
equivalently useable electronic format, regarding the drugs Aredia and/or Zometa. Include all
information within the databases regarding Aredia or Zometa, as well as any source documents
referenced within or related to data in the databases:

    a.    Your adverse events databases, including databases concerning adverse health
        outcomes that do not qualify as official "adverse event reports," including without
        limitation ARGUS and SINA, in their native electronic form, for Aredia or
        Zometa.
    b.    Your databases for the tracking of sales calls and drug samples for the drugs
        Aredia or Zometa.
    c.    Your databases tracking clinical communications or communications with doctors
        or any health care providers regarding the drugs Aredia or Zometa.

FILED UNDER SEAL

    d.    Your databases for tracking regulatory issues for the drugs Aredia or Zometa.

    e.    Your databases for tracking the clinical trials data regarding the drugs Aredia or Zometa.

    f.    Your databases for tracking visiting speakers or paid speaking engagements or honor aria relating to the drugs Aredia or Zometa;

    g.    Your databases for tracking research reports concerning the drugs Aredia or Zometa.

    h.    Your databases for tracking medical literature relating to Aredia and Zometa.

    i.    Your databases for tracking information regarding users or potential users of Aredia or Zometa who contact you regarding either drug;

    j.    A listing of any databases not already mentioned in items a through i which contain information related to Aredia and Zometa.

**RESPONSE:**

NPC objects to this request to the extent it requests "databases" from NPC rather than responsive, relevant information from those databases. "Databases" are proprietary, contain information about products other than Aredia® and Zometa®, and/or require specialized software, knowledge, and training to extract data therefrom or view data contained therein. NPC also objects to this request as vague and overbroad (*e.g.,* "databases tracking regulatory issues"; "source documents referenced within or related to data. NPC also objects to subpart "g" of this request in that it seeks information that, in some instances, has already been produced to plaintiffs *e.g.,* regulatory information about Aredia® and Zometa®, which has been produced in the NDAs and related documents. NPC also objects to this request because it is unlimited as to date, non-specific about the information plaintiffs seek, and unduly burdensome. In particular, subpart "j" of this request is vague and unduly burdensome because it seeks "a listing of any databases not already mentioning in items a through i which contain information related to Aredia and Zometa." This request can be read as seeking irrelevant information, such as information regarding Aredia® revenues or other irrelevant information. NPC also objects to subpart "j" because it constitutes an interrogatory not a document request. NPC will not respond

12

FILED UNDER SEAL

to subpart "j".  Without waiving these or any other objections, NPC states that it has the

following databases that may contain information responsive to plaintiffs' request:

      a.  ARGUS and SINA

      b.  EDGE and COMPASS

      c.  MEDICUS

      d.  REDI

      e.  CREDI

      f.  Events Central/Speaker Central

      g.  There are no NPC databases intended to track "research reports" *per se,* although some information on these topics may be found in the REDI or CREDI databases.

      h.  NOVEL

      i.  MEDICUS (customer information center)

NPC can extract and provide specific information from these databases in a searchable format,

but will not produce the entire database in active format.  NPC is willing to discuss with

plaintiffs what specific responsive and relevant information they seek from these databases and

will work with plaintiffs to provide responsive information.


**REQUEST NO. 11**

      Any and all audio or video recording (in any format) of any of your experts discussing Aredia, Zometa, and/or osteonecrosis of the jaw, including but not limited to the March 22-24, webcast on Novartis website of Dr. Coleman, and Aredia and Zometa launch videos.

      **RESPONSE:**

      NPC objects to this request as vague and overbroad and as not limited to the issues in this

litigation to the extent it seeks information about any condition other that ONJ.  Without waiving

FILED UNDER SEAL

these or any other objections, NPC is searching for such material and will produce responsive materials, to the extent any exist for NPC's previously disclosed experts, after appropriate arrangements can be made with the PSC for review and/or copying of such tapes and an agreement is reached regarding cost sharing.

**REQUEST NO. 12**

Any and all documents reflecting advertising or marketing budgets for Aredia or Zometa between 1999 and the present.

**RESPONSE:**

NPC objects to this request in that it seeks financial information, which this Court has ruled is not discoverable at this stage of the litigation. *See* Order dated January 25, 2007, at 12.

**REQUEST NO. 13**

Any and all documents reflecting financial incentives or rewards for physicians or medical providers for purchasing, prescribing infusing, recommending, or otherwise using Aredia or Zometa.

**RESPONSE:**

NPC objects to this request as vague and overbroad, and as seeking information that is not relevant to any claims or defenses in this litigation. Without waiving these or any other objections, NPC is not presently aware of any documents responsive to this request.

**REQUEST NO. 14**

Any and all documents containing information regarding, reflecting, relating, describing, or concerning sales of Aredia or Zometa, and the effect on such sales, real or projected, of the content or proposed content of the label or warning for the drug.

FILED UNDER SEAL

**RESPONSE:**

NPC objects to this request as vague and as potentially requesting financial information, which this Court has ruled is not discoverable at this stage of the litigation.  To the extent the request does not encompass financial information, NPC states that it is looking for responsive information and will provide such responsive information if any exists.

**REQUEST NO. 15**

Any and all documents reflecting, relating, describing, or containing drafts of warnings, cautions or other label information however termed prepared in connection with Novartis's change of the labels for the drugs in 2003 and 2004 to include information regarding ONJ.

**RESPONSE:**

Developing the language of the labeling for a pharmaceutical product is a cooperative process between the sponsor (here NPC) and the FDA.  NPC has produced the documents memorializing that process to plaintiffs, including those documents in the NDAs for Aredia® and Zometa®.  Thus, this request seeks to have NPC search the documents NPC has already produced, which plaintiffs can do themselves because NPC produced documents in searchable format(s).  Plaintiffs represented to the Court that they have "(a) create[d] a virtual depository containing images of the key documents selected by the PSC counsel from the document productions of the Defendant in MDL 1760; (b) create[d] a bibliographic database providing a "coded" index of such key documents;(c) create[d] a virtual depository of the depositions of each generally applicable fact witness taken in MDL 1760 and in any coordinated state-court actions; [and] (d) creat[ed] . . . time-lines, casts of characters, and other summaries and analyses relating

15

FILED UNDER SEAL

# Exhibit 20

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

1

2

3  IN RE: AREDIA AND ZOMETA,        }
   PRODUCTS LIABILITY               }
4  LITIGATION                       }
                                    }
5                                   }         No. 3:06-MD-01760
                                    }
6                                   }
                                    }
7                                   }
                                    }
8

9

10

11

12                  JANUARY 22, 2007

13             TRANSCRIPT OF MOTION HEARING

14         BEFORE THE HONORABLE JOE B. BROWN
             UNITED STATES MAGISTRATE JUDGE
15

16

17

18

19

20
         Proceedings recorded by electronic sound recording;
21                 Transcript prepared by:

22                   Dawn Suffridge
                   2704 Fairfax Avenue
23                 Nashville, TN 37212
                    (615) 383-0489
24

25

ORIGINAL

1    limited to domestic events - -

2         THE COURT:     Or any source - -

3         MS. LATIMER:     Yes to any source, and we do not

4    intend to limit our production in this case to domestic events

5    Your Honor.

6         THE COURT:     Okay.  Yeah, I think anything that's

7    an adverse is to be reported.  And in the case you're doing,

8    then keep doing it.

9         MS. LATIMER:     Thank you Your Honor.

10        THE COURT:     Alright.  Let's see, now we get into

11   this 35 and 36 sales and profits.  I'm not gonna get into

12   their sales and profits until we get further down the pike.  I

13   mean, at some point if you start getting into punitive and

14   such, I think you'd be entitled to them, but I'm not going

15   there right now.

16        MR. OSBORN:     We'd like you to consider Your Honor,

17   just sales and profits related to Aredia and Zometa, not the

18   company as a whole, but just the two drugs that are at issue

19   here, we'd note our request for that.

20        THE COURT:     Well, okay, they want at this present

21   time, to limit the request for sales and profits for these two

22   drugs.

23        MS. LATIMER:     It's still an issue that there is

24   exclusively punitive damages as far as I know Your Honor, and

25   that the only thing that has been identified by the plaintiffs

FILED UNDER SEAL90

1  to my knowledge as relevant and befitting their request.  And

2  the Tennessee State Court (inaudible) may be applicable to

3  this litigation yet, and that's something that we need to

4  brief sooner than later I suppose, but - -

5        THE COURT:    I prefer later rather than sooner.

6        MS. LATIMER:   I'm amenable to that Your Honor, but

7  in any event, there has been at least to my knowledge, no

8  statement of relevance at this point.  And in fact, I think

9  what would apply suggests exactly as Your Honor has just

10  suggested, that sales, profits, financial information, be

11  deferred until after some merit discovery has taken place.

12        THE COURT:    Yeah, I'm gonna hold up on that, I'm

13  gonna hold off on that.

14        MR. OSBORN:    One last plea Your Honor - -

15        THE COURT:    Okay.

16        MR. OSBORN:    I'll be brief.  We believe we need

17  the information for our class certification motion that's

18  gonna be upcoming.  As Your Honor is probably under Rule 23,

19  one of the criteria is numerosity and we think that

20  information about revenue and sales would give us, we could

21  work backwards and do division based off prescriptions and so

22  on, we can figure out approximately how many people are in the

23  class.  Numerosity is gonna be a key issue that we have to

24  establish on behalf of the PFC for our class certifications.

25        THE COURT:    Well - -

FORM AZ-13    PENGAD · 1-800-631-6989

FILED UNDER SEAL

# Exhibit 21

FILED UNDER SEAL

- Dr. Marx letter of 36 cases was not peer reviewed

LF f/u: but if stay broader, looking at this overall, still need to show overall clinical benefit.

A: we want to capture cases by conservative nature we are using now.

K: show us the data elements you will use in new studies to capture dx of ONJ and severity. Can you show us design?

A: we are in the process of planning that with a detailed CRF

K: need to have a slide that shows what these proposed criteria are for the OMFS.

JCar: in your clin trials, you took series of xrays which include hips and jaw. These were taken up to 1 year and 2 years: can you get those and if so, can you ascertain if there are preexisting abnormalities or abnormalities over time? Have you done that?

A: Yes, we can do that but no we have not done that.
K: NEED SLIDE: HAVE RADIOGRAPHS, WILL LOOK AT, HERE ARE CRITERIA WE WILL USE

JCar: Are you looking at this in the CTIBL trials?

A: Have not seen. We have not been looking specifically for this but will do so going forward.

JCar: If it is dosing-related, then need to specificry MDACC is only monthly-dosed patients? Is it?
A: yes. We are also doing dosing duration study that will provide info

Dr. Landes: Duration of admin, in MDACC. Durie data suggest is cumulative effect. In your MDACC you say started with high dosing number, but range includes 4 doses. I'd like to see bar graph of latency in these patients.

Also, aren't you doing a bon emets prevention study? That would be a good control group.

A. We are looking at it.
YH: We have several studies. Ongoing in UK. Dosing is........

ZA-0792201

FILED UNDER SEAL

# Exhibit 22

# FILED UNDER SEAL

**From:**      DianeOncology Young
**Sent:**      Thursday, February 24, 2005 2:24 AM
**To:**        YongJiang Hei; Peter Tarassoff
**Subject:**   surveys/scans for Zometa

Yong and Peter,

When we have one of our ad boards for next steps, we should ask the oral surgeons if there is anything that is worthwhile to look at in this dataset...either the bone scans or the bone films...agree with Jerry that we may not be capturing the jaw adequately, but would like to verify this.

Best regards,

Diane

DEPOSITION
EXHIBIT
106
DATE: 6/25/08
MARY G. VAN DINA, C.S.R.

—— Forwarded by DianeOncology Young/PH/Novartis on 02/23/2005 09:21 PM ——

     Jerry Retkwa
02/22/2005 04:58 PM

       **To:**    DianeOncology Young/PH/Novartis@PH
       **cc:**    YongJiang Hei/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH
       **Subject:**   surveys/scans for Zometa

Dear Diane and Yong:

Linda is here, and tells me you might find the attached interesting.  It's the views we took for Zometa 010, 011 and 039. The filsm are bieng stored in Boston, but probably don't adequately cover the jaw for our purposes.



Survey
ᴺages.ppt.zip (1 MB

Jerry

1

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZAEM-01348871

YOUNG_DIANNE20080605-4058-0001

FILED UNDER SEAL

# Exhibit 23

# FILED UNDER SEAL

**ZOMETA-Post ODAC Follow-UP**
**Teleconference (TC) with FDA and Novartis (April 6, 2005)**

**NVS Attendees**

**Oncology**

| | |
|---|---|
| P.K. Narang, Ph.D., FCP | Drug Regulatory Affairs |
| Yong Jiang Hei, MD | Medical Affairs |
| Diane Young, MD | Clinical Development |
| M. Scott | Marketing/Communications |
| F. Mounier, MD | Marketing |
| Anne Altmeyer, Ph.D. | Project Management |
| Katarzyna Sablinska, MD | Clinical Epidemiology |
| Dionigi Maladorno, MD | Clinical Safety/Epidemiology |
| William Holden, Ph.D. | Clinical Safety/Epidemiology |

**Non-Oncology**

| | |
|---|---|
| Lynn Mellor | Drug Regulatory Affairs |
| Theresa Rosario Jansen, Ph.D. | Clinical Development |

**************************************************************

**Minutes**

On March 31 2005, via an e-mail, FDA advised Novartis (DRA Manager: Annmarie Petraglia) of their desire to have a TC on April 6, 2005, to follow-up on items following the March 4th ODAC where emergent reports on ONJ in patients receiving IV bisphosphonates were presented. Specifically, per their communication, they wished to discuss our program for dentists and the ONJ registry study.  Teleconference was held between 9:30-10:30 am.

During the TC, FDA staff inquired about status of the key proposals presented to ODAC. Specifically following was discussed and relevant associated action items are noted.

**1. Protocol 2352 (RND study to assess impact of treatment duration on continued benefit):**
NVS stated that it expects the trial to start in 4Q2005 and it would take about 5 years. NVS proposed to submit a DRAFT version to FDA in May/June timeframe after including feedback from the Advisory Board on ONJ planned for May 2005. This was deemed acceptable.
**[Action: Novartis – Submit protocol for SPA by mid June 2005]**

**2. Publication of 'White paper'**
FDA requested a copy of this paper, and asked the name of the journal where this is being submitted and when.
**[Action: Novartis – Submit White Paper to FDA and advise on timing by April 30, 2005]**

**3. MDACC Trial**
Novartis reaffirmed that most data from this study is anticipated to be available by July 2005.

**4. Registry/Natural History study**
FDA asked if NVS had given any additional thought to a registry. NVS advised that we were leaning towards a natural history study but wanted to get some more feedback from the Advisory Board and wait for MDACC data to assess risk factors.  Dr. Pazdur stated that FDA is interested

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ALTMEYER_ANNE20080314-2839-0001

FILED UNDER SEAL

in having some idea about the ONJ incidence (and how to identify patients at risk, how they are diagnosed, managed, understand dental pathology, etc. ), and this was a high-priority issue for them. MDACC data is skewed and they would prefer for us to consider some sort of registry (cast a big/broad net) that would involve various Oncology co-operative groups to get timely information. On several occasions he commented on the usefulness of looking at all BPs, but further elaborated that the Division needs to discuss internally on this topic some more. He asked that we should discuss this again after our Advisory Board but soon.
**[Action: DODP/FDA – Internally discuss registry for all BPs and revisit. Set up TC]**
**[Action: Novartis – Formalize 'Concept' proposal addressing noted issues by June 2005 and discuss with DODP]**

**4. Program for Dentists**
NVS updated FDA on DRAFT letter being formulated for Dentists, plans to share with division for feedback (by April 14, 2005), mail to a list of Dentists secured from ADA (>100,000) by April 18, follow-up with market research for effectiveness of communication, and address need for further steps.
**[Action: Novartis – Send DRAFT letter to FDA for comment/guidance by April 14, 2005]**

ALTMEYER_ANNE20080314-2839-0002

FILED UNDER SEAL

# Exhibit 24

# FILED UNDER SEAL



**Linda Lantwicki**
08/04/2005 01:31 PM

To: Franck Mounier/PH/Novartis@PH, Geoffrey Cook/PH/Novartis@PH,
Katalin Csermak Renner/PH/Novartis@PH, Leo
Lacerna/PH/Novartis@PH, Nana Shirina/PH/Novartis@PH, Nicholas
Sauter/PH/Novartis@PH, Patricia Stewart/PH/Novartis@PH, Peter
Tarassoff/PH/Novartis@PH, Prem Narang/PH/Novartis@PH, Steven
Goldfarb/PH/Novartis@PH, YongJiang Hei/PH/Novartis@PH, Zoe
Stefanidou/PH/Novartis@PH, Djordje Filipovic/PH/Novartis@PH, Anne
Altmeyer/PH/Novartis@PH, Michael Scott/PH/Novartis@PH

cc:

Subject: Dear Dentist Letter Market Research

Dear ZIM,

FYI.

Save your feedback for the meeting on Wednesday.

Sincerely,
Linda

Sr. Project Manager - Zometa Issue Management Team & Gimatecan
Director, PJM

Office: 862-778-2336
Mobile: 908-392-4957
----- Forwarded by Linda Lantwicki/PH/Novartis on 08/04/2005 01:28 PM -----

> **DEPOSITION
> EXHIBIT
> 2844
> DATE: 3|4|08
> MARY G. VAN DINA, C.S.R.**

**Michael Scott**
08/04/2005 10:12 AM

To: Linda Lantwicki/PH/Novartis@PH
cc:
Subject: Dear Dentist Letter Market Research

Linda,

Can you put this on the agenda for the next IMT meeting?

Michael
----- Forwarded by Michael Scott/PH/Novartis on 08/04/2005 10:11 AM -----



**Kathy Koukouras**
08/03/2005 03:28 PM

To: Michael Scott/PH/Novartis@PH, Michael Barninger/PH/Novartis@PH,
Jennifer Herron/PH/Novartis@PH, Fred McClellan/PH/Novartis@PH,
Barbara Lupinacci/PH/Novartis@PH

cc:

Subject: Dear Dentist Letter Market Research

Z Team,

Attached below is the vendor report for the Dear Dentist Letter market research.

94% of oral surgeons are aware that ONJ has been reported in cancer patients receiving IV
bisphosphonates compared to only 39% for dentists.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZA-0973500

ALTMEYER_ANNE20080314-2844-0001

# FILED UNDER SEAL

5796 Novartis - ONJ - Final report.ppt.zip

Thanks,

Kathy Koukouras

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0973501

ALTMEYER_ANNE20080314-2844-0002

FILED UNDER SEAL

# Exhibit 25

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Anne Altmeyer |
| **Sent:** | Tuesday, May 02, 2006 6:33 PM |
| **To:** | Linda Lantwicki |
| **Subject:** | Re: AZURE and ONJ |



----- Forwarded by Anne Altmeyer/PH/Novartis on 05/02/2006 02:32 PM -----

> Kevin-1 Lynch
> 05/01/2006 05:57 PM
>
> > To:   Rosh Dias/PH/Novartis@PH
> > cc:   Anne Altmeyer/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH, Giovanna Zingarelli/PH/Novartis@PH
> > Subject:   Re: AZURE and ONJ

Hi Rosh

The plan in MM6 ONJ survey is quite well advanced in terms of process, although we don't have a CRF defined as yet - but the full CRF would only be needed for cases where dental problems have been identified. Thus, all patients will be surveyed for any suggestion of a dental issue, and that subset (presumably small) will be fully evaluated.  The plan is to discuss and present this at the national ALLG trials group meeting later this week and then implement within the next month or two.  Advice at present is that as this is non-interventional, is related to significant safety issue, and is part of an already fully approved study, such a survey will not need full IRB submissions but rather sign off by IRB chairpersons.

Giovanna Zingarelli is Medical Adviser managing this project so I will ask her to send through a more detailed update, thanks Giovanna.

Best wishes

Kevin

> Rosh Dias
> 02/05/2006 07:47 AM
>
> > To:   Kevin-1 Lynch/PH/Novartis@PH
> > cc:   Nicholas Sauter/PH/Novartis@PH, Anne Altmeyer/PH/Novartis@PH
> > Subject:   Re: AZURE and ONJ

Many thanks Kevin.

I agree this would be a great opportunity to collect some data in a prospective manner and would support collecting this info in AZURE. How far developed is this in the MM6 study - do you have a questionnaire/CRF etc?

Kind regards,
Rosh

Rosh Dias MD, MRCP(UK)
Global Brand Medical Director,
Zometa Program
Novartis Oncology
Telephone: (+1) 862 778 8854

1

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZAEM-03067489

# FILED UNDER SEAL

Kevin-1 Lynch
05/01/2006 07:00 AM

>To:     Nicholas Sauter/PH/Novartis@PH
>cc:     Rosh Dias/PH/Novartis@PH
>Subject:     Re: AZURE and ONJ

Thanks Nick.

Rosh, congratulations on the new position!

An interesting consideration in the AZURE study is the metastatic type dosing for 6 months and then reduced dosing frequency for the next 18 months (3 monthly dosing) and then out to 5 years (6 monthly dosing).  With this number of patients, this may give opportunity for dose-intensity-related observations, as well as those relating to cumulative dosing.

Best wishes to you both

Kevin

Nicholas Sauter
01/05/2006 08:55 PM

>To:     Kevin-1 Lynch/PH/Novartis@PH, Rosh Dias/PH/Novartis@PH
>cc:     Anne Altmeyer/PH/Novartis@PH, Gabriela Gruia/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH, Nana Shirina/PH/Novartis@PH, Thomas Bock/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH
>Subject:     AZURE and ONJ

Dear Kevin,

Thank you very much for sharing this information.
Rosh Dias has just accepted the position of Global Medical Brand Director (GMA) for Zometa.
I am including him on this correspondence.

Dear Rosh:
It may be worthwhile to consider Novartis support for the initiative Rob Coleman suggests.  We are already providing financial support for AZURE.  The dosing in AZURE is for prevention of bone mets, which is much less than treatment. We can discuss.

Thanks
Nick

Nicholas Sauter, M.D.

Novartis Pharmaceuticals Corporation
Phase 2/3 Development, Oncology
One Health Plaza, Bldg FP 105/PL 072
East Hanover, NJ 07936
TEL:  862-778-6564
FAX:  973-781-2443
nicholas.sauter@novartis.com

Kevin-1 Lynch
04/30/2006 11:14 PM

2

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)                    ZAEM-03067490

ALTMEYER_ANNE20080314-2880-0002

FILED UNDER SEAL

To:     Nicholas Sauter/PH/Novartis@PH
cc:     Anne Altmeyer/PH/Novartis@PH, Gabriela Gruia/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH, Nana Shirina/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH, Thomas Bock/PH/Novartis@PH
Subject:     Re: Slide deck regarding ONJ

Hi Nick

I am sure you have seen the communications from Sheffield with regards AZURE but I notice the letter to investigators is quite consistent with our exchange below (see 4th paragraph 1st page).


Best wishes

Kevin



        Nicholas Sauter
11/04/2006 12:39 PM

        To:     Kevin-1 Lynch/PH/Novartis@PH
        cc:     Linda Lantwicki/PH/Novartis@PH, Thomas Bock/PH/Novartis@PH, Nana Shirina/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH, Anne Altmeyer/PH/Novartis@PH, Gabriela Gruia/PH/Novartis@PH
        Subject:     Re: Slide deck regarding ONJ

Dear Kevin,

Thank you for this suggestion. The AZURE study resides in Global Medical Affairs. It would be an interesting population to study for the reasons you point out. If a proposal were drafted from GMA regarding this trial, it could be reviewed at the ZIM protocol and develop review subteam (PRDT). The funding would need to come from GMA.

Nana, Thomas, let me know whether you would like to move forward on this.

Regards
Nick

Nicholas Sauter, M.D.

Novartis Pharmaceuticals Corporation
Phase 2/3 Development, Oncology
One Health Plaza, Bldg FP 105/PL 072
East Hanover, NJ 07936
TEL: 862-778-6564
FAX: 973-781-2443
nicholas.sauter@novartis.com



        Kevin-1 Lynch
04/10/2006 05:49 PM

        To:     Linda Lantwicki/PH/Novartis@PH
        cc:     Thomas Bock/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH
        Subject:     Re: Slide deck regarding ONJ

Dear Linda and Thomas

Many thanks for these slides.

3

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)    ZAEM-03067491

ALTMEYER_ANNE20080314-2880-0003

There is a study of great relevance that is not mentioned here: the AZURE study has enrolled over 3000 patients in a randomised, placebo-controlled fashion in which oncology dose intensity is maintained for at least six infusions and then continued at lesser intensity for 5 years. This is the first large study which can provide prospective, controlled data on ONJ incidence in an era when most investigators will be well educated on recognition and management (at least with regards avoiding invasive procedures) of the condition. Moreover, the patients are relatively 'well' and do not have the many confounding issues common to patients with metastatic bone malignancy. Finally, it is not yet clear that any association with ONJ is related to duration of exposure or simply a stochastic event but AZURE may also help with this question, including questions relating to dose intensity.

Has the team considered implementing a formal ONJ questionnaire/survey into this study? We are going to do something similar within our local MM6 study (much smaller and less powerful but still a useful exercise). Our plan here is to assess each patient as to whether dental review has been sought and only for those patients in whom a dental complaint has occurred we will perform a detailed evaluation for ONJ. Perhaps something similar could be considered for AZURE?

Kind regards

Kevin

        Linda Lantwicki
11/04/2006 05:17 AM

        To:     Thomas Bock/PH/Novartis@PH
        cc:     _PH.O.DEV.ONCBU.MEDICALDIRECTORS@PH, John Hohneker/PH/Novartis@PH, Geoffrey
Cook/PH/Novartis@PH, Vivienne Laird/PH/Novartis@PH
        Subject:      Re: Slide deck regarding ONJ

Dear Thomas,
Thank you for distributing.

I would like to request that all Medical Directors in the CPOs be trained on these slides as soon as possible.

Sincerely
Linda

Zoldronic Acid Issue Management Team Leader

        Thomas Bock
03/31/2006 04:59 PM

        To:     Gabriella Camboni/PH/Novartis@PH, Marcia Kayath/PH/Novartis@PH, Marthin
Kwakkelstein/PH/Novartis@PH, Jia-Hua Wang/PH/Novartis@PH, John Hohneker/PH/Novartis@PH, Douglas
Hager/PH/Novartis@PH
        cc:     Robert Johnson/PH/Novartis@PH, Anne Altmeyer/PH/Novartis@PH, Donald
Swainson/PH/Novartis@PH, Erik Fink Eriksen/PH/Novartis@PH, Franck Mounier/PH/Novartis@PH, Geoffrey
Cook/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH, Lynn Mellor/PH/Novartis@PH, Lynne
McGrath/PH/Novartis@PH, Nicholas Sauter/PH/Novartis@PH, Peter Freund/PH/Novartis@PH, Steven
Goldfarb/PH/Novartis@PH, Thomas Bock/PH/Novartis@PH, John Hohneker/PH/Novartis@PH, Aki
Suzuki/PH/Novartis@PH, Anila Verma/PH/Novartis@PH, Dionigi Maladorno/PH/Novartis@PH, Giuseppe
Alvaro/PH/Novartis@PH, Heike Schwende/PH/Novartis@PH, Jennifer Brenner/PH/Novartis@PH, Jim
Niebanck/PH/Novartis@PH, John Caminis/PH/Novartis@PH, Jonathan Green/PH/Novartis@PH, Katalin Csermak
Renner/PH/Novartis@PH, Katarzyna Sablinska/PH/Novartis@PH, Leo Lacerna/PH/Novartis@PH, Michael
Scott/PH/Novartis@PH, Nana Shirina/PH/Novartis@PH, Patricia Stewart/PH/Novartis@PH, Paul
McGinley/PH/Novartis@PH, Peter Tarassoff/PH/Novartis@PH, Renee Anderson/PH/Novartis@PH, Robert
Spaet/PH/Novartis@PH, Tina Boggiano/PH/Novartis@PH, Vivienne Laird/PH/Novartis@PH, Yoshie
Inoue/PH/Novartis@PH, Zoe Stefanidou/PH/Novartis@PH

4

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZAEM-03067492

ALTMEYER_ANNE20080314-2880-0004

Subject:       Slide deck regarding ONJ

**FILED UNDER SEAL**

Dear Colleagues,

Attached please find the medical slide presentation on osteonecrosis of the jaw (ONJ).  This presentation is approved for use by Novartis medical personnel with external medical audiences or for distribution to external thought leaders who request information on ONJ. Please forward this presentation to the medical heads and suitable medical staff in the countries of your regions as soon as possible.

The presentation will be updated on a monthly basis and available via the brand books.  A link to the location in brand books will be forwarded to you separately in the next few days.  If you need additional information that is not contained in this slide deck, please contact Linda Lantwicki, ZIM Leader, linda.lantwicki@novartis.com.

Let me take the opportunity to thank the ZIM team, its leader, Linda Lantwicki, and its sponsor, John Hohneker, for the work and diligence on these materials.

Sincerely,


Thomas Bock
VP & Global Head, Medical Affairs
Novartis Oncology




[ Attachment "APPROVED ONJ EXTERNAL MED SLIDE DECK.ONC VER.MAR 17 06.PPT.ZIP" removed by Kevin-1 Lynch ]




[ Attachment "REC_ONJ_LETT_INVESTIGATORS_V0.6_13_APRIL_06.DOC" removed by Kevin-1 Lynch ]

5

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)                ZAEM-03067493

ALTMEYER_ANNE20080314-2880-0005

FILED UNDER SEAL

# Exhibit 26

# FILED UNDER SEAL

**Geoffrey Cook**

07/01/2005 01:32 PM

To: David Epstein/PH/Novartis, RAINER BOEHM/PH/Novartis, Djordje Filipovic/PH/Novartis

cc: DianeOncology Young/PH/Novartis, Herve Hoppenot/PH/Novartis, Anthony Venditti/PH/Novartis, Prem Narang/PH/Novartis, Franck Mounier/PH/Novartis, Michael Scott/PH/Novartis, Steven Goldfarb/PH/Novartis, YongJiang Hei/PH/Novartis, Peter Tarassoff/PH/Novartis, Linda Lantwicki/PH/Novartis, Michele Galen/PH/Novartis, Kathy Bloomgarden/X/PH/Novartis,

Subject: NEJM Correspondence on ONJ to be published next week

Dear David, Rainer & Djordje,

As we expected, the three letters regarding cases reports of ONJ in cancer patients treated with bisphosphonates will be published in the *New England Journal of Medicine* (NEJM) on 7 July 2005 ( EMBARGOED UNTIL 6 July 2005 5:00 ET). Two of the letters note approximately 20 cases of ONJ in multiple myeloma patients at Dana Farber Cancer Institute in the U.S. and nine cases of ONJ in multiple myeloma and metastatic breast cancer patients at the Clinique St-Pierre in Belgium. The third letter announces the results of a web-based survey of multiple myeloma and breast cancer patients that had previously been presented at the American Society of Hematology annual meeting in December 2004 and at a March 2005 meeting of the ODAC.

Our response, signed by Peter Tarassoff and Yong-jiang Hei, was significantly edited by NEJM. The edits limit the content to providing only the labeling guidance and as Peter notes below, underplay the actions of Novartis to address the needs of patients. The correspondence is attached. We are currently discussed strategies to address this issue. Any reporters who contact us will receive a copy of the submitted response.

We are well prepared to manage inquiries. Actions include:

- Development and distribution of a Q&A/Standby statement to CPOs
- Coordination with Aclasta team in developing media materials and strategy

The fact that the letters are being published during a holiday week is likely to reduce media interest but we are still in an environmental in which health and science reporters are very interested in stories regarding adverse events. We will keep you posted on inquiries.

Best Regards,

Geoff

Geoffrey M. Cook
*Executive Director*
*Global Public Relations*
*Novartis Oncology*
862-778-2675 (office)
973-652-7927 (mobile)

PUBLISHED LETTERS



.NEJM_ONJletters.pdf

NOVARTIS SUBMITTED LETTER

EXHIBIT
3462

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)　　　ZA-0954911

COOK_Geoffrey20080417-3462-0001

FILED UNDER SEAL

# Exhibit 27

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Geoffrey Cook |
| **Sent:** | Friday, December 10, 2004 9:42 PM |
| **To:** | Linda Lantwicki |
| **Subject:** | Re: Statement by Kyle on IMF ONJ Survey data |

**PLAINTIFF'S EXHIBIT 2406**

Thanks.  Celebrating is very important and we intend to celebrate!

Linda Lantwicki
12/10/2004 04:35 PM

> To:    Geoffrey Cook/PH/Novartis@PH
> cc:
> Subject:    Re: Statement by Kyle on IMF ONJ Survey data

Dear  Geoff

Thanks for ending the week on a positive note!  Hope you get to put up a tree if you celebrate Christmas!

Sincerely,
Linda

Sr. Project Manager - Zometa & Gimatecan
Director, PJM

Office:   862-778-2336
Mobile:  908-392-7360

1

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)     ZAEM-01034362

LANTWICKI_LINDA20080227-2406-0001

FILED UNDER SEAL

# Exhibit 28

FILED UNDER SEAL

PLAINTIFF'S EXHIBIT 2408

Final

# Aclasta / Zometa

## Update on ONJ

DPB
24Jan06

ψ NOVARTIS
ONCOLOGY

CONFIDENTIAL

2 Regulated CR 21 Aug 2000
96 Regulated countries

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)                ZA-0945918

LANTWICKI_LINDA20080227-2408-0001

FILED UNDER SEAL



# ONJ—Current Environment

– ONJ awareness is **high** with oncology customers & write to what most persuasion
  increasing with non-oncology customers    STAGES MKT.

• 2105 spontaneous reports with Aredia and Zometa as of 20Dec05
  – 07Dec04: 610 reports   299
  – 16Sep05: 1656 reports   1365   112   (1, 2 cont)

• Numerous publications   140 refined ABSTRACTS + compose letters to Editor.
• Increased concern about use of IV BP in PMO — Based on what?
  Customers' needs                                              KOL MTG.

• Non-oncology priorities:
  – Transparent Communication    – don't Blow
  – Studies                       don't Know?
    » Epidemiology, pathogenesis, risk factors   Do Regn min of
• Oncology priorities:
  – Update of practice guideline on management of ONJ in patients treated
    with IV BPs

Lawyer Leaders :    2    ‖ NOVARTIS
Basic assumption.                                     ONCOLOGY

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)    ZA-0945919

LANTWICKI_LINDA20080227-2408-0002

FILED UNDER SEAL

*ᵈⱨ* NOVARTIS
ONCOLOGY

# ONJ –Key Actions completed by Novartis

## Aclasta/Reclast

- Aclasta SPC includes ONJ statement April 2005
- ONJ language included in Paget's draft label (under review) *us*
- Discussion with KOLs at Aclasta Strategic Advisory Board reg. ONJ *Nov*

## Zometa

- Gained a better understanding of ONJ (e.g. working definition, MDACC, ONJ management guidelines/White Paper published in Jan06)
- Implemented Clinical and regulatory initiatives (e.g. dental assessment into studies, ONJ expedited reporting) *＊*
- Communicated extensively world wide internally & externally

## Zometa & Aclasta/Reclast

- Zoledronic Acid Issues Management (ZIM) Team operational — *Link. to elemats*
  *(back up slides: 15-19)*
- Investigators brochure updated Aug 2005
- ONJ adjudication process established & operational

3

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZA-0945920

LANTWICKI_LINDA20080227-2408-0003

FILED UNDER SEAL

# Key Next Steps for 2006

- Refine ONJ definition
- Further identify risk factors/population
- Update and refine practice guidelines for prevention & treatment of ONJ
- Establish Research Plan
- Develop a joint Communication Plan
- Develop coordinated process for KOL management
- Follow up on ongoing activities

Key Topics for
ONJ Advisory Board
(11-12Feb06)

4    ◊ NOVARTIS
ONCOLOGY

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0004

FILED UNDER SEAL

ʊ NOVARTIS
ONCOLOGY

# Joint Aclasta / Zometa ONJ Advisory Board
## (11-12Feb06)

- **Key objectives:**
  - Refine working definition of ONJ:
    - Working definition established at 09May05 Advisory Board *(back up slides: 13-14)*
  - Evaluate risk factors
    - White Paper/manuscript/slides on ONJ definition & risk factors (submission: 2Q06)
  - Identify key areas of research to focus on
    - Preclinical, clinical, epidemiology
  - Update and refine practice guidelines for prevention and treatment of ONJ
    - White Paper/manuscript/slides on ONJ definition & risk factors (submission: 2Q06)

- **Experts:**
  - Involve Aclasta and Zometa KOLs:
    - Bone specialists
    - Oncologists
    - Oral surgeons
    - Dentists

CONFIDENTIAL

5

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945922

LANTWICKI_LINDA20080227-2408-0005

FILED UNDER SEAL

# Clinical Practice Guidelines for Prevention and Treatment of ONJ

- **Recently published guidelines: Partially address issues**
  - Migliorati et al. (2005)* Managing the care of patients with BP-associated osteonecrosis.
  - Ruggiero et al. (2006)** Practical guidelines for the prevention, diagnosis, and treatment of ONJ in patients with cancer. (Original "White" Paper)

- **What is _not_ addressed by current guidelines:**
  - Distinguish between magnitude of ONJ risk in oncology vs. non-oncology patient populations
  - Provide a risk assessment tool that assists physician to evaluate the risk of developing ONJ vs. the consequences of withholding IV BP therapy (SREs – cancer patients, fractures – osteoporosis patients)

- **Need for clinical guideline for Aclasta/Reclast: Under consideration**

* Migliorati et al. AAOM Position Paper. *JADA* 2005; 136: 1658-68
** Ruggiero et al. *J Onc Prac* 2006; 2: 7-14.

CONFIDENTIAL

(ı) NOVARTIS
ONCOLOGY

6

LANTWICKI_LINDA20080227-2408-0006

FILED UNDER SEAL

# Plan for Clinical Practice Guidelines to Manage ONJ in Cancer Patients

- **Objective**
  - Guidance regarding pre-treatment dental care, and whether or not to temporarily withhold IV BP for dental procedures or discontinue IV BP if ONJ occurs.

- **Method for Developing Guidelines**
  - Identify key decision points (Medical, Dental)
  - Apply existing guidelines and data for partial support
  - Use risk assessments tool for ONJ vs. SRE for informed decisions

- **Timelines**
  - Experts feedback on Novartis' draft guidelines: Advisory Board 11-12Feb06
  - White Paper dissemination: 1-2Q06
  - Submit final Manuscript: Jun06

ᵭ NOVARTIS
ONCOLOGY

7

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945924

LANTWICKI_LINDA20080227-2408-0007

FILED UNDER SEAL

# Communication Plan

- **KOL draft key messages and draft media messages available**
  *(back up slides 20-21)*

- **Communication Plan Development:**

  - Objective:
    - Ensure consistent messaging by Novartis about Zoledronic Acid's excellent efficacy and safety profile with factual evidenced-based communication about ONJ.

  - Deliverables/Timeline:
    - Finalize key messages: Jan06
    - Generate global communication Plan: Feb06
    - Drive global adoption of key messages and communication Plan: 2Q06
    - Develop a publication plan: Feb06

- **Aclasta/Zometa Communication Team formed to proactively address issues**

Մ NOVARTIS
ONCOLOGY

8

CONFIDENTIAL

ZA-0945925

LANTWICKI_LINDA20080227-2408-0008

FILED UNDER SEAL

# Management of KOL Interactions & Advisory Boards

- Objective:
  - To develop a process to identify and coordinate interactions with KOLs and plan and coordinate Advisory boards to ensure:
    - overall benefit is kept in perspective
    - consistency in messages

- Deliverables/Timeline:
  - Define objectives & process for coordinating Advisory Boards: 1Q06
  - Establish a list of ONJ speakers and KOLs: 1Q06
  - Communicate process to CPOs: 2Q06
  - Develop and distribute ONJ slide kit: 2Q06

- Management of KOL Team formed

ʊ NOVARTIS ONCOLOGY

9

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0009

FILED UNDER SEAL

# Key Ongoing & Planned Zometa Activities

10  ψ NOVARTIS
ONCOLOGY

- **Clinical studies (Post ODAC Commitment):**
  - Retrospective Chart Review of cancer MDACC:
    - Analysis presented by principal investigator at ASBMR (Sep05)
    - Continued internal analysis and interactions with MDACC
    - Abstract submitted for ASCO 2006
    - Publication expected in NEJM - pending manuscript preparation by MDACC and review by Novartis
  - OPTIMIZE-2 (2352): Initiation in Jan06 *(back up slide: 22)*
  - SWOG study 0307/US38: Initiated in Nov05 *(back up slide: 23)*
  - US Registry trial: Initiation planned for 2006
    - Prospective evaluation of the incidence of ONJ in cancer patients with various tumor types newly prescribed Zometa--currently under review by SWOG.

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945927

LANTWICKI_LINDA20080227-2408-0010

FILED UNDER SEAL

# Key Ongoing & Planned Zometa Activities (cnt'd)

● **Regulatory Interactions:**

– Update on the progress of MDACC data analysis to HAs:

  • Preliminary data slides provided to HAs (Oct05)

  • Follow up communication planned for end of Jan06

– CHMP Class Review on BP & ONJ:

  • Outcome expected week of 23-26 Jan (originally Oct05)

– Update ONJ frequency from Zometa BPI from 'rare' to 'uncommon' (Type II variation; Feb06)

11   NOVARTIS
ONCOLOGY

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945928

LANTWICKI_LINDA20080227-2408-0011

FILED UNDER SEAL

NOVARTIS ONCOLOGY

# Back ups

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945929

LANTWICKI_LINDA20080227-2408-0012

FILED UNDER SEAL

13  𝟀 NOVARTIS
ONCOLOGY

# ONJ Definition & Staging Criteria

- ONJ Working Definition, based on Panel of Experts (09May05):

  - Exposed bone in the maxillofacial area

    - that occurred spontaneously

    - or is induced by a dental surgery that has no evidence of healing for more then 3 – 6 weeks after appropriate care

  - May or may not be associated with infection

  - May or may not be associated with pain

  - In the absence of prior radiation to head and neck

- Refinement needed (Objective of 11-12 ONJ Advisory Board):

  - Clarify duration of non-healing

  - Clarify terminology and diagnostic criteria ONJ / OMJ

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945930

LANTWICKI_LINDA20080227-2408-0013

FILED UNDER SEAL

# ONJ Definition & Staging Criteria (cnt'd)

- ONJ Staging, based on Panel of Experts (09May05):

**Table 1. ONJ Severity Grading**

| Grade | Symptom guide |
|-------|---------------|
| 1 | Asymptomatic |
| 2 | Mild |
| 3 | Moderate |
| 4 | Severe |

**Table 2. ONJ Lesion Size Grading**

| Grade | Size, diameter* |
|-------|-----------------|
| 1A | Single lesion < 0.5 cm |
| 1B | Multiple lesions, largest < 0.5 cm |
| 2A | Single lesion 0.5 to 0.99 cm |
| 2B | Multiple lesions, largest 0.5 to 0.99 cm |
| 3A | Single lesion 1 to 2 cm |
| 3B | Multiple lesions, largest 1 to 2 cm |
| 4A | Single lesion > 2 cm |
| 4B | Multiple lesions, largest > 2 cm |

*Lesion size measured as the largest diameter.

- May need to refine severity / staging

14 ♻ NOVARTIS
ONCOLOGY

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945931

LANTWICKI_LINDA20080227-2408-0014

FILED UNDER SEAL

15  🜋 NOVARTIS
ONCOLOGY

# ZIM Governance – Mission / Purpose

- The Zoledronic Acid Issues Management Team (ZIM) exists to proactively address & manage issues related to ONJ in patients treated with Zoledronic Acid

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945932

LANTWICKI_LINDA20080227-2408-0015

FILED UNDER SEAL

16   ψ NOVARTIS ONCOLOGY

# ZIM Primary Objectives

- Organizationally manage issues related to ONJ and serve as the point of contact for NVS senior management.

- Create strategic plan with several parts (e.g. Research plan with clinical, preclinical, epidemiology) to identify risk factors with the objective of preventing or treating ONJ. Plan will also evaluate scenarios which may require labeling changes, development and implementation of a risk minimization plan and regulatory response processes as well.

- Create a communication platform and plan to meet stakeholder needs communicate consistently with science based evidence about ONJ, so that we speak with one credible voice as an organization. while respecting implications for patients & customers

- Maximize resource allocations across the organization for addressing ONJ issues

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945933

LANTWICKI_LINDA20080227-2408-0016

FILED UNDER SEAL

NOVARTIS ONCOLOGY

# ZIM Objectives 2006

## Communication:

- Establish key messages and generate Global Communication Plan - Q1
- Develop and issue technical brief on each key message and drive global adoption of strategy - Q2

## KOL / Advisory Board Management

- Agree on list of KOLs and the process to define objectives and coordinate Advisory Boards WW - Q1
- Communicate Ad Board process to CPOs. Develop and distribute ONJ slide kits - Q2

## Definition & Clinical Practice Guidelines :

- Refine definition of ONJ and staging criteria and integrate the refined definition into a Clinical Practice Guideline. Obtain external consensus at Advisory Board - Q1
- Disseminate "white paper" and obtain further feedback. Submit for publication - Q2
- Obtain endorsement / support from relevant dental, hematological, oncology and non-oncology associations. Implement ONJ definition in clinical trials and use to characterize spontaneous reports. Q3
- Decide need / next steps External Consensus Panel on ONJ - Q4

## Strategy and Scientific Review

- Establish Protocol Review and Development team - Q1
- Establish strategy, generate research plan and secure required resources. Identify list of common risk factors for ONJ. Submit publication MDACC study - Q2
- Implement research plan. Release statement of risk in non-oncology population. - Q3

17

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0017

FILED UNDER SEAL

𝔟 NOVARTIS
ONCOLOGY

# ZIM Team Members

## • Core:

- John Hohneker (Sponsor)
- Linda Lantwicki (Leader)

- Anne Altmeyer (IPL[1])
- Peter Freund (IPL[2])

- Franck Mounier (Brand Leader[1])
- Donald Swainson (Brand Leader[2])

- Yong Hei (Brand Medical Director[1])
- Erik Fink Eriksen (Brand Medical Director[2])

- Lynne McGrath (DRA[1])
- Lynn Mellor (DRA[2])

- Steve Goldfarb (Legal)

## • Extended:

- Geoffrey Cook / Vivienne Laird (PR)
  - Jennifer Brenner (Legal)
  - Katalin Csermak Renner
- Dionigi Maladorno /Sabine Weaver (CS &E)
  - Nicholas Sauter (CPL)
  - Katarzyna Sablinska (Epidemiology)
- Nana Shirina (MA) / Leo Lacerna (US MA)
- Peter Tarassoff (USMA) / John Caminis (CRD)
- Zoe Stefanidou / Renee Anderson (EU)
- Jim Niebanck or Michael Scott / Paul McGinley (US MKT)
  - Tina Boggiano (G MKT)
- Jonathan Green (RES) / Robert Spaet (SPA)

## • Copied on Action Items:

- Yoshie Inoue (PJM-J)
- Heike Schwende / Brenda Hamilton (PJM)
- Patricia Stewart (ROW)

18

**Zometa[1] Aclasta/Reclast[2]**

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0018

FILED UNDER SEAL

# 4 Subteams of the ZIM formed to Address Different Aspects of ONJ

- Outcome of Zoledronic Acid Issue Management (ZIM) Joint Aclasta/Zometa F2F meeting, 14-15Dec05
  - ZIM governance, mission/purpose, objectives, responsibilities and membership

- 4 Subteams with representatives from Aclasta and Zometa Teams:
  - Communication
  - KOL/Advisory Board Management
  - Strategy & Scientific Review
  - ONJ Definition & Clinical Practice Guidelines

ḋ NOVARTIS
ONCOLOGY

19

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0945936

LANTWICKI_LINDA20080227-2408-0019

FILED UNDER SEAL

# KOL DRAFT Key Messages - 'ONJ'

- 'ONJ' is a poorly understood condition and Novartis has an ongoing commitment to work with the medical community to better understand, diagnose and treat this condition

- There are cases of 'ONJ' reported with bisphosphonates, however the vast majority of these reports are in patients with advanced cancer

- In the bisphosphonate-treated cancer population, the reported frequency is low (0.83% as reported in the MD Anderson chart review)

  – These patients have multiple risk factors including chemotherapy, radiation therapy, corticosteroid and tooth extraction

  – The background incidence is unknown in cancer patients not taking bisphosphonates

- In non-cancer patients 'ONJ' has been reported very infrequently with bisphosphonates

  – To date, there have been no confirmed cases of 'ONJ' in patients with osteoporosis or Paget's disease treated with Aclasta in the Clinical trial database containing 12,000 patient-years of data.

  – There have been rare reports with oral bisphosphonates in the non-cancer population

  – In non-cancer patients, bisphosphonates show benefit for osteonecrosis in other parts of the body (e.g. osteonecrosis of the hip)

20    ᵿ NOVARTIS
ONCOLOGY

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0020

FILED UNDER SEAL

# DRAFT Media Messages – 'ONJ'

- Novartis takes patient safety very seriously and proactively worked with EU health authorities to add information on 'ONJ' to our 3 marketed bisphosphonate brands Zometa (November 2004), Aredia (November 2004) and Aclasta (April 2005).
    - Following the CHMP decision, Novartis will work with the EMEA on any specific label changes required.

- 'ONJ' has been reported in patients with cancer receiving treatment regimens including bisphosphonates. Many of these patients were also receiving chemotherapy and cortico-steroids. The majority of reported cases have been associated with dental procedures such as tooth extraction.

- In published literature, 'ONJ' has been reported very infrequently in the tens of millions of people without cancer who are taking bisphosphonates for non-cancerous metabolic bone disorders.

- To date, there have been no confirmed cases of 'ONJ' in patients with osteoporosis or Paget's disease treated with Aclasta in the Clinical trial database containing 12,000 patient-years of data.

- More study is needed on this condition and Novartis will continue to take action to better understand, characterize and help manage 'ONJ'.

21   ᵼᵼ NOVARTIS
ONCOLOGY

CONFIDENTIAL

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZA-0945938

LANTWICKI_LINDA20080227-2408-0021

FILED UNDER SEAL

# OPTIMIZE-2 Study Design

**Patients:**
- Breast Ca+ bone mets
- Zometa® pretreated 10 to 12 doses during previous year

N =1650

Randomization 2:2:1

Tx Group B, n =660

Zometa q 12 wk (placebo interim infusions)

+ Rescue: Zometa q 4 wk after first SRE

q 4 week study drug infusions

| 0 | 4 | 8 | 12 | 16 | 20 | 24 | 28 | 32 | 36 | 40 | 44 | 48 | 52 |

First study drug infusion

weeks analysis*

*Primary efficacy endpoint: Time to first SRE

NOVARTIS ONCOLOGY

22

ZA-0945939

LANTWICKI_LINDA20080227-2408-0022

FILED UNDER SEAL

# SWOG 0307: Study Design

- Randomized phase III trial; NSABP 34 replacement trial
- Stage I, II, and III breast cancer on standard adjuvant therapy (n = 6000)



R
A
N
D
O
M
I
Z
E

Zometa® 4 mg IV
q mo x 6 mos, q 3
mos x 2.5 yrs

Clodronate 1600 mg
PO daily x 3 yrs

*Daily supplemental calcium (1000 to 1500 mg) and vitamin D (400 to 800 IU)

23 NOVARTIS ONCOLOGY

CONFIDENTIAL

LANTWICKI_LINDA20080227-2408-0023

FILED UNDER SEAL

# Exhibit 29

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Geoffrey Cook |
| **Sent:** | Friday, December 10, 2004 9:26 PM |
| **To:** | Annmarie Petraglia; Carsten Goessl; Dionigi Maladorno; Geoffrey Cook; John Caminis; Jonathan Green; Katalin Csermak Renner; Katarzyna Sablinska; Linda Lantwicki; Michael Scott; OLIVER JUNG; Peter Tarassoff; Robert Johnson; Robert Spaet; Stefano Fratarcangeli; Steven Goldfarb; YongJiang Hei; Barbara Kennedy; Deborah Dunsire |
| **Cc:** | Michele Galen |
| **Subject:** | Statement by Kyle on IMF ONJ Survey data |



**PLAINTIFF'S EXHIBIT**
2 414

This statement by Robert Kyle has been posted to the IMF website.

Best Regards,

Geoff

Dr. Robert A. Kyle, chairman of the IMF's Scientific Advisory Board, made the following statement following Dr. Durie's presenation at ASH:
"The presentation by Dr. Durie raises a concern to all of us.
Although the web-based study has epidemiologic shortcomings and does not allow one to say anything about the frequency of osteonecrosis of the jaw, it does demonstrate its existence. In my 40+ years of caring for patients with multiple myeloma, I have not seen or heard of osteonecrosis of the jaw in this disease until 1-2 years ago.
We definitely need more data/information about this condition. At present I believe it is prudent to advise patients to avoid dental procedures while taking intravenous bisphosphonates. Studies are needed to define the duration and dosage of bisphosphonate therapy for multiple myeloma. Furthermore, we need to address the status/activity of myeloma bone disease in making this decision.
Bisphosphonates have proven benefit in multiple myeloma. We must be careful not to "throw out the baby with the bath water."

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZAEM-01015350

LANTWICKI_LINDA20080227-2414-0001

FILED UNDER SEAL

# Exhibit 30

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Michael Scott |
| **Sent:** | Friday, January 20, 2006 7:04 PM |
| **To:** | Linda Lantwicki |
| **Cc:** | Jim Niebanck; Kathy Koukouras |
| **Subject:** | Re: Market Research on awareness of ONJ |

PLAINTIFF'S
EXHIBIT
2422

Hi Linda,

The Dear Dr letter for Oncs was mailed Sept 2004, so this was conducted post-mailing.

Michael

> Linda Lantwicki
> 01/20/2006 01:43 PM
>
> To:    Kathy Koukouras/PH/Novartis@PH
> cc:    Jim Niebanck/PH/Novartis@PH, Michael Scott/PH/Novartis@PH
> Subject:    Re: Market Research on awareness of ONJ

Dear Kathy,

Thanks this is interesting but not the presentation I saw.

Dear Michael,

I thought there was a presentation that you did which measured the level of awareness with ONC Hematol etc, after the Dear Doctor letter came out.

Sincerely,
Linda

Director, PJM

Office:  862-778-2336
Mobile:  908-392-4957

> Kathy Koukouras
> 01/20/2006 10:43 AM
>
> To:    Michael Scott/PH/Novartis@PH
> cc:    Jim Niebanck/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH
> Subject:    Re: Market Research on awareness of ONJ

Hi Linda,

Attached below is the ONC ATU study from May 05, where we had asked several ONJ awareness questions. They can be found on slides 18 and 19.

1

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)        ZAEM-001538064

**FILED UNDER SEAL**

Thanks,

Kathy Koukouras
Senior Analyst, Zometa Market Research
Novartis Pharmaceuticals
180 Park Avenue, Bldg. 105
Florham Park, NJ 07932-0675
kathy.koukouras@novartis.com
tel: 862-778-5571

Michael Scott
01/20/2006 10:33 AM

To:     Kathy Koukouras/PH/Novartis@PH
cc:     Jim Niebanck/PH/Novartis@PH, Linda Lantwicki/PH/Novartis@PH
Subject:     Market Research on awareness of ONJ

Hi Kathy,
I believe Linda is referring to the Onc ATU with the ONJ awareness questions.  Can you forward it to her?

Michael
----- Forwarded by Michael Scott/PH/Novartis on 01/20/2006 10:32 AM -----

Linda Lantwicki
01/20/2006 10:30 AM

To:     Jim Niebanck/PH/Novartis@PH, Michael Scott/PH/Novartis@PH, Zoe Stefanidou/PH/Novartis@PH
cc:     Franck Mounier/PH/Novartis@PH
Subject:     Market Research on awareness of ONJ

Dear All,
I have the MKT res from July 2005 for dentists and oral surgeons.  I think there was also a study of ONC which is not on the Zometa Database.  May I have a copy?

Zoe  Any update on awareness in the EU among ONC, dental surgeons and dentists?

Sincerely,
Linda

Director, PJM

Office:  862-778-2336
Mobile:  908-392-4957

[ Attachment "ONC ATU TABLES_CHARTS.PPT.ZIP" removed by Linda Lantwicki ]

2

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZAEM-001538065

LANTWICKI_LINDA20080227-2422-0002

FILED UNDER SEAL

# Exhibit 31

FILED UNDER SEAL

DEPOSITION
EXHIBIT
3322
DATE: 4/15/08
MARY G. VAN DINA, C.S.R.

**An exploratory epidemiological study of ONJ in cancer patients**

**Objectives:**

1. to describe the characteristics of ONJ patients with cancer

2. to guesstimate the frequency of ONJ in cancer pts

3. to determine feasibility of further epidemiological investigation to measure the ONJ prevalence and its association with BP use

**Study design:** survey

**Site:** 10 oncology and/or oral surgery centers in the US and Europe

**Cost:** $ 250,000 – 300,000 (based on a recent estimation for a similar design)

**Steps:**

1. clarify the case definition (action item for NEM)

2. identify major referral centers across the US and Europe for treatment of ONJ in cancer pts (oncology and/or oral surgery centers) (action item for NEM)

3. send letter to these centers surveying them to see which would be interested in participating in a chart abstraction study

4. ask referral centers to review pt charts to identify cancer pts with ONJ and to abstract information regarding type of cancer, cancer treatment, dental/oral surgery procedures and other risk factors (list of questions to be defined). For information not available, the site would have to call the patients, obtain consent, and interview them for missing information.

The characteristics of cancer pts with ONJ would be described to monitor for a possible pattern and to influence subsequent development of a more quantitative study, e.g. **case control study**;

- if we find that only a part of ONJ cancer cases have a history of a BP therapy, we may consider matching controls for ONJ cases to find a proportion of BP users and compare the proportions of BP users in the case and control groups, thus test an association between ONJ and BP in cancer pts. (Feasibility depends mainly on number of ONJ cases and proportion of BP user among them).

Furthermore,

- if we find centers which serve a defined population so a denominator could be estimated (total number of cancer pts or a total number of cancer pts receiving a BP), we would be able to conduct **a cross-sectional study** to estimate prevalence of ONJ (the proportion of new and pre-existing ONJ cases).

SABLINSKA_Katarzyna20080415-3322-0001

# FILED UNDER SEAL

Finally,

- a **prospective study** to determine a real incidence of ONJ could be conducted based on the centers identified during the exploratory stage (if the burden of ONJ suggests that such a study is feasible). Such a prospective study could serve as a basis for a case control study (for every new case of ONJ among cancer pts, a control with similar cancer history would be matched and their exposure to BPs compared).

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)    ZAED-00048855

SABLINSKA_Katarzyna20080415-3322-0002

FILED UNDER SEAL

# Exhibit 32

FILED UNDER SEAL

| | |
|---|---|
| **From:** | Paul Pixton |
| **Sent:** | Thursday, September 01, 2005 9:11 PM |
| **To:** | Peter Tarassoff |
| **Cc:** | Allen Hauser |
| **Subject:** | Re:  Dr. Michael Cadra  (California Association of Oral and Maxillofacial Surgeons) |

Dear Peter:
I had a conversation today with Dr. Michael Cadra of Modesto, CA.  Dr. Cadra is the President of the California Association of Oral and Maxillofacial Surgeons(CALAOMS).  Dr. Cadra organized a survey which requested that oral surgeons in the state of CA submit whether they have any ONJ cases that they are seeing.  174 oral surgeons responded to the survey.  I am including the data in a graph that I generated; but contains data exactly as described to me.  Dr. Cadra stated this data is unpublished and he would not provide me with a written copy.  He and his group are still determining what to do with data, regarding publishing.  There are validation problems with the data, (eg, he didn't provide me with how many total surgeons were sent survey), but it is interesting.


I have provided Dr. Cadra with the White Paper as well as discussed what Novartis has and is doing regarding understanding ONJ.  He and I will be discussing White Paper further, with possibility of him sending white paper out to all CA state oral surgeons.

Dr. Cadra has biggest concern not for Zometa cancer patients, (because he understands that Zometa is important part of supportive care for metastatic cancer patients), but rather for the 65 year old woman with benign osteopenia who is placed on oral agents (30% of patients in his data were on oral agents).
 He also has concern that many oral surgeons and oncologists are not submitting ADE reports to FDA.

I will continue to discuss data with Dr. Cadra as new information is forthcoming.  I will also encourage him to promote FDA ADE reporting within his organization.

Contact Info:
CALAOMS
Central Office
151 N. Sunrise Ave.
STE #1304
Roseville, CA 95661
(800) 500-1332
(916) 783-1332
(916) 772-9220 FAX

Dr. Michael Cadra
201 E. Orangeburg Suite A
Modesto, CA 95350
209-527-5050
email:   info@bakercadra.com

Paul Pixton, PharmD
Regional Scientific Manager
Novartis Pharmaceuticals
Oncology Scientific Operations
801-796-0943
801-870-5113



DEPOSITION
EXHIBIT
32 45
DATE: 4/10/08
MARY G. VAN DINA, C.S.R.

1

FILED UNDER SEAL

# Exhibit 33

FILED UNDER SEAL

DEPOSITION
EXHIBIT
3916
DATE: 5/30/05
MARY G. VAN DINA, C.S.R.

| | |
|---|---|
| **From:** | Nicholas Sauter |
| **Sent:** | Friday, May 26, 2006 11:03 AM |
| **To:** | Linda Lantwicki; Richard Weitzman; Lynne McGrath |
| **Cc:** | Nicholas Sauter |
| **Subject:** | THE AUSTRALIAN ONJ SURVEY - PREVIEW COPY |

Dear Linda, Rich, Lynne,

See attached postal survvey of all oral and maxillofacial surgeons in Australia conducted by Dr. Alistair Goss (was at the London Ad Board). It looks like he is sending to the TGA (HA) in Australia, and probably will want to publish it.

I have cut and pasted the abstract for your convenience. Please circulate to rest of ZIM Linda if you feel appropriate. Erik and John were copied on the initial message.

Regards
Nick

ABSTRACT

Purpose. The purpose of this study is to determine the number, demographics and types of osteonecrosis of the jaws (ONJ) associated with the bisphosphonates in Australia. Estimation of the incidence of ONJ for different bone diseases, bisphosphonates and if extractions were performed, were calculated.

Material & Methods. A postal survey of all Oral and Maxillofacial Surgeons in Australia concerning their experience of ONJ was conducted for the two year period 2004/2005. Further case information was obtained from other dentists and the Commonwealth of Australia Adverse Drug Reaction Advisory Committee (ADRAC). The data were analysed and compared to information on the use of bisphosphonates for bone disease and the incidence of dental extractions.

Results. One hundred and fifty eight cases of ONJ were identified. These were mainly in patients with bone malignancy (72%) and the main trigger was dental extraction (73%). The reported number of cases varied between different Australian states with the highest incidence being reported in the states with the best integrated health systems.

The incidence of ONJ in osteoporotic patients, mainly on weekly oral alendronate was 1 in 2,260 to 8,470 (0.1 to 0.4%) patients. If extractions were performed the calculated incidence was 1 in 296 to 1,130 cases (0.09 to 0.34%). The total dose of oral alendronate at the onset of ONJ was 9,060(±7,269)mgm.

The incidence of ONJ for Paget's disease cases was 1 in 56 to 380 (0.26 to 1.8%) If extractions were performed the calculated incidence of ONJ was 1 in 7.4 to 48 (2.1 to 13.5%).

The incidence of ONJ in bone malignancy cases, treated with mainly intravenous Zoledronate or Pamidronate was 1 in 31 to 80 (1.25 to 3.2%). If extractions were performed the calculated incidence of ONJ was 1 in 4 to 8(9.5 to 25%)

The total dose of Pamidronate was 3,285(±2530)mgm and Zoledronate 62(±54.20)mgm at the onset of ONJ. The median time to onset of ONJ was 12 months for zoledronate, 22 months for pamidronate, and 24 months alendronate.

Conclusions. Prior to the prescription of bisphosphonates for bone disease the patient should be made dentally fit so that the need for subsequent dental extractions is minimised. Appropriate informed consent for the risk of ONJ for different bisphosphonates, for osteoporosis and malignancy both in general and in particular for dental extractions can be provided.

Nicholas Sauter, M.D.

Novartis Pharmaceuticals Corporation
Phase 2/3 Development, Oncology
One Health Plaza, Bldg FP 105/PL 072
East Hanover, NJ 07936
TEL: 862-778-6564
FAX: 973-781-2443

1

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZAEM-02936453

WEITZMAN_RICHARD20080530-3918-0001

nicholas.sauter@novartis.com
—— Forwarded by Nicholas Sauter/PH/Novartis on 05/26/2006 06:55 AM —— FILED UNDER SEAL

Oral Surgery <oral.surgery@adelaide.edu.au>
05/25/2006 11:08 PM

To:    "Mackay, Kerri" <kerri.mackay@health.gov.au>
cc:    "Pope, Jill" <jpope@tg.com.au>, "Sauter, Nicholas" <nicholas.sauter@novartis.com>, "Eriksen, Erik"
<erik_fink.eriksen@novartis.com>, "Caminis, John" <john.caminis@novartis.com>, "Kimmel, Donald"
<donald_kimmel@merck.com>, "Sambrook, Philip" <sambrook@med.usyd.edu.au>, "Olver, Ian"
<IOlver@cancer.org.au>, "Abbott, Paul" <pvabbott@cyllene.uwa.edu.au>, "Mc Cullough, Michael"
<M.Mccullough@unimelb.edu.au>, "Savage, Neil" <n.savage@uq.edu.au>, "Tennant, Marc" <marc@crroh.uwa.edu.au>,
"Matthews, John" <jemathews@ozemail.com.au>, John Matthews <jemathews@ozemail.com.au>, Robert Boyd-boland
<robert.boyd-boland@ada.org.au>, Neil Savage <n.savage@uq.edu.au>, "Purcell, Patrick"
<Patrick.Purcell@health.gov.au>
Subject:    BISPHOSPHONATE ASSOCIATED OSTEONECROSIS OF THE JAWS - THE AUSTRALIAN
SURVEY - PREVIEW COPY

Dear Kerri,

I am pleased to forward you a copy of this paper prior to submission to
the American Journal of Oral and Maxillofacial Surgery.  In particular I
would like to thank ADRAC for their input.

I would note that there was some delays in the finalization of this
paper as relatively late in the piece we realized that there was a
problem with the denominator for the oncology cases.  Accordingly at the
moment I have used the high and the low figure.  Dr Victor Ferrari of
Novartis Pharmaceuticals Australia is currently working on this aspect
of the data to ensure what is the realistic estimate.

Otherwise we are happy with the numbers that we have established.
Essentially this is the way that the data falls.

I would ask all to whom I have sent the preview to keep this in
accordance with principles of normal academic review of a paper.
Essentially the key questions are whether or not the numbers which we
have established have then been fairly interpreted.

The other issue which is important is as to the extent to which
Australian Practice represents North American and European experience.
Certainly my anecdotal opinion is that Australia is fairly similar to
the United States in its prescription and clinical treatment.  Whereas
perhaps Europe is more orientated to less aggressive treatment.

I would appreciate any comments or questions to be made promptly as I
would wish to submit this article within a few weeks.  (Not later than
June 30, 2006) I will advise you when it has been accepted.  I would
note that the Journal does put accepted papers on its website and at
that time then the information can be more widely used and disseminated.

Kind regards,

Alastair N. Goss
Professor

cc  Dr J Pope, Editor TG Writing Group, Dental and Oral Guidelines
cc  Dr Patrick Purcell - ADRAC
cc  Dr Nicholas Sauter - Pharmaceuticals USA
cc  Dr Erik Fink Eriksen, Novartis Pharma AG, Switzerland

2

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZAEM-02936454

WEITZMAN_RICHARD20080530-3918-0002

FILED UNDER SEAL

cc  Dr J Caminis, Novartis Global-(USA)
cc  Dr Victor Ferrari, Novartis Pharmaceuticals (Australia)
cc  Dr D Kimmel, Merck (USA)
cc  Ms L Dudek, Merck  (Australia)
cc  Dr Philip Sambrook, ANZBMS and Osteoporosis Australia
cc  Dr I Olver, CEO, Cancer Foundation Australia
cc  Prof. P. Abbott, A/Prof. M McCullough,  A/Prof N Savage, Dr M
Tennant, Dr J Matthews, Members Therapeutics Committee, Australian
Dental Association

--

Oral and Maxillofacial Surgery Unit
The University of Adelaide  SA  5005
AUSTRALIA

Tel +61 8 8303 5103
Fax +61 8 8303 4402
Email oral.surgery@adelaide.edu.au
Web www.dentistry.adelaide.edu.au/o&mfs/0&mfs_index.html

CRICOS Provider Number 00123M

This email message is intended only for the addressee(s)
and contains information that may be confidential and/or
copyright.  If you are not the intended recipient please
notify the sender by reply email and immediately delete
this email. Use, disclosure or reproduction of this email
by anyone other than the intended recipient(s) is strictly
prohibited. No representation is made that this email or
any attachments are free of viruses. Virus scanning is
recommended and is the responsibility of the recipient.



Bisphosphonate
associated ONJ ...

3

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZAEM-02936455

WEITZMAN_RICHARD20080530-3918-0003

FILED UNDER SEAL

# Exhibit 34

FILED UNDER SEAL

# TELECON MEETING MINUTES

**MEETING DATE:** April 6, 2005   **TIME:** 9:30 A.M.   **LOCATION: via telephone**

**IND/NDA:** 55,831   **Meeting Request Date:** FDA requested the meeting on 3-31-05

**DRUG:**     Zometa (zoledronate)

**SPONSOR/APPLICANT:** Novartis

**TYPE of MEETING/TELECON:**

Special – follow-up to ODAC meeting on ONJ



DEPOSITION
EXHIBIT
4070
DATE: 6/5/08
MARY G. VAN DINA, C.S.R.

**FDA PARTICIPANTS:**

Richard Pazdur, MD, Division Director, DODP
John Johnson, MD, Medical Team Leader
Nancy Scher, MD
Amna Ibrahim, MD, Medical Reviewer
Raji Sridhara, PhD, Team Leader, Statistics
Ann Staten, RD, Project Manager

**INDUSTRY PARTICIPANTS:**

P.K. Narang, Ph.D., FCP, Drug Regulatory Affairs
Yong Jiang Hei, MD, Medical Affairs
Diane Young, MD, Clinical Development
M. Scott, Marketing/Communications
F. Mounier, MD, Marketing
Anne Altmeyer, Ph.D.,    Project Management
Katarzyna Sablinska, MD, MPH, Clinical Epidemiology
Dionigi Maladorno, MD, Clinical Safety/Epidemiology
William Holden, Ph.D., Clinical Safety/Epidemiology
Lynn Mellor, Drug Regulatory Affairs
Theresa Rosario Jansen, Ph.D., Clinical Development

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

IND 55,831 Zometa
Meeting minutes
Page 2

FILED UNDER SEAL

**BACKGROUND:**   On March 4, 2005, an advisory committee discussed ONJ in patients receiving IV bisphosphonates and discussed the need to educate the general dentist regarding ONJ and the need for a registry and additional trials.

**MEETING/TELECON OBJECTIVES:**

To discuss plans for a Dentist education program and ONJ registry, and other proposals discussed at ODAC.

**QUESTIONS  for DISCUSSION  with FDA RESPONSE and DECISIONS REACHED:**

The status of the following proposals presented at the March 4, 2005 ODAC were discussed.

1. **Protocol 2352 (Randomized study to assess impact of treatment duration on continued benefit):**

   Novartis stated that it expects the 3-arm trial to start in 4Q2005 and it would take about 5 years. The plan is for >3000 patients at more than 100 U.S.sites, to complete accrual in 2-3 years.  Novartis proposed to submit a DRAFT version to FDA in May or June, following feedback from the ONJ Advisory Board planned for May 2005.  FDA agreed.

   **Action: Novartis – Submit protocol for SPA by mid June 2005 – (Delay discussed at a 6-9-05 t-con with Novartis, due to pending issues to be worked out regarding patient enrollment due to the placebo arm.)**

2. **Publication of 'White paper'**

   FDA requested a copy of this paper, and inquired to which journal and when it will be submitted.

   **Action: Novartis – Submit White Paper to FDA and advise on timing by April 30, 2005 – (done on June 7, 2005, Novartis informed FDA that the**

YOUNG_DIANNE20080605-4070-0002

IND 55,831 Zometa
Meeting minutes
Page 3

FILED UNDER SEAL

manuscript was submitted to the **Journal of Clinical Oncology** on May 13, 2005.)

3. **MDACC Chart Review Study**

Novartis expects that most data will be available by July 2005.

4. **Registry/Natural History study**

FDA asked if Novartis had progressed with development of a registry. Novartis advised that they are leaning towards a natural history study but wanted to get some more feedback from the Advisory Board and wait for MDACC data to assess risk factors. Dr. Pazdur stated that FDA wants data about ONJ incidence and risk factors and clinical course. Dr. Pazdur stated this was a high-priority issue. MDACC data is skewed and Novartis should consider some sort of registry (perhaps cast a big/broad net) that would involve various Oncology co-operative groups to get timely information.

**Action: Novartis – Formalize 'Concept' proposal addressing noted issues by June 2005 and discuss with DODP**

5. **Program for Dentists**

Novartis updated FDA on the DRAFT letter being formulated for Dentists, plans to share with division for feedback (by April 14, 2005), mail to a list of Dentists secured from ADA (>100,000) by April 18, follow-up with market research for effectiveness of communication, and address need for further steps.

**Action: Novartis – Send DRAFT letter to FDA for comment/guidance by April 14, 2005 – (done – Dear Dentist letter issued on May 5, 2005.)**

**UNRESOLVED ISSUES OR ISSUES REQUIRING FURTHER DISCUSSION:**

See above #1 and #4.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

IND 55,831 Zometa
  Meeting minutes
Page 4

# FILED UNDER SEAL

**ACTION ITEMS:** See above #1 and #4.

Concurrence Chair:_____

_____
Ann Staten, RD                                   John Johnson, MD
Project Manager                                  Medical Team Leader

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)          ZAEM-001472185

YOUNG_DIANNE20080605-4070-0004

FILED UNDER SEAL

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

```
/s/
---------------------
John Johnson
10/21/2005 08:27:00 AM
```

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZAEM-001472186

YOUNG_DIANNE20080605-4070-0005

FILED UNDER SEAL

# Exhibit 35

FILED UNDER SEAL

**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
  -and-
**SPRIGGS & HOLLINGSWORTH**
1350 I Street, N.W., Ninth Floor
Washington, DC 20005
(202) 898-5800

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

| | |
|---|---|
| IN RE: ZOMETA®/AREDIA® LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MIDDLESEX COUNTY |
| APPLICABLE TO ALL CASES | CIVIL ACTION CASE NO: 278 MT |

### NOVARTIS PHARMACEUTICALS CORPORATION'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant Novartis Pharmaceuticals Corporation ("NPC"), by and through counsel,

pursuant to the New Jersey Rules Governing Civil Practice 4:18-1, hereby makes the following

supplemental responses to Plaintiffs' First Request for Production of Documents (hereinafter

"NPC's Supplemental Responses").

### PRELIMINARY STATEMENT

Prior to the March 5, 2008 initial status conference in this matter ("MT 278"), plaintiffs'

counsel, Seeger Weiss LLP and Valad and Vecchione, served the following 83 document

requests on NPC, document requests that indisputably overlap substantially with document

requests served on behalf of these same counsel in parallel consolidated federal multidistrict

FILED UNDER SEAL

for Production, No. 16 (MDL, Sept. 26, 2005). Subject to its objections in the MDL, NPC has

produced documents in response to this request which will be available to plaintiffs in this

litigation.

NPC further objects to this request to the extent it incorrectly presumes that there are

"drafts, revisions, [or] alterations" of the entries for Aredia® and Zometa® published in the PDR.

The Physician Desk Reference publishes the package insert or labeling for pharmaceuticals

without alteration.

34.    All documents concerning any evaluation, assessment, investigation, or survey of
the views, attitudes, conclusions, or understandings of any actual or potential prescribing
physician or other healthcare provider concerning the safety, efficacy, actual or proposed
labeling, or other safety-related communication concerning any Relevant Product.

**RESPONSE**

NPC asserts and incorporates by reference its Objections to Plaintiffs' Instructions and

Definitions Nos. 1, 2, 3, 4, 5, 6, 7, 8, and 9, and its General Objections Nos. 1, 2, 3, 4, 5, 6, 7, 8,

and 9. NPC objects to this request to the extent it seeks discovery of information protected by

the attorney-client privilege and/or the work product doctrine. NPC also objects to this request

on the grounds that the term "safety-related communication" is undefined, rendering the request

vague.

NPC also objects to this request on the grounds that it seeks "safety related

communications" regarding purported adverse events in patients taking Aredia® or Zometa® that

are not at issue in this case, such as renal complications.

This request is also substantially similar to the Plaintiffs' First Request for Production

Nos. 12-15 (MDL, Sept. 26, 2005). Subject to its objections in the MDL, NPC has produced

documents in response to this request which will be available to plaintiffs in this litigation.

# FILED UNDER SEAL

Subject to and without waiving such objections, NPC understands this request to seek market research regarding Aredia® and Zometa®. Responsive documents may be found in the following documents already produced in the MDL: ZA-0823028 to ZA-0850052, ZAED-01374270 to ZAED-01380026, ZAED-01380914 to ZAED-01398946, ZAED-01417865 to ZAED-01419025, ZAED-01696215 to ZAED-01698320, ZAED-01759450 to ZAED-01762169. In addition audio and video recordings that may be responsive are available and NPC will produce them to plaintiffs after appropriate arrangements can be made for review and/or copying of such materials and cost-sharing is agreed upon. Additional responsive documents may also be found in documents collected from custodial sources, and produced in the MDL, including but not limited to: Peter Tarassoff, P. Steven Williams, Ephraim Abam, Dionigi Maladorno, Yong-Jiang Hei, and Archives.

Potentially responsive documents reflecting "any surveys of the views, attitudes, conclusions, or understandings of any actual or potential prescribing physician or other healthcare provider," including dentists, regarding Aredia® or Zometa® may be found in the documents identified by Bates range attached as Exhibit E to NPC's Supplemental Responses.

35.    All documents concerning any investigation or inquiry conducted by or on behalf of any governmental, regulatory, self-regulatory, agency, industry or trade association, medical body or association, medical journal, institutional review board, or Board of Directors, including any internal committee thereof, concerning any Relevant Product.

**RESPONSE**

NPC asserts and incorporates by reference its Objections to Plaintiffs' Instructions and Definitions Nos. 1, 2, 3, 6, 7, 8, and 9 and its General Objections Nos. 1, 2, 3, 4, 5, 6, 8, and 9. NPC objects to this request to the extent it seeks the production of documents exclusively in the possession, custody, or control of third parties, or otherwise outside NPC's possession or control.

92

FILED UNDER SEAL

72.    All documents concerning communications or other materials distributed, published, or otherwise disseminated by NPC to physicians, pharmacists, other healthcare professionals, the public, or consumers regarding any change in the labeling or recommendations for use of any Relevant Product, including Dear Doctor letters.

**RESPONSE**

NPC objects to this request as duplicative of requests 22, 28, 47 and 71, and refers

plaintiffs to the responses thereto, which are hereby incorporated by reference.

73.    All documents concerning any evaluation, assessment, survey, or focus panel conducted concerning any actual, proposed, or draft marketing, advertising, promotion, sales, or detail materials, or any marketing message or statement considered by you whether or not such marketing message or statement was ever actually utilized.

**RESPONSE**

NPC asserts and incorporates by reference its Objections to Plaintiffs' Instructions and

Definitions No. 9 and its General Objections Nos. 1, 2, and 3.  NPC objects to this request as

overbroad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery

of admissible evidence to the extent it seeks all documents without time limitation and does not

confine the scope of the request to documents relating to Aredia® or Zometa® and issues relevant

to the subject matter of this litigation.  As drafted, this request would require NPC to search for,

screen and produce documents relating to every pharmaceutical medication or product it has ever

manufactured, marketed, distributed or sold in the United States at any time.  NPC will work

with plaintiffs' counsel to narrow the scope of this request to subject matters relevant to this

litigation.

NPC objects to this request as duplicative of Request No. 34, and refers plaintiffs to the

responses thereto, which are hereby incorporated by reference.

FILED UNDER SEAL

74.    All documents concerning any evaluation, assessment, investigation, or survey of the views, attitudes, conclusions, or understandings of any actual or potential prescribing physician or other healthcare provider concerning any actual or proposed marketing claim or assertion, advertisement, promotional material, or other communication concerning any Relevant Product.

**RESPONSE**

NPC objects to this request as duplicative of Request No. 34, whose response is hereby

incorporated by reference.

75.    All documents concerning any investigation, testing, or research performed to determine the truthfulness and accuracy of any assertion or claim made in any advertisement about any Relevant Product, including the efficacy, safety, risks, or benefits of any Relevant Product.

**RESPONSE**

NPC asserts and incorporates by reference its Objections to Plaintiffs' Instructions and

Definitions Nos. 6, 7, and 9 and its General Objections Nos. 1, 2, and 3.  NPC objects to the

extent it seeks discovery of information protected by the attorney-client privilege and/or the

work product doctrine.  NPC further objects to this request to the extent it seeks the production

of documents exclusively in the possession, custody, or control of third parties, or otherwise

outside NPC's possession or control.  Subject to and without waiving such objections, NPC

states that it is not aware of any responsive documents.

76.    All documents concerning any FDA or any Foreign Government Regulatory Authority warnings or comments on any marketing, advertising, promotion, or detailing of any Relevant Product, including all documents concerning NPC's responses thereto.

**RESPONSE**

NPC asserts and incorporates by reference its Objections to Plaintiffs' Instructions and

Definitions Nos. 6, 7, and 9 and its General Objections Nos. 1, 2, 3, and 6.  NPC objects to this

request to the extent it seeks documents relating to any agency other than the United States Food

FILED UNDER SEAL

# Exhibit 36

FILED UNDER SEAL



260 U.S. Highway 202/31
Suite 1000
Flemington, NJ 08822

908-788-9393
Fax: 908-788-7179
www.hcdi.net

## Proposal for Novartis Pharmaceuticals
### Study Among Dentists

Name of Requester: Kathy Koukouras
Date of Request: June 6, 2005

**OBJECTIVE:**
Novartis Pharmaceuticals is interested in initiating a quantitative study with dentists to assess their overall awareness that osteonecrosis of the jaw (ONJ) has been seen in cancer patients on bisphosphonate therapy. Communications addressing this have recently been sent to dentists.

The goal is gain a quick read on the level of awareness among dentists.

**METHODOLOGY:**
A structured survey will be used to meet the study objectives. Data collection will be conducted through the Internet, allowing a significant amount of respondent information to be gathered in a short period of time. In addition, Internet data collection overcomes potential privacy concerns of respondents and affords a wide geographic dispersion.

At the beginning of the survey, respondents will be asked to respond to a series of questions pertaining to awareness of ONJ and its association with cancer patients. The respondents will then be asked specific probes to determine the level of understanding and awareness.

In addition to quantitative questions, the survey design will allow Novartis Pharmaceuticals to document and capture verbatim statements regarding issues presented by the study participants. Any comments made will be captured and categorized by HCD personnel to allow statistical analysis to be performed.

Novartis Pharmaceuticals will receive a link which will allow the viewing of the survey results in real time. The use of HCD's iReport site allows not only the viewing of these data but also the performance of cross tabulation exercises.

**CODING, QUALITY CONTROL & INTERNET SECURITY:**
Prior to fielding a questionnaire, HCD uses an internal panel to review the survey to be sure that the questions are clear and that there are no faults in programming.

HCD confirms that respondents meet the required recruiting specifications through a screening and quality control procedure. This methodology enables us to conduct objective, random surveys and provide our clients with timely data of high integrity.

- 1 -

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

FILED UNDER SEAL

During survey execution, the results are viewed periodically to monitor for problems. In addition, each of the survey pages has a link that will allow the respondent to contact HCD in the event of any technical difficulties. Any communication received via this link is responded to immediately to resolve the problem.

At survey completion, the raw data are examined to determine any outliers, invalid or incomplete data. In the case of incomplete data, the respondent is contacted and asked to complete the information. Any data deemed to be invalid is then discarded. An example of invalid data would be the same response to all questions.

Each of the verbatim responses to the open-ended questions is then examined and categorized. Verbatim comments are coded and entered into a database. Raw verbatim responses are available for viewing during the data collection process and both raw verbatim comments and coded interpretations will be part of the final data set. Once the responses are initially classified, they are reviewed to ensure proper categorization and consistency of coding.

HCD has a proprietary survey application that is secure, fraud-proof and confidential. During surveys, all online transactions are protected with 128-bit SSL Certificates, the strongest encryption presently available. All components of the survey – including questions, answers, identification of respondents, and respondents' choices – are identified by tamper proof database IDs.

Unlike most survey applications available in the market, HCD does not rely on cookie technology, which Internet users and corporations are increasingly prohibiting from their computer systems. Using "sessions" that do not time out and the database ID assigned to each potential respondent, an individual can start a survey on one computer and finish it on another (for example, a respondent can start the survey at work and finish it at home). Additionally, when survey logic demands it, measures can be put in place to prevent respondents from changing answers once they've submitted a page on the survey.

The survey application is also hosted with redundant web servers and databases to ensure availability and reliability.

**SAMPLE:**
A random selection representing the target audience will be identified and contacted by email, FAX, and mail and invited to register to participate in an on-line survey. The appeal correspondence will contain the address of a password-protected registration site on the Internet. Upon entering the registration site respondents will be presented with screening questions to confirm their eligibility to participate. The screening criteria will be determined with Novartis to ensure that potential respondents meet the required recruiting criteria. Once qualified, registrants will be offered an honorarium as an incentive to complete the survey, and given a unique identifying number for use in gaining access to the survey site. Respondents will be given anonymity and their names and individual responses will not be shared with Novartis.

One hundred dentists will be surveyed. The survey is expected to contain approximately 10 questions and take no more than 10 minutes to complete.

**DELIVERABLES:**
Deliverables include a quantitative survey and a report with executive summary in presentation format.

In addition to the report mentioned, HCD will provide a report facility with basic tabulation and cross tabulation capability using the survey response elements below presented in

- 2 -

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846772
ZA-0846772

FILED UNDER SEAL

real time on a password-protected web site. On-line reporting allows reviewing the results at any time during data collection.

Online data reports will be in the following formats:

- Tabular Response Counts (including mean, median and standard deviation)
- Charts and Graphs (where applicable)
- Raw Verbatim comments (source for the coded entries)

**PROJECT TIMELINE:**

| Event | Event Duration | Total Elapsed Time |
|---|---|---|
| Format, program and test survey | 2 days | 2 days |
| Broadcast and obtain responses[1] | 5 days | 7 days |
| Analyze data and prepare report | 10 days | 17 days |

[1]May include weekend days
Note: On-line results are available immediately upon survey launch via HCD's iReport web site

**PROJECT COST:**

| Quantitative Internet Study | n = 100 |
|---|---|
| Format, program and test surveys | $3,000 |
| Recruit respondents | $8,500 |
| Honoraria @ $60 each | $6,000 |
| On-line reports | N/C |
| Tabulate and code responses, analysis and report | $5,500 |
| | |
| **Estimated Project Cost** | **$23,000** |

Cost estimates include recruiting, hosting and all professional time associated with project direction, data collection, analysis, reporting and presentation.

A 10% contingency applies to all budgets. The contingency allows for any unanticipated costs or savings that occur while conducting the research. It does not cover changes in project specifications (number of interviews, interview length, incidence rates, etc.). Changes in specifications may necessitate a budget revision. Thereafter, a new budget will be in effect, including the 10% contingency on the new budget. Novartis Pharmaceuticals will be advised in advance of any expected use of the contingency.

All client-approved professional staff travel costs associated with this project will be billed at cost.

**STANDARDS AND PRACTICES**

This study, and all studies conducted by HCD Research, will comply with the research guidelines, ethics and standards established by the American Marketing Association (AMA), Advertising Research Foundation (ARF), Council of American Survey Research Organizations (CASRO), and the Marketing Research Association (MRA).

- 3 -

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846773
ZA-0846773

FILED UNDER SEAL

**PAYMENT TERMS:**
Upon acceptance of this agreement Novartis Pharmaceuticals agrees to pay 50% of the contract amount up front and the final 50% upon delivery of the final report. Terms are net 30 days.

HCD Research will treat all information received from Novartis Pharmaceuticals as confidential and shall not disclose or use such information for any purpose other than to fulfill its obligations to Novartis Pharmaceuticals.

Novartis Pharmaceuticals shall have sole ownership rights in any reports, data or other results of work performed in connection with this project.

Invoice Dates:

First payment (7/1/05):              $ 11,500

At Study completion (7/29/05)        $ 11,500

This quote is valid for 30 days from date of receipt.

Accepting for Novartis Pharmaceuticals:

_____
Name

_____
Title

_____
Date

Contact for HCD Research:

_____
Name

  Sr. Director, Client Development
_____
Title

_____
Date

- 4 -

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846774
ZA-0846774

FILED UNDER SEAL



260 U.S Highway 202/31
Suite 1000
Flemington, NJ 08822

908-788-9393
Fax: 908-788-7179
www.hcdi.net

### INTERNET MARKETING RESEARCH EXPERIENCE, MANAGEMENT & STAFFING

#### EXPERIENCE:

Health Care Direct was founded in 1991 and began executing Internet marketing research studies in 1996.  Since November 1999, the company has conducted over 1,000 surveys via the Internet, including:

- Concept Tests,
- Market Assessments,
- Multidimensional Scaling,
- Conjoint Analysis, and
- Pricing Sensitivity Studies.

HCD also uses the Internet to accomplish qualitative types of marketing research objectives such as in-depth interviews and Tele-Web groups (on-line focus groups).  We continue to conduct traditional marketing research studies (e.g., Focus groups, one-on-one interviews, etc.) as well.

HCD does not rely on survey panels for recruiting respondents.  Instead, random sampling is used within target segments to minimize the bias associated with overused panels.  HCD has developed innovative methods for screening survey participant and validating response data integrity.  Through an elaborate screening and quality control procedure, we confirm that respondents meet the required recruiting specifications.  This methodology enables us to conduct objective, random surveys and provide our clients with timely survey data of the highest integrity.

Our clients have included major pharmaceutical, medical/surgical, and diagnostic corporations.  The studies conducted have been in the areas of therapeutics, diagnostics, molecular biology, consumer education, pharmacogenomics, and others. The studies have included physicians and other medical professionals from various specialties as well as patients with various ailments.

#### STAFF:

#### Glenn R. Kessler, Managing Partner

At HCD he introduced use of the Internet as a medical market research tool and has been instrumental in introducing and producing world wide Internet Symposia to medical societies and medical professionals.  In addition he has helped major companies develop strategies for merging product lines and sales organizations.

Prior to founding HCD, Mr. Kessler held various sales and marketing positions with Roche Diagnostic Systems and Ortho Diagnostics Systems (a division of Johnson and

- 5 -

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846775
ZA-0846775

FILED UNDER SEAL

Johnson). Positions included Director of National Accounts and member of the Roche Diagnostic Operating Committee, Business Unit Manager for Immunoassay Products and Marketing Manager for computer data management systems for Ortho.

In addition to his experience in the diagnostics industry, he was a market research analyst for Time Life Incorporated as well as on the adjunct faculty of University of Baltimore where he taught consumer behavior to juniors and seniors in the college's marketing program.

Mr. Kessler received a bachelor's degree from American University in 1975 and a Masters in Business Administration from the University of Maryland in 1977.

### James P. Rowell, Managing Partner

Mr. Rowell is Managing Partner and co-founder of Health Care Direct (HCD), a database marketing company. Services include Database Development, Database Marketing Programs, Targeted Market Research, Strategic Planning, Sales Force Deployment and INTERNET Strategies.

Prior to founding HCD, Mr. Rowell was the President of the Somerset Consulting Group, a company that specialized in sales and marketing consulting, specifically in the area of market research and new business development. These services were integrated with Health Care Direct in 1993.

Earlier work experience includes Ortho Diagnostic Systems, a Johnson & Johnson company, from 1969 to 1985. Positions held include: Group Product Director, Marketing Director, Sales Manager and Sales Representative. Responsibilities included general management of sales and marketing functions including market research, product finance, national accounts, sales training and development product promotion advertising, technical services and technology acquisition.

Mr. Rowell received his Bachelor of Arts Degree from Olivet College in 1966 and served in the US Army from 1966 to 1969 earning the rank of First Lieutenant.

### Craig Alter, MD, Consulting Medical Director

Dr. Alter is responsible for assessing strategic requirements and interpreting medical issues for marketing research projects and medical conferences. He also acts as a moderator for on-line consensus groups and assists in the design of medical research questionnaires.

Dr. Alter is a specialist in Pediatric Endocrinology in The Children's Hospital of Philadelphia and a Clinical Assistant Professor of Pediatrics at the University of Pennsylvania School of Medicine. Previously, he served as Assistant Professor of Pediatrics at the University of Massachusetts Medical School.

During his tenure at Penn, Dr. Alter has received numerous awards and grants, including Fellow Teacher of the Year Award, Faculty Teaching Award and National Faculty Development Scholars Program.

Dr. Alter received a BA, Summa Cum Laude, in mathematics and chemistry from the University of Pennsylvania and an M.D. with honors from Harvard Medical School and the Massachusetts Institute of Technology Health and Science Program. He served his residency at Boston Children's Hospital, which is ranked among the country's leading children's hospitals.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846776
ZA-0846776

FILED UNDER SEAL

### Dr. Chan Choi, Consulting Director, Market Research Services

Dr. Choi is responsible for directing the company's traditional and Internet-based market research services, including project planning and implementation, survey data analysis and reporting, and designing on-line research applications.

Dr. Choi is an associate professor of marketing at the Rutgers University Graduate School of Management, where he has received numerous awards and grants. Among them include being a two-time recipient of the General Electric Teaching Fellowship Award for his work in developing web-based communication and teaching.

He earned MA and Ph D degrees in decision sciences and marketing from The Wharton School, University of Pennsylvania, where he studied under Dr. Wayne S. DeSarbo, a pioneer in conjoint modeling and analysis. He earned an MBA in management science from Michigan State University, and BA and BS degrees in management and pharmaceutics from Seoul National University in Korea.

Dr. Choi has authored and co-authored numerous articles and research papers for leading domestic and international management publications. He has also co-authored several books, and has presented at national and international management conferences.

### Dr. Arthur Kover, Consulting Director

Dr. Kover is a leader in design and execution of advertising testing. During the 1990's he was Chair of the Marketing Department at Fordham University's Graduate School of Business. At HCD, Arthur is designing optimal methods to adapt advertising research to the Internet.

Before entering academia, Arthur spent 20 years directing research activities at some of the world's largest advertising agencies including:

- Kenyon & Eckhardt (now Bozell)
- Cunningham & Walsh
- J. Walter Thompson

Dr. Kover received his BA from Cornell University and his MA and Ph.D. from Yale University. In addition to working with HCD, he serves as Editor of *The Journal of Advertising Research* and is a Management Fellow at Yale University's School of Management.

### Ina Noble, Senior Director of Client Development

Ms. Noble has over twenty years of experience in the healthcare industry in tactical marketing, strategic marketing, business development and sales support.

Responsibilities have included managing cross functional teams; developing and implementing business plans; forecasting; developing and implementing promotions; maintaining and increasing the profitability of multi-million dollar product lines; new product assessment; developing and implementing sales and product training programs; and project management in highly competitive environments.

Prior to being associated with Health Care Direct, Ms. Noble held various sales and marketing positions with SMG Marketing Group, IMS, Dentsply International, Becton Dickinson and Company, EM Diagnostics, Inc. and ER Squibb and Sons, Inc. Positions included Account Director, Senior Product Manager, Program Manager, Training Specialist, and Research Associate.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846777
ZA-0846777

FILED UNDER SEAL

In addition, she was an Education Coordinator responsible for a Medical Technology program as well as on the adjunct faculty of Rutgers University where she taught Hematology and Parasitology to seniors in the medical technology program.

Ms. Noble received a Bachelor of Science degree from the University of Pennsylvania in 1972 and a Masters in Business Administration from Rutgers University in 1980.

### Bob Feldman, Senior Consultant

Prior to joining Health Care Direct, Mr. Feldman was Vice President of business development and client service for Macro International, a wholly owned division of Opinion Research Corporation. He also served as Director, business development for the international division of BASES. Mr. Feldman has over thirty years of experience in marketing and marketing research including over ten years in the international pharmaceutical industry in new product development, Rx to OTC conversions and strategic planning.

Mr. Feldman worked at Schering-Plough where his efforts supported the global launch of Claritin as an OTC brand of antihistamine. He also started up and the international market research function at Allergan Pharmaceuticals, managing both the ethical ophthalmic and contact lens care products marketing research programs.

Mr. Feldman earned a BBA in Statistics in 1968 and an MBA in Management in 1974 from Bernard Baruch College.

### Richard Berke, Director of Operations and Legal Affairs Advisor

Mr. Berke has managed operations and provided guidance for legal affairs at Health Care Direct for the past three years.

Responsibilities have included developing and expanding of Internet services; managing of Internet market research program; developing new products and services; planning and implementation of new computer network and Internet infrastructure; managing technical and non-technical support staff; project management of complex Internet marketing and market research programs; providing legal guidance in areas of contract, Internet, trademark and privacy related issues.

Prior to being associated with Health Care Direct, Mr. Berke held various legal and academic positions including a private law practice and serving as an adjunct faculty member of the Community College of Philadelphia.

Mr. Berke received a BA from the State University of New York at Stony Brook in 1987 and a JD from Boston College in 1991. He is licensed to practice law before the courts of the Commonwealth of Pennsylvania, the Commonwealth of Massachusetts, U.S. District Court for the Eastern District of Pennsylvania and the U.S. Court of International Trade.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0846778
ZA-0846778

FILED UNDER SEAL

# Exhibit 37

FILED UNDER SEAL

# Osteonecrosis Of The Jaw
## - Feedback From Dentists & Oral Surgeons -

Research Conducted July 22 - 25, 2005

Prepared For:    φ NOVARTIS

Prepared By:    HCD research

*HCD Project #5796*

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749886
ZA-0749886

FILED UNDER SEAL



*Osteonecrosis of the Jaw*

# Table of Contents

Background and Objectives        3

Methodology                      5

Summary of Findings              7

Research Findings                9

Appendix                        18

*Table of Contents*

FILED UNDER SEAL

# Background and Objectives

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749888
ZA-0749888

FILED UNDER SEAL

*Osteonecrosis of the Jaw*

*Background & Objectives*

- Novartis recently sent information to dentists and oral surgeons concerning the occurrence of osteonecrosis of the jaw in cancer patients. This research study was conducted in order to assess dentists' and oral surgeons' awareness of this issue.

- Specific objectives of this research were to determine:

  – Whether or not respondents are familiar with specific information concerning the occurrence of osteonecrosis of the jaw in cancer patients and whether or not they convey this information to their office staff;

  – Which medical/dental journals and other publications are read on a regular basis (at least once per month) by respondents;

  – Which medical/dental conferences respondents have attended in the past year.

4

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749889
ZA-0749889

FILED UNDER SEAL

# Methodology

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749890
ZA-0749890

FILED UNDER SEAL



*Methodology*

- A structured survey was used to meet the study objectives. Respondents were selected at random from a database of dentists and oral surgeons and contacted by FAX, mail or email, and invited to visit a password-protected site on the Internet to complete a registration page.

- Respondents whose eligibility to participate was confirmed via screening questions were offered the opportunity to participate in the survey and given a unique identifying number for use in accessing the survey site. Respondents were eligible to participate if they are a dentist or oral surgeon working in an active practice.

- The final sample consisted of 103 respondents, including 71 dentists and 32 oral surgeons.

## Statistical Analysis

- Differences in means and/or proportions between two or more groups are evaluated using z-tests or ANOVA (analysis of variance). All significantly larger means or proportions are indicated in charts and tables using superscripts. All statistical tests are conducted at $p <$ .05, that is, statistically significant differences between groups observed in this study have only a 5% probability of occurring by chance alone.

- Although statistical analyses are provided for all data, caution should be used in interpreting results based on fewer than 20 respondents.

6

ZA-0749891
ZA-0749891

FILED UNDER SEAL

# Summary of Findings

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

FILED UNDER SEAL

*Osteonecrosis of the Jaw*

8

*Summary of Findings*

- The results of this research showed that oral surgeons are much more familiar than dentists with the information provided by Novartis concerning osteonecrosis of the jaw (ONJ) in cancer patients who are on IV bisphosphonate therapy.

  – 94% of oral surgeons and 39% of dentists are aware that ONJ has been reported in cancer patients receiving IV bisphosphonates.

  – 91% of oral surgeons and 52% of dentists are aware that cancer patients who are receiving IV bisphosphonates are advised to receive a dental exam and appropriate preventive dentistry prior to the initiation of therapy.

  – 84% of oral surgeons and 47% of dentists are aware that cancer patients who are receiving IV bisphosphonates are advised to avoid invasive dental procedures.

- 73% of dentists and 60% of oral surgeons have communicated this information to their office staff.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749893
ZA-0749893

# Research Findings

✓ Familiarity with Osteonecrosis of the Jaw in Cancer Patients

✓ Communication of Information to Office Staff

✓ Size of Practice

✓ Dental Journals/Publications Read Regularly

✓ Medical/Dental Conferences Attended

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749894
ZA-0749894

FILED UNDER SEAL

Research Findings

Osteonecrosis of the Jaw

- Oral surgeons were far more likely than dentists to say they are aware that ONJ has been reported in patients receiving IV bisphosphonates (**94% vs. 39%**).

### Respondents' Familiarity With Information:
### - Osteonecrosis Of The Jaw (ONJ) Has Been Reported In Patients Receiving IV Bisphosphonates -



| | Not At All Familiar | | | | | | Very Familiar |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Total (n=103): | (17%) | (4%) | (6%) | (18%) | (13%) | (14%) | (30%) |
| Dentists (n=71): | (23%) | (6%) | (9%) | (24%) | (14%) | (13%) | (13%) |
| Oral Surgeons (n=32): | (3%) | (0%) | (0%) | (3%) | (9%) | (16%) | (69%) |

Dentists (3.9)  Total (4.7)  Oral Surgeons (6.4)*

**Not Familiar with Information**
Total: 26%
Dentists: 37%*
Oral Surgeon: 3%

**Familiar with Information**
Total: 56%
Dentists: 39%
Oral Surgeon: 94%*

*Asterisks indicate significantly greater proportions/means, Oral Surgeons vs. Dentists

Base: Total respondents
Q7.  How familiar are you with the following information concerning cancer patients who are receiving intravenous bisphosphonates such as Aredia or Zometa?

10

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)                    ZA-0749895
ZA-0749895

FILED UNDER SEAL

Research Findings

*Osteonecrosis of the Jaw*

- Oral surgeons were more likely than dentists to say they are aware that cancer patients who are receiving IV bisphosphonates are advised to have a dental exam and appropriate preventive dentistry prior to initiating treatment (**91%** vs. **52%**).



**Respondents' Familiarity With Information:**
**- Cancer Patients Who Are Receiving IV Bisphosphonate Treatment Are Advised To Receive A Dental Examination And Appropriate Preventive Dentistry Prior To Initiating Therapy -**

|  | Not At All Familiar 1 | 2 | 3 | Dentists (4.2) 4 | Total (4.8) 5 | Oral Surgeons (6.1)* 6 | Very Familiar 7 |
|---|---|---|---|---|---|---|---|
| **Total** (n=103): | (16%) | (5%) | (6%) | (10%) | (14%) | (20%) | (30%) |
| **Dentists** (n=71): | (20%) | (7%) | (9%) | (13%) | (14%) | (23%) | (16%) |
| **Oral Surgeons** (n=32): | (6%) | (0%) | (0%) | (3%) | (13%) | (16%) | (63%) |

**Not Familiar With Information**
Total: 26%
Dentists: 35%*
Oral Surgeon: 6%

**Familiar With Information**
Total: 64%
Dentists: 52%
Oral Surgeon: 91%*

*Asterisks indicate significantly greater proportions/means, Oral Surgeons vs. Dentists

Base: Total respondents
Q7. How familiar are you with the following information concerning cancer patients who are receiving intravenous bisphosphonates such as Aredia or Zometa?

11

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)
ZA-0749896
ZA-0749896

Research Findings

*Osteonecrosis of the Jaw*

- Oral surgeons were more likely than dentists to say they are aware that cancer patients who are receiving IV bisphosphonates are advised to avoid invasive dental procedures (**84%** vs. **47%**).

**Respondents' Familiarity With Information:**
**- Cancer Patients Who Are Receiving IV Bisphosphonate Treatment Are Advised To Avoid Invasive Dental Procedures -**



*Not At All Familiar*

| | 1 | 2 | 3 | Dentists (4.0) | Total (4.7) | Oral Surgeons (6.1)* 6 | Very Familiar 7 |
|---|---|---|---|---|---|---|---|
| **Total** (n=103): | (17%) | (7%) | (7%) | (12%) | (12%) | (16%) | (31%) |
| **Dentists** (n=71): | (23%) | (10%) | (9%) | (13%) | (13%) | (18%) | (16%) |
| **Oral Surgeons** (n=32): | (3%) | (0%) | (3%) | (9%) | (9%) | (9%) | (66%) |

**Not Familiar with Information**
*Total: 30%*
*Dentists: 41%\**
*Oral Surgeon: 6%*

**Familiar with Information**
*Total: 58%*
*Dentists: 47%*
*Oral Surgeon: 84%\**

HCD

12

*\*Asterisks indicate significantly greater proportions/means, Oral Surgeons vs. Dentists*

*Base: Total respondents*
*Q7. How familiar are you with the following information concerning cancer patients who are receiving intravenous bisphosphonates such as Aredia or Zometa?*

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

FILED UNDER SEAL

*Osteonecrosis of the Jaw*

*Research Findings*

13

- Of the respondents who were familiar with the information about ONJ, **68%** said they conveyed this information to their office staff. While not statistically significant, dentists were slightly more likely than oral surgeons to convey this information to their staff (**73%** vs. **60%**).



**Percentage Of Respondents Who Communicated**
**ONJ Information To Their Office Staff**

*Base: Respondents familiar with information about ONJ*
*Q10. Have you communicated this information to your office staff (e.g., dental hygienist)?*

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749898
ZA-0749898

FILED UNDER SEAL

*Research Findings*

*Osteonecrosis of the Jaw*

- Respondents see an average of **75** patients per week. Dentists see significantly more patients per week than oral surgeons (**80** vs. **64**, respectively).



***Number Of Patients Seen By Respondents In An Average Week***

*Base: Total respondents*
*Q3. How many patients do you personally see in your practice in an average week?*

14

FILED UNDER SEAL

Osteonecrosis of the Jaw

Research Findings

15

## Journals/Dental Publications Read Regularly By Respondents

| | Total (n=103) | Dentists (n=71) (A) | Oral Surgeons (n=32) (B) |
|---|---|---|---|
| Journal of the American Dental Association | 73% | 69% | 81% |
| Journal of Oral and Maxillofacial Surgery | 22% | 1% | 69%[A] |
| Journal of Contemporary Dental Practice | 20% | 25%[B] | 9% |
| Journal of Dental Research | 16% | 20%[B] | 6% |
| Dental Economics | 8% | 11%[B] | 0% |
| Journal of the Academy of General Dentistry | 8% | 11%[B] | 0% |
| Journal of Dental Education | 12% | 16%[B] | 3% |
| Compendium | 7% | 8% | 3% |
| Advances in Dental Research | 8% | 10% | 3% |
| Journal of the American Association of Oral and Maxillofacial Surgeons | 5% | 0% | 16% |
| Dental Products Report | 4% | 6% | 0% |
| Dental Town | 3% | 4% | 0% |
| International Journal of Oral and Maxillofacial Surgery | 2% | 0% | 6% |

Note: Journals/publications mentioned by one respondent each include (Dentists): TMJ, NEJM, Journal of the California Dental Association, Journal of Cosmetic Dentistry, Implantology, General Practice, Dentistry Today, CRA News, Cranio, American Association of Women Dentists, Contemporary Esthetics, Dental Products Review, Dental Products Research; (Oral Surgeons): Canadian Dental Association, Texas Dental Journal, Oral Implantology, International Journal of Dental Implants, JAMA, Anesthesia Progress.

Base: Total respondents
Q4. Do you read any of following journals or publications for dental professionals on a regular basis (at least once per month)?

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749900
ZA-0749900

FILED UNDER SEAL



16

*Research Findings*

*Osteonecrosis of the Jaw*

- Nearly all respondents (**95%**) attended medical/dental conferences in the past year.



**Percentage Of Respondents Who Attended Medical/Dental Conferences In the Past Year**

- Total (n=103): 95%
- Dentists (n=71): 94%
- Oral Surgeons (n=32): 97%

Base: Total respondents
Q5. Have you attended any medical/dental conferences in the past year?

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749901
ZA-0749901

Osteonecrosis of the Jaw

Research Findings

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - Top Responses* -

| | Total (n=103) | Dentists (n=71) (A) | Oral Surgeons (n=32) (B) |
|---|---|---|---|
| AAOMS (American Association of Oral and Maxillofacial Surgeons) | 17% | 0% | 56%[A] |
| American Dental Association Annual Session | 15% | 16% | 13% |
| Chicago Dental Society (Midwinter Meeting) | 15% | 19% | 7% |
| Greater NY Dental Meeting | 12% | 16%[B] | 3% |
| California Dental Association Meeting | 7% | 9% | 3% |
| ADA Management Conference | 5% | 6% | 3% |
| Texas Dental Association | 3% | 3% | 3% |
| AGD (Academy of General Dentistry) | 2% | 3% | 0% |
| Zimmer bone graft course | 2% | 0% | 6% |
| Implant conference | 2% | 0% | 6% |
| Thomas P. Hinman Dental Meeting | 1% | 0% | 2% |

*See Appendix for complete list of conferences attended

Base: Total respondents
Q6. Which medical/dental conference(s) have you attended in the past year? Check all that apply.

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749902
ZA-0749902

FILED UNDER SEAL

Appendix

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749903
ZA-0749903

FILED UNDER SEAL

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - National Meetings/Conferences -

| | Total (n=103) | Dentists (n=71) | Oral Surgeons (n=32) |
|---|---|---|---|
| AAOMS (American Association of Oral and Maxillofacial Surgeons) | 17% | 0% | 56% |
| ADA Management Conference | 15% | 18% | 6% |
| American Dental Association Annual Session | 15% | 15% | 13% |
| ADA Management Conference | 15% | 18% | 6% |
| Thomas P. Hinman Dental Meeting | 2% | 0% | 6% |
| AGD (Academy of General Dentistry) | 2% | 3% | 0% |
| AAPF (American Academy of Periodontology Foundation) | 1% | 1% | 0% |
| ADSA (American Dental Society of Anesthesiology) | 1% | 0% | 3% |
| AAMRO (American Association of Medical Review Officers) | 1% | 1% | 0% |
| AAFS | 1% | 1% | 0% |
| Richard Marks Product Review | 1% | 0% | 3% |
| ASDA | 1% | 0% | 6% |
| American Headache Society | 1% | 1% | 0% |
| Alpha Omega International Dental Conference | 1% | 1% | 0% |
| American Academy of Otolaryngology | 1% | 1% | 0% |
| American College of Oral and Maxillofacial Surgery | 1% | 0% | 3% |
| Association of Military Surgeons US | 1% | 1% | 0% |
| Job Corps Annual Meeting | 1% | 1% | 0% |
| Oral & Maxillofacial Surgery Review | 1% | 0% | 3% |
| Sports Dental Traumatology Conference | 1% | 1% | 0% |
| New Clinical Drug Evaluation Unit | 1% | 1% | 0% |
| American Academy of Sleep Medicine | 1% | 1% | 0% |
| Joint Conference of American College/Canadian Oral and Maxillo Surgeons | 1% | 0% | 3% |

Base: Total respondents
Q6. Which medical/dental conference(s) have you attended in the past year?

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749904
ZA-0749904

FILED UNDER SEAL

*Osteonecrosis of the Jaw*

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - Local/Regional Meetings/Conferences -

| | Total (n=103) | Dentists (n=71) | Oral Surgeons (n=32) |
|---|---|---|---|
| Chicago Dental Society (Midwinter Meeting) | 15% | 18% | 6% |
| Greater NY Dental Meeting | 12% | 15% | 3% |
| Texas Dental Association | 12% | 15% | 3% |
| California Dental Association Meeting | 7% | 8% | 3% |
| Buffalo-Niagara Meeting | 1% | 1% | 0% |
| Dawson Pankey Study Club | 1% | 1% | 0% |
| Greater Houston Dental Society | 1% | 1% | 0% |
| Hawaii Dental Association | 1% | 1% | 0% |
| Hawaii Dental Forum | 1% | 1% | 0% |
| Indiana Dental Association | 1% | 1% | 0% |
| Pacific Dental Conference | 1% | 1% | 0% |
| Alabama Dental Association | 1% | 0% | 3% |
| Arizona Dental Association | 1% | 1% | 0% |

20

Base: Total respondents
Q6. Which medical/dental conference(s) have you attended in the past year?

FILED UNDER SEAL

21

*Appendix*

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - Local/Regional Meetings/Conferences (Cont'd) -

| | Total (n=103) | Dentists (n=71) | Oral Surgeons (n=32) |
|---|---|---|---|
| DC Dental Meeting | 1% | 1% | 0% |
| Michigan Dental Association | 1% | 1% | 0% |
| University of Minnesota | 1% | 1% | 0% |
| Southwest Dental Conference | 1% | 1% | 0% |
| Michigan | 1% | 1% | 0% |
| University of L Alumni Day | 1% | 1% | 0% |
| Nashville Dental Society | 1% | 0% | 3% |
| New Jersey Dental Convention | 1% | 1% | 0% |
| North Carolina Medical Society | 1% | 1% | 0% |
| Seattle Study Club Meeting | 1% | 1% | 0% |
| Minn Oral Surgery Review | 1% | 0% | 3% |
| Chicago Dental Implant Conference | 1% | 0% | 3% |
| Southeastern Society | 1% | 0% | 3% |

Base: Total respondents
Q6. Which medical/dental conference(s) have you attended in the past year?

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749906
ZA-0749906

FILED UNDER SEAL

Osteonecrosis of the Jaw

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - Local/Regional Meetings/Conferences (Cont'd) -

| | Total (n=103) | Dentists (n=71) | Oral Surgeons (n=32) |
|---|---|---|---|
| Western Essex | 1% | 0% | 3% |
| Mississippi District 3 | 1% | 1% | 0% |
| Florida Dental Association | 1% | 0% | 3% |
| Florida Society of Oral and Maxillofacial Surgery | 1% | 0% | 3% |
| Florida Dental Society of Anesthesia | 1% | 0% | 3% |
| Greater Long Island Dental Meeting | 1% | 1% | 0% |
| IDA | 1% | 1% | 0% |
| Liberty Conference | 1% | 1% | 0% |
| South Carolina Association of Family Physicians | 1% | 1% | 0% |
| Tennessee Dental Association | 1% | 1% | 0% |
| St. Barth Dental Association | 1% | 1% | 0% |
| Las Vegas Institute | 1% | 1% | 0% |
| New York State Society of Oral and Maxillofacial Surgeons | 1% | 0% | 3% |

Appendix

Base: Total respondents
Q6. Which medical/dental conference(s) have you attended in the past year?

22

PRODUCED PURSUANT TO PROTECTIVE ORDER ENTERED IN CASE 3:06-MD-1760 (MD TENN)

ZA-0749907
ZA-0749907

FILED UNDER SEAL

*Osteonecrosis of the Jaw*

*Appendix*

23

## Medical/Dental Conferences Attended By Respondents In The Past Year
### - Product/Procedure-Related Meetings/Conferences -

|  | Total (n=103) | Dentists (n=71) | Oral Surgeons (n=32) |
|---|---|---|---|
| Zimmer Bone Graft Course | 2% | 0% | 6% |
| Implant Conference | 2% | 0% | 6% |
| Laser Conference | 1% | 1% | 0% |
| Advanced Bone Grafting | 1% | 0% | 3% |
| Bisco Symposium | 1% | 1% | 0% |
| Noble Bi-Care Oral Maxillofacial Surgery | 1% | 0% | 3% |
| Pri-Med Florida | 1% | 1% | 0% |
| Full Mouth Recon | 1% | 1% | 0% |
| Implants | 1% | 1% | 0% |
| Bone Grafting | 1% | 1% | 0% |
| Olmos TMJ Residency | 1% | 1% | 0% |
| Rondeau Orthodontics | 1% | 1% | 0% |

Base: Total respondents
Q6.  Which medical/dental conference(s) have you attended in the past year?